

ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 19 2003

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GENERAL ELECTRIC CAPITAL
BUSINESS ASSET FUNDING
CORPORATION, a Delaware
corporation,

        Plaintiff,

v.

LE PETIT BISTRO, INC., ALI
KABIRI, MARYAM MIRASSADI,
a/k/a MARIAM M. KABIRI, a/k/a
MARIAN M. KABIRI, a/k/a MARYAN
KABIRI, AND DOES 1 THROUGH
100, INCLUSIVE,

        Defendants.

CIVIL ACTION FILE

NO.   **1·03-CV-2847**

**CAP**

## COMPLAINT FOR EMERGENCY RELIEF
## AND DAMAGES

    Plaintiff General Electric Capital Business Asset Funding Corporation,

through its undersigned counsel makes and files this Complaint for Emergency

Relief and Damages against Defendants Le Petit Bistro, Inc., Ali Kabiri, Maryam

Mirassadi, a/k/a Mariam M. Kabiri, a/k/a Marian M. Kabiri, a/k/a Maryan Kabiri

(collectively, "Defendants"), stating as follows:



FORMS RECEIVED
Consent To US Mag.
Pretrial Instructions

## INTRODUCTION

1.      General Electric Capital Business Asset Funding Corporation ("GEBAF") brings this action because it is in imminent danger of losing nearly $20,000,000 in loans outstanding to, and fraudulently obtained by, defendant Le Petit Bistro, Inc. ("Le Petit") and guaranteed by Le Petit's sole shareholder and CEO, defendant Ali Kabiri ("Kabiri").

2.      Kabiri is operating Le Petit, a multi-location fast food business, in a flagrantly fraudulent and illegal manner.  Both Kabiri and Le Petit are under criminal investigation in multiple states, including Georgia, and the State of Minnesota has filed a thirty-three (33) felony count criminal complaint against Le Petit and Kabiri.  Kabiri is attempting to conduct the business of Le Petit in a haphazard "all-cash" basis that threatens the viability of the ongoing enterprise, and is diverting and fraudulently conveying assets of Le Petit, including several large wire transfers of funds out of the country in an effort to move assets and property outside of the reach of Le Petit's legitimate creditors.

3.     Le Petit, a fast food chain operating in approximately 53 cities, owes a at least $24 million to its various creditors, including approximately $20 million to GEBAF. Le Petit has defaulted on its payment obligations to GEBAF, is more than a month past due on its payments to most other creditors, and is approximately three months past due on its lease payments to its landlords. Kabiri is engaged in a wholesale misappropriation of the considerable cash proceeds of Le Petit's operations. Le Petit also has recently closed multiple locations and sold certain of GEBAF's collateral without GEBAF's consent and without remitting or accounting for the proceeds of such sale. In addition, certain of Le Petit's bank accounts have been frozen as Mr. Kabiri's personal bail in the Minnesota prosecution.

4.     For these reasons and others described in detail below, GEBAF has filed this Complaint to establish its claims against the Defendants, consisting of breaches of the various loans and guaranties, fraud, fraudulent conveyance, equitable accounting, constructive trust and alter ego, and to obtain the immediate and emergency relief that it must have in order to preserve the status quo and protect its claims pending a full adjudication of its rights.

5.     Given the circumstances summarized above and discussed in more detail below, the viability of Le Petit as an ongoing business is in immediate danger. The only ability that GEBAF and other creditors have to recover in full on their claims against Le Petit is for Le Petit to continue in operation, but as a lawful going concern. A liquidation of Le Petit's assets would be disastrous for Le Petit's creditors, and would result of in the loss of hundreds of jobs. Accordingly, contemporaneously with this Complaint GEBAF has filed its Emergency Motions for Appointment of Receiver over Defendant Le Petit Bistro, Inc.; For Temporary Restraining Order and Preliminary and Permanent Injunction against Defendants Le Petit Bistro, Inc. and Ali Kabiri; and For Prejudgment Attachment Against Defendant Ali Kabiri (the "Emergency Motions").

## THE PARTIES

6.     Plaintiff GEBAF is a Delaware corporation with its principal place of business in Bellevue, Washington.

7.     Defendant Le Petit is a Georgia corporation with its principal place of business in Atlanta, Georgia. The registered agent of Le Petit is Defendant Kabiri. Le Petit may be served at the last known residence of Ali Kabiri, which is 120 Riley Ridge Road NW, Atlanta, Georgia 30327-4359.

8.     Defendant Kabiri is a natural person who resides in Atlanta, Georgia. Upon information and belief, Kabiri has been, at all relevant times, the CEO, CFO, secretary, and sole shareholder of Le Petit.  Kabiri may be served at his last known residence, which is 120 Riley Ridge Road NW, Atlanta, Georgia 30327-4359.

9.     Defendant Maryam Mirassadi ("Mirassadi"), a/k/a Mariam M. Kabiri, a/k/a Marian M. Kabiri, a/k/a Maryan Kabiri is a natural personal who resides in Atlanta, Georgia.  Mirassadi is at all relevant times herein Kabiri's wife.  Mirassadi may be served at her last known residence, which is 120 Riley Ridge Road NW, Atlanta, Georgia 30327-4359.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

11.    This Court has personal jurisdiction over Le Petit because Le Petit is a Georgia corporation with its principal place of business located within the Northern District of this Court.  This Court has personal jurisdiction over Kabiri and Mirassadi because they reside within this judicial district.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because all defendants reside within the Northern District of Georgia.

5

## GENERAL ALLEGATIONS

### The 2000 Loan and Guaranty

13.    Le Petit is a multi-state fast food restaurant chain that owns and operates approximately 80 locations over 53 cities.  The restaurants are primarily located in food courts in shopping centers and airports in the United States.  Average annual sales in Units open one year or longer have been represented to GEBAF to be $622,724.

14.    In 1999, GEBAF loaned Le Petit approximately $1.5 million. The loan was evidenced by a Loan and Security Agreement and supplemental agreements thereto and several Promissory Notes, attached hereto as **Exhibit A.** Le Petit granted GEBAF a security interest in all equipment located on certain properties.  In 2000 and 2001, GEBAF increased the amount loaned to Le Petit by approximately $2 million, for a total of approximately $3.5 million (the "2000 Loan").

15.    In the 2000 Loan documents, Le Petit made the following representations and warranties (among others) to GEBAF:

> (a)    that it had filed all required tax returns and had paid all taxes shown to be due and payable on such returns, including interest and penalties, and all other applicable taxes **(Exhibit A, Paragraph 5(e))**;

(b)    that it knew of no proposed tax assessment against it and all of its tax liabilities had been adequately provided for **(Exhibit A, Paragraph 5(e))**;

(c)    that the equipment was free and clear of all liens other than GEBAF's lien **(Exhibit A, Paragraph 5(f))**;

(d)    that Le Petit's business and operations had been and were being conducted in accordance with all applicable laws, rules and regulations, other than violations which could not have a material adverse effect on Le Petit's financial condition or operations**(Exhibit A, Paragraph 5(g))**;

(e)    that all documents, records, instruments, certificates, statements and information provided to GEBAF by Le Petit were true and accurate in all material respects and did not contain any untrue statements, or fail to contain any statement of material fact necessary to make the statements made not misleading; and that there was no material fact known to Le Petit that Le Petit had not disclosed in writing which could materially and adversely affect its financial condition or operations**(Exhibit A, Paragraph 5(h))**; and

(f)    that the security interest granted to GEBAF was a valid, first priority security interest in the equipment **(Exhibit A, Paragraph 5(i))**.

16.    In the 2000 Loan documents, Le Petit also made the following covenants (among others) to GEBAF:

(a)    that it would repay the loan as set forth in the corresponding Promissory Notes**(Exhibit A, Paragraph 6(a))**;

(b)     that it would keep the equipment free and clear of any security interest, lien or encumbrance of any kind **(Exhibit A, Paragraph 6(c))**; and

(c)     that it would furnish to GEBAF and cause its guarantor (Kabiri) to furnish to GEBAF, upon request, annual balance sheets, profit and loss statements, and all other financial information and reports including tax returns of Le Petit and its guarantor (Kabiri) **(Exhibit A, Paragraph 6(m))**.

17.     In connection with the 2000 Loan, Kabiri executed a Personal Guaranty (the "2000 Guaranty"). A copy of the 2000 Guaranty is attached hereto as **Exhibit B**. The 2000 Guaranty unconditionally and absolutely obligated Kabiri to pay the obligations owing by Le Petit to GEBAF under the 2000 Loan.

18.     Mirassadi acknowledged that Kabiri was acting on behalf of the marital community when he guaranteed the obligations to GEBAF. The assets of the marital community of Kabiri and Mirassadi are subject to the 2000 Guaranty.

**The 2003 Loan and Guaranty**

19.     On or about March 31, 2003, GEBAF loaned Le Petit approximately $16,645,000, which loan was supported by an Interim Equipment Promissory Note dated March 31, 2003 ("Interim Note"). An additional $431,708.69 was loaned to Le Petit on June 4, 2003 and supported by an Equipment Promissory Note dated June 4, 2003 ("2003 Note"), which increased the total amount of the loan in 2003

to $17,076,708.69. The $17,076,708.69 loan was evidenced by the Interim Note and the 2003 Note and a Loan and Security Agreement, dated June 4, 2003 ("2003 Loan Agreement"), pursuant to which GEBAF was granted a security interest in the equipment located on 65 Le Petit restaurant sites located in 19 states, the District of Columbia and Puerto Rico. The indebtedness represented by the 2003 Loan Agreement, the Interim Note, and the 2003 Note is collectively referred to as the "2003 Loan". Sixteen of these restaurant sites are located in Georgia. The Interim Note is attached hereto as **Exhibit C;** the 2003 Note is attached hereto as **Exhibit D;** and the 2003 Loan Agreement is attached hereto as **Exhibit E. The 2000 Loan and the 2003 Loan are cross defaulted, such that a default on either one of the loans constitutes a default on the other loan.**

20.     Under the terms of the 2003 Loan Agreement, Le Petit made the following representations and warranties (among others) to GEBAF:

> (a)     that all financial statements and other information concerning Le Petit provided by Le Petit in connection with the transaction were true, correct and complete in all material respects, and that there had been no amendments to the financial information since the date it was prepared or delivered to GEBAF (**Exhibit E, Paragraph 3(i)**);
>
> (b)     that no change had occurred with respect to Le Petit's financial condition or the equipment collateral as reflected in the financial information that had not been disclosed in writing to GEBAF which had or could result in a material adverse effect on the equipment collateral or

Le Petit's ability to perform under the loan documents **(Exhibit E, Paragraph 3(i))**;

(c)    that Le Petit is qualified to do business as a foreign corporation in the State of Minnesota and other states where the collateral is located. **(Exhibit E, Paragraph 3(ii))**; and

(d)    that there were no suits, actions, proceedings or investigations pending or, to the best of Le Petit's knowledge, threatened against or involving Le Petit, the equipment collateral or the properties before any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority having jurisdiction or supervisory or regulatory authority over the collateral or Le Petit, unless the suits, actions, proceedings or investigations have not had or would not result in a material adverse effect **(Exhibit E, Paragraph 3(iii))**.

21.    Also under the terms of the 2003 Loan Agreement, Le Petit made several promises and covenants to GEBAF. These promises and covenants included:

(a)    that Le Petit would repay the loan as set forth in the corresponding Promissory Notes **(Exhibit E, Paragraph 1)**;

(b)    that GEBAF would, at all times, have a perfected security interest in the equipment that would be prior to all other interests **(Exhibit E, Paragraph 2)**;

(c)    that Le Petit would not permit any of the equipment collateral to be subject to any lien, charge or encumbrance except that of GEBAF and would keep the equipment collateral free and clear of all liens, charges,

encumbrances and adverse claims **(Exhibit E, Paragraph 4)**;

(d)     that Le Petit would pay all taxes, assessments and other governmental charges **(Exhibit E, Paragraph 4)**;

(e)     that, upon request by GEBAF, Le Petit would submit written evidence of payment of all tax, assessment or other governmental charges **(Exhibit E, Paragraph 8)**;

(f)     that Le Petit would provide GEBAF with access to all files, correspondence and documents relating to the equipment **(Exhibit E, Paragraph 14)**; and

(g)     that Le Petit would, within 45 days of the end of each fiscal quarter, deliver to GEBAF: (a) complete financial statements including a balance sheet, profit and loss statement, statement of cash flows and all other related schedules for that fiscal period, (b) income statements for the business at the specific properties; and (c) all other financial information that GEBAF may reasonably request in order to establish compliance with the financial covenants in the loan documents; and that Le Petit would provide GEBAF with personal financial statements and tax returns of its guarantor (Kabiri) on an annual basis, and any such information concerning its business that GEBAF may reasonably request **(Exhibit E, Paragraph 9)**.

22.     In connection with the 2003 Loan, Kabiri executed an Unconditional Guaranty of Payment and Performance (Equipment) (the "2003 Guaranty"). A copy of the 2003 Guaranty is attached hereto as **Exhibit F**. The 2003 Guaranty unconditionally and absolutely obligated Kabiri to pay the obligations owing by Le Petit to GEBAF under the 2003 Loan Agreement, Interim Note and 2003 Note.

23.    Although Mirassadi did not acknowledge the 2003 Guaranty, the 2000 Guaranty includes an acknowledgement by Mirassadi that Kabiri was acting on behalf of the marital community and the 2000 Guaranty contemplated and included subsequent obligations incurred by Le Petit in favor of GEBAF. Accordingly, the assets of the marital community of Kabiri and Mirassadi are subject to the 2003 Guaranty.

### Events Occurring Subsequent to the 2000 and 2003 Loans

24.    After the funding of the 2003 Loan, in July 2003, GEBAF received a subpoena related to a criminal complaint ("Criminal Complaint") filed and served by the State of Minnesota against Le Petit on or about March 25, 2003. The Criminal Complaint was filed several days before the execution of the Interim Note and the 2003 Guaranty, and several months prior to the funding and the execution of the 2003 Loan Agreement and 2003 Note. On or about June 18, 2003, the Criminal Complaint was amended to add Kabiri as a defendant ("Amended Criminal Complaint"). Attached hereto as **Exhibit G** is a true and correct copy of the Amended Criminal Complaint received by GEBAF.

25.    The Amended Criminal Complaint reflects that the State of Minnesota began an investigation of Le Petit in February 2002, and that Kabiri and Le Petit had knowledge of the investigation as early as March 8, 2002. Neither the Criminal

Complaint, nor the investigation which lead up to the filing of the Criminal Complaint, nor any of the operative facts alleged in the Criminal Complaint were ever disclosed to GEBAF prior to the execution of the 2003 Loan and 2003 Guaranty.

26. The Amended Criminal Complaint charges thirty-three (33) counts of felonies against Le Petit and Kabiri. The Amended Criminal Complaint alleges that Le Petit owed approximately $96,082.84 in sales tax to the State of Minnesota for the period March 2000 to October 2002, but that Le Petit failed to file any tax returns or pay any sales tax during that time period.

27. The Amended Criminal Complaint also alleges that in the fall of 2000 and in 2001, Kabiri attempted to sell Le Petit, and that Kabiri was advised by a company hired to perform due diligence for the sale, American Safety Financial Corporation, by letter dated October 10, 2000, that (i) not all state tax returns had been prepared and timely filed for 1998, 1999 and 2000, and that (ii) Le Petit had undisclosed sales tax liabilities (including sales tax liability, interest, failure to pay and failure to file penalties) on its reported financial statements. This sales tax liability was never disclosed to GEBAF at any time prior to the 2000 or 2003 Loans. In conjunction with a prospective purchaser, Kabiri agreed to establish an

escrow account not to exceed $3,000,000 to address unpaid payroll and sales tax liabilities.

28.    The Amended Criminal Complaint further alleges that tax liens had been filed against Le Petit in Georgia, Missouri, Texas, Florida and New Jersey, and tax delinquency notices and/or failure to file tax notices had been sent to Le Petit from the states of Florida, Indiana, Massachusetts, Michigan, Missouri, North Carolina and Texas.  GEBAF's own recent investigation confirms the existence of substantial tax liens.

29.    Materials recently provided to GEBAF by Minnesota authorities also indicate that Le Petit has failed to file tax returns or to remit taxes to the State of New York since November 2000, and that a criminal investigation is currently pending against Le Petit by the State of New York.  These materials also indicate that no personal tax returns for Kabiri or corporate tax returns for Le Petit had been filed with the IRS for the years 1999-2000.  This information was not disclosed to GEBAF by Kabiri or Le Petit prior to the funding of the 2003 Loan.

30.    The Amended Criminal Complaint further alleges that, during the execution of a search warrant at Kabiri's personal residence on May 19, 2003, only a few weeks before the execution of the 2003 Note, Kabiri indicated to certain agents that he was having problems with his business due to employee turnover,

14

rapid expansion and cash flow. Documents recently provided to GEBAF by Minnesota authorities indicate that on March 25, 2003, only a few months before the 2003 Loan, Kabiri told one agent that Le Petit was "on the brink of going bankrupt" and told another agent in a separate conversation that Le Petit was going into bankruptcy in a few days, that business had not been good at his stores and that he had been unable to meet his payroll and pay for food costs. Neither Kabiri nor anyone else associated with Le Petit ever disclosed any of these problems or concerns to GEBAF prior to the funding of the 2003 Loan.

31.    As of August 15, 2003, Le Petit was in default, pursuant to both the 2000 Loan and the 2003, for failure to make timely payments. Accordingly, on or about August 15, 2003, GEBAF sent a notice of default to Le Petit and to Kabiri as guarantor of the loans to Le Petit. The notice indicated that a monetary default existed because Le Petit was late in paying approximately $250,000 to GEBAF, and that nonmonetary breaches existed because Le Petit had made false misrepresentations and warranties to GEBAF. GEBAF sent the notice of default via Federal Express to both Kabiri's home address and the corporate address provided by Le Petit. The notice to the corporate address was returned by Federal Express because Le Petit was no longer located at that address. GEBAF has been unable to locate the current address of Le Petit's headquarters and/or corporate

offices, and has recently been advised by Le Petit employees that there are no such offices and that Le Petit is bankrupt.  In any event, GEBAF believes that Kabiri received the notice of default because Le Petit's Atlanta attorney John Creasy contacted GEBAF regarding the notice after the notice had been sent.

32.    On or about August 30, 2003, GEBAF sent a letter to Le Petit and Kabiri requesting that the parties meet the following week to discuss the monetary and non-monetary breaches under the 2003 Loan.  GEBAF also requested certain financial and other information to which it was entitled under the 2003 Loan. GEBAF did not receive any response to this letter from Le Petit or Kabiri, but Le Petit's attorney advised GEBAF on September 2, 2003 that Kabiri would not attend the meeting.  Although the attorney indicated he would attempt to obtain the information requested, no such information has been provided to GEBAF.

33.    Minnesota authorities have recently provided information to GEBAF which indicates that as of approximately March 2003, Le Petit was not registered with the Secretary of State's Office in Minnesota to do business in the State of Minnesota.  On or about September 15, 2003, GEBAF confirmed that, contrary to what Le Petit and Kabiri had represented to GEBAF, Le Petit has never been registered to do business in the State of Minnesota.

34.   GEBAF has recently begun conducting a review of the financial information provided to GEBAF by Le Petit and Kabiri before the 2003 Loan to determine the accuracy of such information. Although this review is still pending, the following discrepancies have been noted by GEBAF to date:

(a)   GEBAF has compared the monthly sales information from the Criminal Complaint with the information provided by Le Petit and Kabiri to GEBAF's underwriting department for two stores in Minnesota. In the Criminal Complaint, it is alleged that the sales at the Mall of America store for the period of January 2002 through June 2002 were $190,504. Le Petit and Kabiri reported to GEBAF prior to the 2003 Loan that sales for this period at this store were $229,000. In the Criminal Complaint, it is alleged that the sales at the Rosedale store for the period of January 2002 through June 2002 were $187,000. Le Petit and Kabiri reported to GEBAF prior to the 2003 Loan that sales for this period at this store were $289,000. Based upon these comparisons, it appears that Le Petit and Kabiri over-reported sales on these two locations alone by approximately 50%.

(b)   GEBAF has compared the Le Petit corporate tax returns for the years ending December 31, 2001 and December 31, 2000 provided to GEBAF prior to the 2003 Loan with Minnesota corporate tax returns for these same years which Kabiri told Minnesota authorities had been filed with the Minnesota Department of Revenue. The following chart illustrates the material differences from what was reported on the Le Petit IRS form 1120 (corporate tax return) at line 28 (federal taxable income), what was found in documents by Minnesota law enforcement authorities at Le Petit's accountants' offices and what was reported on the Minnesota state returns, which incorporate, in part, information from line 28 of IRS form 1120:

| YEAR | IRS FORM 1120; LINE 28 Version Provided to GEBAF underwriting | MINNESOTA CORPORATION FRANCHISE TAX (Page 2, Line 1— "from federal form 1120, line 28") | IRS FORM 1120; LINE 28 Version obtained by Minnesota Law Enforcement Authorities from Le Petit's Accountants on September 8, 2003) |
|---|---|---|---|
| 2000 | $173,025 | $13,476 | $ 42,117 |
| 2001 | $ 61,759 | ($64,310) | ($108,456) (as reported on Georgia Corporation Tax Return, Form 600) |

(c) Le Petit reported ($4,523,520) in taxable income (loss) for year ending December 31, 2002.  This loss was never reported to GEBAF.

35.    In September 2003 GEBAF inspected multiple Le Petit restaurant locations.  Based upon these inspections, GEBAF has learned (a) that Le Petit is no longer accepting credit card in most, if not all, of its locations, (b) that multiple locations have been sold or otherwise transferred to new operators under different names, all without notice to or consent by GEBAF, and (c) that some locations appear to be  simply shutting down and going dark.

36.    In September 2003, counsel for Le Petit informed counsel for GEBAF

that (a) Le Petit is behind by approximately three months in lease payments to

landlords, (b) that a number of landlords are demanding payment in full on past

due rent, (c) that five Le Petit Locations have been closed in recent months and one

more is scheduled for closing soon, (d) that Le Petit is behind in payments to

nonlandlord creditors by one to one and a half months, (e) that Le Petit's total

indebtedness is approximately $24 million, with approximately $20 million owed

to GEBAF, and (f) that Le Petit's books and records were in disarray and that

Kabiri has refused to incur the expense to correct the company's financials.

### FIRST CLAIM FOR RELIEF
### (Breach of the 2000 Loan against Le Petit)

37.    GEBAF incorporates the allegations set forth in paragraphs 1 through

36 of the Complaint as if fully set forth herein.

38.    GEBAF    has    complied    with    all    conditions    precedent    to    the

enforcement of its rights under the terms of the 2000 Loan documents, unless

excused.

39.    Le Petit is in breach of and default under the 2000 Loan by failing to

make timely payments to GEBAF under these documents.  As of September 8,

2003, Le Petit owed $2,820,448 in principal balance, as well as late fees, attorney's

fees, costs and expenses. GEBAF has elected to accelerate the amounts due and owing under the 2000 Loan, which it is entitled to do without notice to Le Petit pursuant to the terms of the loan documents. GEBAF believes and contends that the 2000 Loan is governed by the law of Washington. If Georgia law applies, which GEBAF denies, then this Complaint constitutes ten days' written notice to Le Petit that GEBAF intends to pursue its right to collect attorney's fees, and Le Petit may avoid liability for attorney's fees by paying the 2000 Loan balance in full within ten days of its receipt of this Complaint.

40.    Le Petit has also committed a nonmonetary breach of the 2000 Loan by failing to provide GEBAF with financial information regarding Le Petit and Kabiri, its guarantor, when this information was requested by GEBAF.

41.    Upon information and belief, Le Petit committed nonmonetary breaches of the 2000 Loan by, among other things, misrepresenting (a) that all applicable tax returns had been filed and all taxes paid, (b) that it did not know of any proposed tax assessments against it, (c) that the equipment was free of all liens and/or that GEBAF's interest in the equipment collateral was a first priority interest. (d) that it was licensed to do business in states where GEBAF's collateral was located, including the State of Minnesota, (e) that all information submitted to GEBAF was accurate and that there were no undisclosed material facts known to

Le Petit that could materially affect its financial condition or operation. Le Petit may also be in breach of the 2000 Loan by failing to keep the equipment collateral clear of any other security interests.

42.   As a result of Le Petit's breach of the 2000 Loan, GEBAF has been damaged in an amount to be determined at trial including, but not limited to, the principal amount owing under the 2000 Loan, as well as interest, late fees, prepayment fees, attorney's fees, costs and expenses.

## SECOND CLAIM FOR RELIEF
### (Breach of the 2000 Guaranty against Kabiri)

43.   GEBAF incorporates the allegations set forth in paragraphs 1 through 42 of the Complaint as if fully set forth herein.

44.   GEBAF has complied with all conditions precedent to the enforcement of its rights under the terms of the 2000 Loan and the 2000 Guaranty, unless excused.

45.   Le Petit currently owes GEBAF in excess of $2,820,448 under the terms of the 2000 Loan.

46.   Pursuant to the terms of the 2000 Guaranty, Kabiri is liable for all amounts currently due under the 2000 Loan and all future amounts due and owing under these documents, as well as all damages stemming from Le Petit's breach of the 2000 Loan. In addition, Kabiri is liable for the costs, expenses and attorney's

fees incurred by GEBAF in collecting the sums due under the 2000 Loan documents. GEBAF believes and contends that the 2000 Loan and 2000 Guaranty are governed by the law of Washington. If Georgia law applies, which GEBAF denies, then this Complaint constitutes ten days' written notice to Kabiri that GEBAF intends to pursue its right to collect attorney's fees, and Kabiri may avoid liability for attorney's fees by paying the 2000 Loan balance in full within ten days of his receipt of this Complaint.

47.    Kabiri is in breach of and default under the 2000 Guaranty by failing to pay GEBAF the amounts due under the 2000 Loan and by failing to perform the obligations of Le Petit under the 2000 Loan.

48.    As a result of the breach by Kabiri of the 2000 Guaranty, GEBAF has been damaged in an amount to be determined at trial including, but not limited to, the principal amount owing under the 2000 Loan, as well as interest, late fees, prepayment fees, attorney's fees, costs and expenses.

49.    The assets of the marital community of Kabiri and Mirassadi are subject to execution to satisfy GEBAF's claims under the 2000 Guaranty.

**THIRD CLAIM FOR RELIEF**
**(Breach of the 2003 Loan against Le Petit)**

50.    GEBAF incorporates the allegations set forth in paragraphs 1 through 49 of the Complaint as if fully set forth herein.

51.   GEBAF has complied with all conditions precedent to the enforcement of its rights under the terms of the 2003 Loan, unless excused.

52.   Le Petit is in breach and default under the 2003 Loan by failing to make timely payments to GEBAF as it agreed to do under the 2003 Loan. Specifically, Le Petit failed to make payments which were due on July 1, 2003, August 1, 2003 and September 1, 2003. Le Petit is in arrears in the amount of $464,715.80 including principal, interest and late fees as of September 8, 2003. GEBAF has elected to accelerate the amounts due and owing under the 2003 Loan, which it is entitled to do without notice to Le Petit pursuant to the terms of these documents. Currently, the total principal balance due and owing under the 2003 Loan is $17,076,708.69, in addition to attorney's fees, costs and expenses. GEBAF believes and contends that the 2003 Loan is governed by the law of Washington. If Georgia law applies, which GEBAF denies, then this Complaint constitutes ten days' written notice to Le Petit that GEBAF intends to pursue its right to collect attorney's fees, and Le Petit may avoid liability for attorney's fees by paying the 2003 Loan balance in full within ten days of its receipt of this Complaint.

53.   Le Petit has also committed nonmonetary breaches of the 2003 Loan by, among other things, making false representations to GEBAF at the time of the

2003 Loan regarding: (a) Le Petit's financial status and viability; (b) the filing of applicable tax returns and the payment of taxes; (c) the status of pending or threatened investigations by governmental entities; and (d) the absence of any liens or other encumbrances on the equipment collateral.

54.    Le Petit has also committed nonmonetary breaches of the 2003 Loan by, among other things: (a) permitting the equipment collateral to be subject to other liens, charges, encumbrances and/or adverse claims; (b) failing to pay all taxes, assessments and other governmental charges; and (c) failing to provide GEBAF with financial and other information relating to Le Petit and Kabiri, its guarantor, when requested by GEBAF.

55.    As a result of Le Petit's breach of the 2003 Loan, GEBAF has been damaged in an amount to be determined at trial including, but not limited to, the principal amount owing under the 2003 Loan, as well as interest, late fees, prepayment fees, attorney's fees, costs and expenses.

## FOURTH CLAIM FOR RELIEF
### (Breach of the 2003 Guaranty against Kabiri)

56.    GEBAF incorporates the allegations set forth in paragraphs 1 through 55 of the Complaint as if fully set forth herein.

57.    GEBAF has complied with all conditions precedent to the enforcement of its rights under the terms of the 2003 Loan and the 2003 Guaranty, unless excused.

58.    Le Petit currently owes GEBAF in excess of $464,715.80 in principal balance under the 2003 Loan, as well as interest, late fees, costs, and attorney's fees.

59.    Pursuant to the terms of the 2003 Guaranty, Kabiri is liable for all amounts currently due under the 2003 Loan and all future amounts due and owing under the 2003 Loan documents.    In addition, Kabiri is liable for the costs, expenses and attorney's fees incurred by GEBAF in collecting the sums due under the 2003 Loan documents. GEBAF believes and contends that the 2003 Loan and 2003 Guaranty are governed by the law of Washington. If Georgia law applies, which GEBAF denies, then this Complaint constitutes ten days' written notice to Le Petit that GEBAF intends to pursue its right to collect attorney's fees, and Le Petit may avoid liability for attorney's fees by paying the 2003 Loan balance in full within ten days of its receipt of this Complaint.

60.    As a result of the breach by Kabiri of the 2003 Guaranty, GEBAF has been damaged in an amount to be determined at trial including, but not limited to, the principal amount owing under the 2003 Loan, as well as interest, late fees, prepayment fees, attorney's fees, costs and expenses.

61.    The assets of the marital community of Kabiri and Mirassadi are subject to execution to satisfy GEBAF's claims under the 2003 Guaranty.

**FIFTH CLAIM FOR RELIEF**
**(Fraud and Fraudulent Inducement against Le Petit and Kabiri)**

62.    GEBAF incorporates the allegations set forth in paragraphs 1 through 61 of the Complaint as if fully set forth herein.

63.    Le Petit, as borrower, and Kabiri, as guarantor, made a number of affirmative misrepresentations to GEBAF in order to induce GEBAF to enter into the 2003 Loan, including: (a) representing that they were not aware of any criminal charges or investigations pending against Le Petit when, in fact, a criminal investigation had been commenced and criminal charges had been filed and served against Le Petit (and subsequently Kabiri) by the State of Minnesota prior to the execution of the 2003 Loan; (b) representing to GEBAF that Le Petit had done a certain level of sales at certain of its stores, while reporting completely different numbers to authorities in Minnesota regarding sales at those same stores; (c) representing that Le Petit had filed all applicable tax returns and paid all taxes

when, in fact, it had not; (d) representing that there were no other liens or other encumbrances on the equipment collateral when, in fact, there were; (e) representing a much higher net income to GEBAF for the years 2000 and 2001 than what it had represented to Minnesota authorities and apparently the IRS; and (f) representing that Le Petit was qualified as a foreign corporation to do business in the State of Minnesota and other states where GEBAF's collateral is located.

64.    Le Petit, as borrower, and Kabiri, as guarantor, also had a duty to disclose to GEBAF all material facts which could potentially affect GEBAF's willingness to enter into the 2003 Loan with Le Petit. Le Petit and Kabiri breached this duty by, among other things, failing to tell GEBAF that Le Petit's business was in trouble and on the brink of bankruptcy, as they had represented to others around the time the parties entered into the 2003 Loan.

65.    Le Petit and Kabiri knew that these misrepresentations and omissions were material and, knew and intended that GEBAF would reasonably rely on the misrepresentations and omissions, and knew that the misrepresentations and omissions would adversely affect GEBAF's willingness to enter into the 2003 Loan. Le Petit and Kabiri nonetheless made the misrepresentations and omissions to GEBAF in order to induce GEBAF to enter into the 2003 Loan.

66.    Le Petit and Kabiri also engaged in fraudulent conduct in order to induce GEBAF to enter into the 2000 Loan by, among other things, affirmatively misrepresenting that all applicable tax returns had been filed and all taxes paid, that it did not know of any proposed tax assessments against it, that the equipment was free of all liens and/or that GEBAF's interest in the equipment collateral was a first priority interest, that all information submitted to GEBAF was accurate and that there were no undisclosed material facts known to Le Petit that could materially affect its financial condition or operation.

67.    GEBAF    reasonably    relied    upon    all    of    the    foregoing misrepresentations and omissions to its detriment by, among other things, entering into the 2003 Loan and paying to Le Petit the amounts contemplated by the 2003 Loan.

68.    As a result of the fraudulent misrepresentations and omissions by Le Petit and Kabiri with respect to the 2003 Loan, GEBAF has been damaged in an amount to be determined at trial.

**SIXTH CLAIM FOR RELIEF**
**(Fraudulent Conveyance against Le Petit and Kabiri)**

69.    GEBAF incorporates the allegations set forth in paragraphs 1 through 68 of the Complaint as if fully set forth herein.

70.   The 2000 and 2003 Loan documents provide that their terms are to be governed by the laws of the State of Washington.

71.   On information and belief, Le Petit, as borrower, and Kabiri, as guarantor, have fraudulently transferred assets of Le Petit under Washington law by using these assets for Kabiri's personal use, such as the payment of Kabiri's mortgage on his personal residence, and by diverting assets out of the country. See R.C.W. § 19.40.041.

72.   These transfers are fraudulent as to GEBAF and possibly other present creditors of Le Petit and/or Kabiri because (a) these transfers were made with the specific intent to hinder, delay and defraud creditors, and/or (b) Le Petit did not receive a reasonably equivalent value in exchange for the transfer and Le Petit was insolvent at that time or became insolvent as a result of the transfer.

73.   As a result of the fraudulent transfers by Le Petit and Kabiri, GEBAF has been damaged in an amount to be determined at trial.  Moreover, GEBAF is entitled to an attachment or other provisional remedy against the property of Le Petit and Kabiri, an injunction against further disposition of assets by Le Petit and Kabiri, and the appointment of a receiver to take charge of the property of Le Petit.

## SEVENTH CLAIM FOR RELIEF
### (Accounting against Le Petit, Kabiri and Mirassadi)

74.    GEBAF incorporates the allegations set forth in paragraphs 1 through 70 of the Complaint as if fully set forth herein.

75.    GEBAF has demanded certain financial information from Le Petit and Kabiri, but Le Petit and Kabiri have refused to provide the requested information to GEBAF.  Moreover, GEBAF does not have a current, valid address for the corporate office of Le Petit, because Le Petit is no longer located at the address previously provided to GEBAF.  Any further demand for information or for an accounting would therefore be futile.

76.    Because GEBAF cannot obtain a proper accounting from Kabiri and Le Petit without an Order from the Court, this Court should compel Le Petit to render an accounting to GEBAF which would include a review of all corporate books and records from January 1, 1999 to the present including, but not limited to, all financial statements, tax returns, unit level store receipts, expenses and liabilities, salary and other payroll documentation, check ledgers, and bank account statements.  The Court should also compel Kabiri and Mirassadi to render an accounting to GEBAF which would include a review of all personal financial statements, bank account statements and tax returns from January 1, 1999 to the present.

## EIGHTH CLAIM FOR RELIEF
### (Constructive Trust against Le Petit)

77.    GEBAF incorporates the allegations set forth in paragraphs 1 through 76 of the Complaint as if fully set forth herein.

78.    Le Petit is currently in possession of the loan proceeds from the 2003 Loan as a result of its fraud, abuse of confidence and other questionable means. Le Petit has gained something for itself which, in equity and good conscience, it should not be permitted to hold.

79.    In light of Le Petit's conduct as set forth above, Le Petit would be unjustly enriched if it were allowed to retain the loan proceeds and therefore it has an equitable duty to return these proceeds to GEBAF. A constructive trust should therefore be imposed against all 2003 Loan proceeds currently in the possession of Le Petit.

## NINTH CLAIM FOR RELIEF
### (Alter Ego Liability)

80.    GEBAF incorporates the allegations set forth in paragraphs 1 through 79 of the Complaint as if fully set forth herein.

81.    Kabiri, as the sole shareholder of Le Petit as well as Le Petit's only officer (Kabiri is CEO, CFO and secretary), has disregarded the corporate entity of

Le Petit such that there is a unity of ownership and interest and the separateness of the corporation has ceased to exist.

82.    Kabiri so dominates and controls Le Petit that Le Petit is his alter ego, thus justifying a piercing of the corporate veil and the imposition of liability against Kabiri for the acts of Le Petit.

### TENTH CLAIM FOR RELIEF
(For Appointment of Receiver Pending Full Adjudication)

83.    GEBAF incorporates the allegations set forth in paragraphs 1 through 82 of the Complaint as if fully set forth herein.

84.    GEBAF faces immediate and irreparable injury if the assets and property of Le Petit are allowed to be further diminished and diverted by Kabiri and those acting in concert with him. The only way to preserve these assets and to maintain the ongoing enterprise value of Le Petit is for a receiver to be appointed to manage and operate the Le Petit enterprise.

85.    GEBAF has no adequate remedy at law in the absence of the appointment of a receiver for the business and assets of Le Petit. In the absence of Le Petit continuing as an ongoing enterprise, there is no possibility that GEBAF or the other creditors of Le Petit will ever recover the amounts that are due to them.

86.     The appointment of a receiver will not harm Le Petit and will in fact preserve the business and assets of the corporation pending a full adjudication on the merits, to the benefit of all holders of legitimate interests in the business.

87.     The grounds for the appointment of a receiver are more fully set out in the Motion of GEBAF filed simultaneously herewith.

WHEREFORE, Plaintiff General Electric Capital Business Asset Funding Corporation prays that judgment enter in its favor and against Defendants Le Petit Bistro, Inc., Ali Kabiri and Maryam Mirassadi, as follows:

1.     On the First Claim for Relief against Le Petit for Breach of the 2000 Loan:

        a.     Compensatory damages in the amount of $2,820,448, which includes the principal loan balance, interest, late fees and prepayment fees through September 8, 2003;

        b.     Attorneys' fees, costs and expenses incurred herein; and

        c.     All further relief the Court deems just and proper.

2.     On the Second Claim for Relief against Kabiri for Breach of the 2000 Guaranty:

a.    Compensatory damages in the amount of $2,820,448, which includes the principal loan balance, plus interest, late fees and prepayment fees;

b.    Attorneys' fees, costs and expenses incurred herein;

c.    That the marital community of Kabiri and Mirassadi be deemed available to satisfy Kabiri's obligations for breach of the 2000 Guaranty; and

d.    All further relief the Court deems just and proper.

3.    On the Third Claim for Relief against Le Petit for Breach of the 2003 Loan:

a.    Compensatory damages in the amount of $17,076,708.69, which includes the principal loan balance, plus interest, late fees and prepayment fees;

b.    Attorneys' fees, costs and expenses incurred herein; and

c.    All further relief the Court deems just and proper.

4.    On the Fourth Claim for Relief against Kabiri for Breach of the 2003 Guaranty:

      a.     Compensatory damages in the amount of $17,086,708.69, which includes the principal loan balance, plus interest, late fees and prepayment fees;

      b.     Attorneys' fees, costs and expenses incurred herein;

      c.     That the marital community of Kabiri and Mirassadi be deemed available to satisfy Kabiri's obligations for breach of the 2000 Guaranty; and

      d.     All further relief the Court deems just and proper.

5.     On the Fifth Claim for Relief against Le Petit and Kabiri for Fraud:

      a.     Compensatory damages in the amount of $19,897,156.35, plus interest, late fees and prepayment fees;

      b.     Punitive damages;

      c.     Attorneys' fees, costs and expenses incurred herein; and

      d.     All further relief the Court deems just and proper.

6.     On the Sixth Claim for Relief against Le Petit and Kabiri for Fraudulent Conveyance:

      a.     Compensatory damages in the amount of $19,897,156.35, plus interest, late fees and prepayment fees;

     b.     A Temporary Restraining Order, and a Preliminary and Permanent Injunction, against further disposition of assets by Le Petit and Kabiri;

     c.     The appointment of a receiver over the assets of Le Petit;

     d.     A Writ of Attachment against the personal and real property of Kabiri; and

     e.     All further relief the Court deems just and proper.

7.     On the Seventh Claim for Relief against Le Petit, Kabiri and Mirassadi for an Accounting:

     a.     An accounting by Le Petit which would include, but not necessarily be limited to all financial statements, tax returns, unit level store receipts, expenses and liabilities, salary and other payroll documentation, check ledgers, and bank account statements from January 1, 1999 to the present;

     b.     An accounting by Kabiri and Mirassadi which would include, but not necessarily be limited to all personal financial statements, bank account statements and tax returns from January 1, 1999 to the present.

     c.     Attorneys' fees, costs and expenses incurred herein; and

d.      All further relief the Court deems just and proper.

8.      On the Eighth Claim for Relief against Le Petit for a Constructive

Trust:

a.      For a constructive trust over all loan proceeds paid out to Le

Petit and/or Kabiri pursuant to the 2003 Loan;

b.      Attorneys' fees, costs and expenses incurred herein; and

c.      All further relief the Court deems just and proper.

9.      On the Ninth Claim for Relief for Alter Ego Liability:

a.      For a finding that Kabiri is the alter ego of Le Petit and is liable

for the actions of Le Petit; and

b.      All further relief the Court deems just and proper.

10.     On the Tenth Claim for Relief for Appointment of a Receiver:

a.      For the appointment of a receiver to preserve the assets of Le

Petit and to continue the business of Le Petit pending a full

adjudication of the merits of the claims.

b.      For such other relief as is just and proper, as outlined in the

Emergency Motion filed by GEBAF in conjunction with this

action.

Dated:  September 19th, 2003

KING & SPALDING LLP


L. Joseph Loveland
Ga. Bar No. 459350
Mark M. Maloney
Ga. Bar No. 468104
191 Peachtree Street
Atlanta, Georgia 30303-1763
(404) 572-4600(Telephone)
(404) 572-5100(Facsimile)

and

Kutak Rock LLP
John H. Bernstein (Colo. Bar #17358)
Craig N. Johnson (Colo. Bar #21905)
Kate E. Manka (Colo. Bar #32583)
Suite 3100
1801 California Street
Denver, CO  80202
(303) 297-2400 (Telephone)
(303) 292-7799 (Facsimile)


Attorneys for Plaintiff General Electric Capital
Business Asset Funding Corporation

## CERTIFICATE OF COMPLIANCE

I certify that to the best of my knowledge the foregoing document complies

with the type and format (including type and point size) selections as set forth in

L.R. 5.1(B) and 7.1(D), N.D. Ga. The font used to prepare this document is 14

Point Times New Roman.

Respectfully submitted this 19th day of September, 2003.

KING & SPALDING LLP

L. Joseph Loveland
Ga. Bar No. 459350
Mark M. Maloney
Ga. Bar No. 468104
191 Peachtree Street
Atlanta, Georgia 30303-1763
(404) 572-4600(Telephone)
(404) 572-5100(Facsimile)



## LOAN & SECURITY AGREEMENT

THIS LOAN AND SECURITY AGREEMENT entered into as of the 5th day of APRIL, 19 99, by and between General Electric Capital Business Asset Funding Corporation, a Delaware corporation, whose address is 10900 NE 4th St., Suite 500, Bellevue, WA 98004 ("Lender") and La Petit Bistro, Inc., a Georgia corporation, whose address is 5801 Roswell Road, Suite B, Atlanta, GA 30328 ("Borrower").

WHEREAS, Lender has agreed to make a commercial loan or loans to Borrower; and

WHEREAS, as a condition to making the loans, and in order to secure the repayment thereof, Lender has required Borrower to execute and deliver to Lender this Loan and Security Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, Borrower and Lender agree as follows:

1.    **Creation of Security Interest.** As security for the due and punctual payment of any and all of the present and future obligations of the borrower to Lender, whether direct or contingent or joint or several, Borrower hereby conveys, assigns and grants to Lender a continuing security interest in all of Borrower's rights, title and interests in and to the equipment described in the Supplemental Security Agreement(s) entered into pursuant to this Loan and Security Agreement from time to time ("Equipment") including all present and future additions, attachments and accessories thereto, all substitutions therefor and replacements thereof and all proceeds thereof, including all proceeds of insurance (such Equipment and property hereinafter called "Collateral").

2.    **The Loans.**

(a)    Subject to the terms and conditions of this Loan and Security Agreement, lender agrees to make a loan or loans to Borrower. The maximum principal amount of any loan or loans to be made by Lender to Borrower shall be within Lender's discretion, subject to the exercise of Lender's reasonable business judgment, and shall be as stated in the loan commitment letter issued by lender to Borrower, or in the event a commitment letter is not issued by Lender, in Lender's internal credit approval (each such loan or loans shall be referred to as "the Loan Amount").

(b)    The Loan Amounts shall be repaid by Borrower as a term loan or term loans ("Term Loan"). The Term Loan shall be evidenced by a promissory note or notes in the form attached hereto as Exhibit "A" ("Term Note"). The payment provisions of each Term Note shall be stated therein.

(c)    If requested by Borrower, and in accordance with the terms and conditions of Section 3 hereof, Lender shall make interim fundings to Borrower of a Term Loan as partial advances of the Loan Amount ("Interim Loans"). The interim Loans shall either be for the payment of the acquisition cost of any items of Equipment delivered and accepted by Borrower prior to the expiration date of Lender's loan commitment to Borrower ("Commitment Expiration date") or to fund progress payments to the vendor or manufacturer of the Equipment, if the making of progress payments was agreed to by Lender in its commitment or approval to make the loan or loans to Borrower. The Interim Loans shall be evidenced by promissory notes in the form attached hereto as Exhibit "B" ("Interim Note"). Interest on all Interim Loans shall be payable as provided therein. The principal amount due under the Interim Loans shall be due as provided in the Interim Notes, at which time, provided no Event of Default hereunder has occurred and is continuing or event which with the passing of time or giving of notice or both would become an Event of Default hereunder has occurred and is continuing. Lender shall consolidate all Interim Loans and convert them to a Term Loan evidenced by a Term Note or Notes. Whether or not a Term Loan is evidenced by one or more Term Notes shall be agreed between Lender and Borrower, or in the absence of such an agreement, as decided by Lender, in the exercise of its reasonable business judgment.

(d)    In the event that the amount loan pursuant to the Interim Loans is less than the Loan Amount, subject to Borrower's compliance with the terms and conditions of this Loan and Security Agreement (including the satisfaction of the conditions of borrowing set forth in Section 7 of this Loan and Security Agreement including but not limited to providing Lender with a description of the items of Equipment), Lender shall disburse to Borrower the balance of the Loan Amount on the same date that the Interim Loans are converted into a term loan.

3.    **Method for Borrowing On Interim Loan.** Borrower shall give Lender at least five (5) business days written notice of a request for the disbursement of an Interim Loan ("Request"), specifying the date on which the Interim Loan is to be disbursed. Such Request shall be in the form attached hereto as Exhibit "C". Such Request shall be accompanied by an original copy of the invoice or invoices to be paid from the Interim Loan. Such Request shall constitute a representation and warranty by the Borrower that (i) as of the date of the Request no Event of Default or event which with the passing of time or the giving of notice or both would constitute an Event of Default hereunder has occurred and is continuing and (ii) in the event items of Equipment have been delivered to Borrower, Borrower has unconditionally accepted the Equipment from the vendor thereof. Subject to the conditions of this Loan and Security Agreement, Lender shall disburse the Interim Loan to the invoicing party, or if Borrower shall have paid the amount of such invoice, Lender shall reimburse Borrower, upon receipt of proof of payment from Borrower.

4.    **Cross Collateral/Cross Default.** All Collateral shall secure the payment and performance of all of Borrower's liabilities and obligations to Lender hereunder and under any of the loan documents relating hereto including, but not limited to all Interim Notes and all Term Notes (the Loan and Security Agreement, the Interim Notes, the Term Notes, the Supplemental Security Agreement(s) and all other loan documents may be referred to herein collectively as the "Loan Documents"). Lender's security interest in the Collateral shall not be terminated until and unless all of Borrower's obligations to Lender under any of the Loan Documents are fully paid and performed. The occurrence of an event of default under any other of the Loan Documents shall be deemed to be an Event of Default hereunder and an Event of Default hereunder shall be deemed to be an event of default under any other of the Loan Documents.



**EXHIBIT**

**A**

Page 1 of 6

 

5    **Representations and Warranties.** Borrower hereby represents and warrants as follows:

(a)    Power and Authorization. Borrower has the full power and (corporate) authority to execute deliver and perform Borrower's obligations under the Loan Documents. The execution and delivery of the Loan Documents have been authorized by all requisite corporate (or partnership) action on the part of Borrower. The execution, delivery and performance of the Loan Documents have not constituted and will not constitute a breach, default or violation of or under Borrower's articles of incorporation, by-laws (partnership agreement), or any other agreement, indenture, contract, lease, law, order, decree, judgment, or injunction to which Borrower is a party or may be bound and have not resulted and will not result in the creation of any lien upon the Equipment pursuant to any agreement, indenture, lease, contract or other instrument to which Borrower is a party, except the lien created by this Loan and Security Agreement.

(b)    Existence. If Borrower is a corporation, Borrower (i) is duly incorporated, validly existing and in good standing under the laws of its state of incorporation, (ii) has all corporate powers and all governmental licenses, authorizations, consents and approvals required to carry out its business as now conducted, and (iii) is duly qualified to transact business as now conducted, and (iii) is duly qualified to transact business as a foreign corporation in each jurisdiction where the Equipment will be located and in the jurisdiction where its principal place of business is located. If Borrower is a partnership, Borrower (i) has been duly formed as a (limited or general) partnership under the laws of the state of its organization, (ii) is comprised of the general partner(s) listed on the Schedule of Partners attached to this Loan and Security Agreement, and (iii) is in good standing under the laws of the state of its formation.

(c)    Binding Effect. This Loan and Security Agreement constitutes the valid and binding agreement of the Borrower; the Interim Notes and the Term Note, when executed and delivered, will constitute the valid and binding obligations of the Borrower; and the Loan Documents are enforceable in accordance with their terms except as (i) the enforceability thereof may be limited by the bankruptcy laws, and (ii) rights of acceleration and the availability of equitable remedies may be limited by equitable principles of general applicability.

(d)    Litigation. There is no action, suit or proceeding pending against, or to the knowledge of the Borrower, threatened against or affecting the Borrower, before any court or arbitrator or any governmental body, agency or official which has not been previously disclosed to the Lender in writing and in which there is a reasonable possibility of an adverse decision which could materially adversely affect the business, financial condition or results of operations of the Borrower or which would in any manner draw into question the validity of any of the Loan Documents.

(e)    Filing of Tax Returns. The Borrower has filed all tax returns required to have been filed and has paid all taxes shown to be due and payable on such returns, including interest and penalties, and all other taxes which are payable by it, to the extent the same have become due and payable. The Borrower knows of no proposed tax assessment against it and all tax liabilities of the Borrower are adequately provided for.

(f)    Title. The Borrower has or shall have at the time it executes the Term Note good and indefeasible title to the Collateral free and clear of all liens other than the Lender's lien.

(g)    Compliance with Law. The business and operations of the Borrower have been and are being conducted in accordance with all applicable laws, rules and regulations, other than violations which could not (either individually or collectively) have a material adverse effect on the financial condition or operations of the Borrower.

(h)    Full Disclosure. All documents, records, instruments, certificates, statements (including, but not by way of limitation, financial statements of Borrower) and information provided to Lender by Borrower in connection with this Loan and Security Agreement are true and accurate in all material respects and do not contain any untrue statement, or fail to contain any statement of a material fact necessary to make the statements contained herein or therein not misleading. There is no fact known to the Borrower that Borrower has not disclosed in writing which could materially and adversely affect the financial condition or operations of Borrower.

(i)    Security Interest. The security interest granted to Lender hereunder is a valid, first priority security interest in the Collateral and has been, or promptly after the execution of the Supplemental Security Agreement describing the Collateral will be, perfected in accordance with the requirements of all states in which any item of the Collateral is located.

(j)    Personal Property. Under the laws of the state(s) in which the Collateral is to be located, the Collateral is deemed to consist solely of personal property.

(k)    Pollution and Environmental Control. Borrower has obtained all permits, licenses and other authorizations which are required under, and is in material compliance with, all federal, state, and local laws and regulations relating to pollution, reclamation, or protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, or hazardous or toxic materials or wastes into air, water, or land, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport, or handling of pollutants, contaminants or hazardous or toxic materials or wastes. Borrower shall maintain all such permits, licenses, and authorizations current.

6.    **Covenants.** Borrower hereby agrees and covenants as follows:

(a)    Payment. Borrower shall pay the indebtedness secured hereby as provided herein and in the Interim Notes and Term Notes.

(b)    Location of Collateral. Borrower will keep the Collateral located at the location or locations stated on the Supplemental Security Agreements, provided, however, that Borrower may change the location of the Collateral with Lender's prior written consent.

(c)    No Liens. Except for the security interest granted hereby or under any other agreement under which Lender is the secured party, whether as mortgagee, beneficiary or otherwise, Borrower shall keep the Collateral free and clear of any security interest, lien or encumbrance of any kind and Borrower shall not sell, assign (by operation of law or otherwise) exchange or otherwise dispose of any of the Collateral.

 

(d)     Insurance.  Borrower shall procure and continuously maintain and pay for (a) all risk physical damage and property insurance covering loss or damage to the equipment for not less than the full replacement value thereof naming Lender as loss payee and (b) bodily injury and property damage combined single limit liability insurance, all in such amounts and against such risks and hazards as are reasonably required by Lender, with insurance companies and pursuant to contracts or policies and with deductibles satisfactory to Lender.  All contracts and policies shall include provisions for the protection of Lender notwithstanding any act or neglect of or breach or default by Borrower, shall provide for payment of insurance proceeds to Lender, shall provide that they may not be modified, terminated or canceled unless Lender is given at least thirty (30) days' advance written notice thereof, and shall provide that the coverage is "primary coverage" for the protection of Borrower or Lender notwithstanding any other coverage carried by Borrower protecting against similar risks.  Borrower shall promptly notify any appropriate insurer and Lender of each and every occurrence, which may become the basis of a claim or cause of action against the insured and provide Lender with all data pertinent to such occurrence.  Borrower shall furnish Lender with certificates of such insurance or copies of policies upon request and shall furnish Lender with renewal certificates not less than thirty (30) days prior to the renewal date.  Proceeds of all insurance are payable first to Lender to the extent of its interest.

(e)     Financing Statements.  At the request of Lender, Borrower will join Lender in executing one or more financing statements pursuant to the Uniform Commercial Code and other documents deemed necessary by Lender under applicable law to record or perfect its security interest in the Collateral, including continuation statements, in form satisfactory to Lender and will pay the cost of filing the same in all public offices wherever filing is deemed by Lender to be necessary or desirable.  Borrower hereby authorizes Lender, in such jurisdictions where such action is authorized by law, to effect any such recordation or filing of financing statements or other documents without Borrower's signature thereto.

(f)     Change of Name or Address.  Borrower will immediately notify Lender in writing of any change in its place of business or the adoption or change of any tradename or fictitious business name, and will upon request of Lender, execute any additional financing statements or other similar documents necessary to perfect or maintain its security interest.

(g)     Use of Equipment, Maintenance.  Borrower will cause the Equipment to be used in a careful and proper manner, will comply with and conform to all governmental laws, rules and regulations relating thereto, and will cause the Equipment to be operated in accordance with the manufacturer's or supplier's instructions or manuals and only by competent and duly qualified personnel.  Borrower will cause the Equipment to be kept and maintained in good repair, condition and working order and will furnish all parts, replacements, mechanisms, devices and servicing required therefor so that the value, condition and operating efficiency thereof will at all times be maintained and preserved, normal wear and tear excepted.  All such repairs, parts, mechanisms, devices and replacements shall immediately, without further act, become part of the Equipment and subject to the security interest created by this Loan and Security Agreement.  Borrower will not make any improvement, change, addition or alteration to the Equipment if such improvement, change, addition or alteration will impair the originally intended function or use of the Equipment or impair the value of the Equipment as it existed immediately prior to such improvement, change, addition or alteration. Any part added to the Equipment in connection with any improvement, change, addition or alteration shall immediately, without further act, become part of the Equipment and subject to the security interest created by this Loan and Security Agreement.

(h)     Inspection.  Lender may at any reasonable time or times inspect the Equipment and may at any reasonable time or times inspect the books and records of Borrower.

(i)     Taxes.  Borrower shall promptly pay, when due, all charges, fees, assessments and taxes (excluding all taxes measured by Lender's income) which may now or hereafter be imposed upon the ownership, leasing, possession, sale or use of the Collateral.

(j)     Performance by Lender.  If Borrower fails to perform any agreement or obligation contained herein, Lender may itself perform, or cause the performance of such agreement or obligation.  Borrower will pay, or reimburse Lender, on demand, for any and all fees, including attorneys' fees, costs and expenses of whatever kind or nature incurred by Lender in connection with (i) the creation, preservation and protection of Lender's security interest in the Collateral, including, without limitation, all fees and taxes in connection with the recording or filing of instruments and documents in public offices, (ii) payments or discharge of any taxes or liens upon or in respect of the Collateral, (iii) premiums for insurance with respect to the Equipment and (iv) this Loan and Security Agreement and with protecting, maintaining or preserving the Collateral and Lender's interests therein, whether through judicial proceedings or otherwise, or in connection with defending or prosecuting any actions, suits or proceedings arising out of or related to the Loan and Security Agreement and the Loan Documents or in connection with any debt restructuring, loan workout negotiations or bankruptcy or insolvency case or proceedings.  All such amounts shall constitute obligations of Borrower secured by the Collateral.  In the event that Borrower fails to perform any of its agreements contained herein, Borrower will, on demand, reimburse Lender for all such expenditures, together with interest thereon from the date of such expenditure until fully reimbursed at the rate of two percent (2%) per month on the outstanding balance of such expenditures or the highest rate permitted by law, whichever is less.

(k)     Power of Attorney.  Borrower hereby irrevocably appoints Lender Borrower's attorney-in-fact, with full authority in the place and stead of Borrower and in the name of Borrower or otherwise, from time to time in the Lender's discretion, to take any action and to execute any instrument which Lender may deem necessary or advisable to accomplish the purposes of this Loan and Security Agreement, including, without limitation: (i) to obtain, compromise and adjust insurance required to be paid to Lender; (ii) to ask, demand, collect, sue for, recover, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; (iii) to receive, endorse, and collect any drafts or other instruments, documents; and chattel paper in connection with clause (i) or (ii) above; and (iv) to file any claims or take any action or institute any proceedings which Lender may deem necessary or desirable for the collection of any of the Collateral or otherwise to enforce the rights of Lender with respect to any of the Collateral.

(l)     No Duties.  The powers conferred on Lender hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, Lender shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Collateral.

 

(m)    Financial Data. Borrower will furnish to Lender and will cause any guarantor of Borrower's obligations to furnish to Lender on request (i) annual balance sheet and profit and loss statements prepared in accordance with generally accepted accounting principles and practices consistently applied and, if Lender so requires, accompanied by the annual audit report of an independent certified public accountant reasonably acceptable to Lender, and (ii) all other financial information and reports that Lender may from time to time reasonably request, including, if Lender so requires, income tax returns of Borrower and any guarantor of Borrower's obligations hereunder.

7.    Conditions of Borrowing. Lender shall not be obligated to make any loan hereunder unless:

(a)    The Interim Notes or Term Notes evidencing such loan shall have been duly executed and delivered to Lender;

(b)    Borrower shall have executed and delivered to Lender the Supplemental Security Agreement describing the Collateral and stating, except with respect to progress payment fundings, the location thereof;

(c)    Except with respect to progress payment fundings, Lender shall have received evidence (as described in Section 6d hereof) that insurance has been obtained in accordance with the provisions of this Loan and Security Agreement;

(d)    Lender shall have received any and all third party consents, waivers or releases deemed necessary or desirable by it in connection with the loan and the Collateral being financed, including, without limitation, Uniform Commercial Code lien releases and the consent and waiver, in form and substance satisfactory to Lender, of each and every realty owner, landlord and mortgagee holding an interest in or encumbrance on the real property where any of the Collateral is to be located;

(e)    All filings, recordings and other actions deemed necessary or desirable by Lender in order to establish, protect, preserve and perfect its security interest in the Collateral being financed by such loan as a valid perfected first priority security interest shall have been duly effected, including, without limitation, the filing of financing statements and the recordation of landlord (owners) and/or mortgagee waivers or disclaimers, all in form and substance satisfactory to Lender, and all fees, taxes and other charges relating to such filings and recordings shall have been paid by Borrower;

(f)    The representations and warranties contained in this Loan and Security Agreement shall be true and correct in all respects on and as of the date of the making of any loan hereunder with the same effect as if made on and as of such date;

(g)    In the sole judgment of Lender, there shall have been no material adverse change in the financial condition, business or operations of Borrower from the earliest date of any financial statement, credit report, business report or similar document submitted to Lender for its review;

(h)    All Loan Documents shall be satisfactory to Lender's attorneys; and

(i)    Lender shall have received, in form and substance satisfactory to Lender, such other documents as Lender shall require including, but not limited to, a Request, proof of payment, vendor invoices and certificates of authority and incumbency.

8.    Default. The occurrence of any of the following events, following the giving of any required notice and/or the expiration of any applicable period of grace, shall constitute an event of default ("Event of Default") hereunder:

(a)    Borrower's default in payment of any installment of the principal of or interest on any Interim Note or Term Note when and after the same shall become due and payable, whether at the due date thereof or by acceleration or otherwise, which default shall continue unremedied for ten (10) days; or

(b)    The failure by Borrower to make payment of any other amount payable hereunder or under any Interim Note or Term Note, and the continuance of such failure for more than ten (10) days after written notice thereof by Lender to Borrower; or

(c)    The failure by Borrower to perform or observe any covenant, condition, obligation or agreement to be performed or observed by it hereunder, which failure shall continue unremedied for thirty (30) days after written notice thereof by Lender to Borrower; or

(d)    The occurrence of a default described in Section 4 hereof; or

(e)    Any warranty, representation or statement made or furnished with respect to the Borrower or the Collateral to Lender by or on behalf of Borrower, in connection with this Loan and Security Agreement, or the indebtedness secured hereby, shall prove to have been false in any adverse, material respect when made or furnished; or

(f)    Borrower shall become insolvent or bankrupt or make an assignment for the benefit of creditors or consent to the appointment of a trustee or receiver; or a trustee or a receiver shall be appointed for Borrower or for a substantial part of its property without its consent and shall not be dismissed for a period of sixty (60) days; or bankruptcy, reorganization, liquidation, insolvency or dissolution proceedings shall be instituted by or against Borrower and, if instituted against Borrower, shall be consented to or be pending and not dismissed for a period of sixty (60) days; or any execution or writ of process shall be issued under any action or proceeding against Borrower in such capacity whereby any of the Collateral may be taken or restrained; Borrower shall cease doing business as a going concern; or, without the prior written consent of Lender, Borrower shall sell, transfer or dispose of all or substantially all of its assets or property; or

(g)    The liquidation, merger, consolidation, reorganization, conversion to an "S" status or dissolution, if Borrower is a corporation or partnership, of Borrower, if in Lender's reasonable opinion, such act shall materially and adversely affect Borrower's ability to perform under any of the Loan Documents; or



(h)    Any item of Collateral is seized or levied on under legal or governmental process or for any reason Lender deems itself insecure. Lender shall be entitled to deem itself insecure when some event occurs, fails to occur or is threatened or some objective condition exists or is threatened which significantly impairs the prospects that any of Borrower's obligations to Lender will be paid when due, which significantly impairs the value of the Collateral to Lender or which significantly affects the financial or business condition of Borrower.

The occurrence of an Event of Default shall terminate any commitment or obligation by Lender to make any of the loans contemplated by this Loan and Security Agreement.

9.    **Remedies Upon Default.**  Upon the occurrence of an Event of Default hereunder, Lender may, at its option, do any one or more of the following:

(a)    Declare all obligations of Borrower to Lender to be immediately due and payable, whereupon all unpaid principal of and interest on said indebtedness and other amounts declared due and payable shall be and become immediately due and payable;

*(b)    Take possession of all or any of the Collateral and exclude therefrom Borrower and all others claiming under Borrower, and thereafter hold, store, use, operate, manage, maintain and control, make repairs, replacements, alterations, additions and improvements to and exercise all rights and powers of Borrower in respect to the Collateral or any part thereof. In the event Lender demands, or attempts to take possession of the Collateral in the exercise of any rights under this Loan and Security Agreement, Borrower promises and agrees to promptly turn over and deliver complete possession thereof to Lender;*

(c)    Require Borrower to assemble the Collateral, or any portion thereof, at a place designated by Lender and reasonably convenient to both parties, and promptly to deliver such Collateral to Lender or an agent or representative designated by it;

(d)    Sell, lease or otherwise dispose of the Collateral at public or private sale, without having the Collateral at the place of sale, and upon terms and in such manner as Lender may determine (and Lender may be a purchaser at any sale); and

(e)    Exercise any remedies of a secured party under the Uniform Commercial Code as adopted in the state where the Collateral is located or any other applicable law.

Except as to portions of the Collateral which are perishable or threaten to decline speedily in value or are of a type customarily sold on a recognized market, Lender shall give Borrower at least ten (10) days' prior written notice of the time and place of any public or private sale of the Collateral or other intended disposition thereof to be made. Such notice may be mailed to Borrower at the address set forth in the first paragraph of this Loan and Security Agreement. Borrower hereby specifically agrees (to the extent that applicable law and public policy allows it to effectively do so) that any public or private sale held in accordance with the terms of this Loan and Security Agreement shall, for the purpose of the Uniform Commercial Code as adopted in the state where the Collateral is located and for all other purposes, be deemed to have been conducted in a commercially reasonable manner and in good faith.

The proceeds of any sale under Section 9(d) shall be applied as follows:

(i)    To the repayment of the costs and expenses of retaking, holding and preparing for the sale and the selling of the Collateral (including legal expenses and attorneys' fees) and the discharge of all assessments, encumbrances, charges or liens, if any, on the Collateral prior to the lien hereof (except any taxes, assessments, encumbrances, charges or liens subject to which such sale shall have been made);

(ii)    To the payment of the whole amount then due and unpaid of the indebtedness of Borrower to Lender;

(iii)    To the payment of other amounts then secured hereunder; and

(iv)    The surplus, if any, shall be paid to the Borrower or to whomsoever may be lawfully entitled to receive the same.

Lender shall have the right to enforce one or more remedies hereunder, successively or concurrently, and such action shall not operate to stop or prevent Lender from pursuing any further remedy which it may have, and any repossession or retaking or sale of the Collateral pursuant to the terms hereof shall not operate to release Borrower until full payment of any deficiency has been made in cash.

10.    **Limitation on Interest.**  It is the intent of the parties to this Loan and Security Agreement to contract in strict compliance with applicable usury laws from time to time in effect. In furtherance thereof, the parties stipulate and agree that none of the terms and provisions contained in the Loan Documents shall ever be construed to create a contract to pay for the use, forbearance or detention of money at a rate in excess of the maximum interest rate permitted to be charged by applicable law from time to time in effect.

11.    **Personal Property/Tags.**  No item of Equipment will be attached or affixed to realty or any building without Lender's prior knowledge and written consent and waiver of the landlord and the mortgagee, if any, of the real property. If so requested by Lender, Borrower will affix tags supplied by Lender, reflecting Lender's security interest in the Equipment.

12.    **Loss and Damage.**  Borrower shall bear the risk of damage, loss, theft, or destruction, partial or complete of the Equipment, whether or not such loss or damage is covered by insurance, except that while Borrower is not in default, Lender agrees to apply toward payment of obligations of Borrower insurance proceeds payable to Lender by reason of such damage, loss, theft, or destruction. In the event of any damage, loss, theft, or destruction, partial or complete, of any item of Equipment, Borrower shall promptly notify Lender in writing and at the option of Lender (a) repair or restore the Equipment to good condition and working order, or (b) replace the Equipment with similar equipment in good repair, condition and working order, or (c) pay Lender, in cash, an amount equal to the unamortized equipment cost for the item or if the Equipment was not purchased with the loan proceeds, the pro rata portion of the outstanding principal balance due under the Interim Note or Term Note, as the case may be, and all other amounts relating to that item of Equipment then due and owing hereunder, and upon payment of

 

that amount, Lender's lien shall be terminated with respect to that item of Equipment only, and Lender will release its interest in that item of Equipment.

13.    **Assignment.** Borrower may not assign or transfer any rights under this Loan and Security Agreement or to the Collateral without Lender's prior written consent.

14.    **Indemnification.** Borrower shall indemnify and hold harmless Lender from and against any and all claims, losses, liabilities, causes of action, costs and expenses (including the fees of Lender's attorneys) ("Claims") in any way relating to or arising out of this Loan and Security Agreement, the other Loan Documents or the Collateral, except for any Claims resulting solely and directly from Lender's gross negligence or willful misconduct.

15.    **Notices.** Whenever Borrower or Lender shall desire to give or serve any notice, demand, request or other communication with respect to this Loan and Security Agreement, each such notice, demand, request or communication shall be in writing and shall be effective only if the same is physically delivered or is by certified mail, postage prepaid, return receipt requested, or by overnight courier, postage prepaid, mailed to the parties at the addresses set forth in the first paragraph of this Loan and Security Agreement, with a copy to Lender's Vice President of Credit. Any party hereto may change its address for such notices by delivering or mailing to the other parties hereto, as aforesaid, a notice of such change.

16.    **No Waiver by Lender.** By exercising or failing to exercise any of its rights, options or elections hereunder, Lender shall not be deemed to have waived any breach or default on the part of Borrower or to have released Borrower from any of the obligations secured hereby, unless such waiver or release is in writing and is signed by Lender. In addition, the waiver by Lender of any breach hereof for default in payment of an indebtedness secured hereby shall not be deemed to constitute a waiver of any succeeding breach or default.

17.    **Further Agreements.** From time to time, Borrower will execute such further instruments as Lender may reasonably require, in order to protect, preserve, and maintain the security interest granted hereby.

18.    **Binding Upon Successors.** All agreements, covenants, conditions and provisions of this Loan and Security Agreement shall apply to and bind the successors and assigns of all parties hereto.

19.    **Governing Laws.** This Loan and Security Agreement shall be governed by the laws of the State of Washington.

20.    **Amendment.** This Loan and Security Agreement can be modified or rescinded only by a writing expressly referring to this Loan and Security Agreement, signed by both of the parties hereto.

21.    **Invalidity of Provisions.** Every provision of this Loan and Security Agreement is intended to be severable. In the event that any term or provision hereof is declared by a court to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable, then to the extent possible all of the other provisions shall nonetheless remain in full force and effect.

IN WITNESS WHEREOF, Borrower and Lender have duly executed this Loan and Security Agreement the day and year first above written.

Lender:    General Electric Capital Business Asset Funding Corporation

By:

(Print Name):

Title:

Borrower:    Le Petit Bistro, Inc.

By:

(Print Name):    ALI M. KABIRI

Title:    PRESIDENT

Social Security Number: (if Borrower is an individual)    410  21  3305

FEIN:    58 - 2205976

 

NO: 1-3892

$ 240,492.26

**INTERIM PROMISSORY NOTE NO. ONE**

August 19, 1999

FOR VALUE RECEIVED, the undersigned, Le Petit Bistro, Inc. ("Maker"), promises to pay to the order of General Electric Capital Business Asset Funding Corporation ("Payee"), at its office at 10900 N.E. 4th Street, Suite 500, Bellevue, Washington 98004, the principal sum of Two Hundred Forty Thousand Four Hundred Ninety-Two Dollars and Twenty-Six Cents ($240,492.26) together with interest on unpaid principal from the date of disbursement of such principal amount until payment in full at a rate per annum equal to 475 basis points (4.75%) over the then weekly average yield of 3 (three) year U.S. Treasury Constant Maturities as published in the Federal Reserve Statistical Release H.15[519] (the "Reference Rate"). The Reference Rate shall be adjusted as of the date of any announced change thereto. Interest shall be computed on the basis of a 360 day year and actual days elapsed. Interest shall accrue on the unpaid principal, commencing on the date that funds are advanced to Maker by Payee hereunder and shall be payable on the fifteenth (15) day of each month until ____11/5/99____ on which date the entire balance of principal and interest unpaid shall be due and payable.

In the event that Payee does not receive any monthly payment on the date due, Maker will pay Payee a late charge of five percent (5%) of the monthly payment outstanding together with the monthly payment and, provided said sum is received within ten (10) days of the date due, Payee agrees not to demand immediate payment of the whole sum of principal and interest as otherwise permitted herein.

If, from any circumstances whatsoever, payment of any obligation due under this Note at the time such performance shall be due shall involve exceeding the maximum amount currently prescribed by any applicable usury statute or any other applicable law, then such obligation shall be reduced to such maximum amount so that in no event shall any payment be possible under this Note, or under any other instrument evidencing or securing the indebtedness evidenced hereby, that is in excess of such maximum amount.

In the event that an Event of Default shall occur under the Loan and Security Agreement (as hereinafter defined) or any other instrument now or hereafter securing repayment hereof, following any required notice and/or the expiration of any applicable period of grace, then, and in such event, the principal indebtedness evidenced hereby, and any other sums advanced hereunder, together with all unpaid interest accrued thereon, shall, at the option of Payee, at once become due and payable and may be collected forthwith, regardless of the stipulated date of maturity. TIME IS OF THE ESSENCE OF THIS NOTE. Interest shall accrue on the outstanding principal for so long as such default continues, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein, at the rate equal to the lesser of fifteen percent (15%) per annum or the maximum rate allowable under law. All such interest shall be paid at the time of and as a condition precedent to the curing of any such default should Payee, at its sole option, allow such default to be cured. In the event this Note, or any part thereof, is collected by or through an attorney-at-law, Maker agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees, whether or not suit is filed.

This Interim Note is one of the notes referred to in and is secured by the Loan and Security Agreement dated April 5, 1999 between Maker and Payee. The terms of the Loan and Security Agreement are incorporated herein by reference.

Maker waives any right of exemption and waives presentment, protest and demand and notice of protest, demand and of dishonor and nonpayment of this Interim Note, and consents that any holder hereof shall have the right, without notice, to grant any extension or extensions of time for payment of this Interim Note or any part thereof or any other indulgences or forbearances whatsoever, or may release any of the security of this Interim Note without in any way affecting the liability of any other party for the payment of this Interim Note.

The due payment and performance of Maker's obligations hereunder shall be without regard to any counterclaim, right of offset, or any other counterclaim whatsoever which Maker may have against Payee and without regard to any other obligations of any nature whatsoever which Payee may have to Maker, and no such counterclaim or offset shall be asserted by Maker in any action, suit or proceeding instituted by Payee for payment of Maker's obligations hereunder.

This Interim Note and the Loan and Security Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

Maker acknowledges that there is no presumption that the value of the property securing this Interim Note is equal to the face amount of the Interim Note, and that a deficiency judgment may be necessary in proceedings taken for enforcement hereof.

No amendment to this Interim Note shall be binding upon Payee unless it is in writing and duly signed by Payee.

IN WITNESS WHEREOF, the Maker has caused these presents to be duly signed the date first above written.

Maker:     Le Petit Bistro, Inc.

By:

(Print Name)    ALI M. KABILI

Title:     PRESIDENT

Address:     5600  ROSWELL RD
            EAST BLDG  STE 250
            ATL., GA  30342

 

| No. | 1-3892-001 | | **TERM PROMISSORY NOTE** |
|---|---|---|---|
| $ | 232,633.64 | August 6, _____ . 19 99 | |

FOR VALUED RECEIVED, the undersigned, Le Petit Bistro, Inc., ("Maker"), promises to pay to the order of GE Capital Business Asset Funding Corp. ("Payee"), at its office at P.O. Box C-97550, Bellevue, Washington 98009, the principal sum of Two Hundred Thirty-Two Thousand Six Hundred Thirty-Three Dollars and Sixty-Four Cents ($232,633.64) together with interest on unpaid principal from the date of disbursement of such principal amount until payment in full at a rate of Ten and 39/100's percent (10.39%) per annum ("Rate") computed on the basis of a 360 day year of twelve consecutive thirty day months. Interest hereunder shall be paid on the unpaid principal, together with principal, in Fifty-Eight 58 installments of Five Thousand One Hundred Sixty-Three Dollars and Twenty-Eight Cents ($5,163.28) commencing on _9/6/99_ and Monthly thereafter until _7/6/2204_, on which date the entire balance of principal and interest unpaid shall be due and payable. It is agreed that each installment, when paid, shall be applied by the holder hereof, first so much as shall be required to the payment of interest accrued as specified hereto, and the balance thereof to the repayment of the principal sum.

The Rate expressed above will be adjusted at Loan Closing in accordance with the following formula: The interest rate expressed above will be increased or decreased 1% for each 1% (or pro rata for any fraction of 1%) change in the current weekly average yield of 3-year U.S. Treasury Constant Maturities as published in the *Federal Reserve Statistical Release H.15[519]*.

Except as may be otherwise expressly provided herein, this Note may not be prepaid in whole or in part, except with the prior written consent of Payee. Maker shall have the privilege of prepaying all (but not part) of the then outstanding balance under this Note on _September 6, 2001_, or on any installment due date thereafter, subject to giving thirty (30) days prior written notice to Payee specifying the date of prepayment and further subject to payment of a prepayment premium equal to the amount, if any, required to offset the adverse impact to Payee of any decline in interest rates. The prepayment premium is determined by (i) calculating the decrease, expressed in basis points (but not less than zero) in the current weekly average yield for Three (3)-Year U.S. Treasury Constant Maturities as published in *Federal Reserve Statistical Release H.15[519]* (the "Index") from the weekly average yield of _5.65%_ as of _August 6, 1999_ to the Friday (or, if Friday is not a business day, the last business day) of the week immediately preceding the prepayment date (ii) dividing the difference by 100, (iii) multiplying the result by the applicable "Premium Factor" set forth below, and (iv) multiplying the product by the principal to be prepaid. Any prepayment shall be applied first to the prepayment premium, if any, next to accrued interest and late charges (if any), and thereafter to the principal then outstanding. The Premium Factor shall be the amount shown on the following chart for the month in which prepayment occurs.

| Number of Months Remaining | (Years) | Premium Factor |
|---|---|---|
| 38 - 25 | ( 3 ) | .014 |
| 24- 13 | ( 2 ) | .010 |
| 12- 1 | ( 1 ) | .005 |

In the event the Federal Reserve Board ceases to publish *Statistical Release H.15[519]*, then the decrease in 3-Year U.S. Treasury Constant Maturities will be determined from another source designated by Payee.

If Maker shall have given to Payee notice of Maker's intention to so prepay, Maker shall not then be entitled to withdraw such notice, and the indebtedness proposed to be prepaid in such notice together with the aforesaid prepayment fee, if applicable, shall be due and payable upon the date specified for such prepayment in such notice. Upon the occurrence of an Event of Default and acceleration of payment of indebtedness evidenced hereby during a period open to prepayment, Maker shall pay to Payee, in addition to any and all other sums due and payable hereunder, as liquidated damages for the loss of Payee's investment and not as a penalty, an amount equal to the prepayment fee which would have been payable hereunder on such date of acceleration in the event of a voluntary prepayment. Maker and Payee agree that the foregoing amounts do not constitute penalties but rather constitute reasonable calculations of the investment loss that would be sustained by Payee in the event of such prepayment.

It is specifically understood and agreed by Maker that, in the event of a default under this Note or under any instrument securing the Note, a tender of payment of the unpaid principal and accrued interest then outstanding shall be deemed a prepayment, and, accordingly, said tender must include the premium herein above required, or if said tender is made prior to the time this privilege is operative, then said tender must include a premium equal to six (6) months' interest at the Rate computed on the principal amount so tendered. It is further understood and agreed by Maker that Payee shall not be obligated to accept said tender, and said tender shall for all purposes be deemed ineffectual and deficient, unless said tender shall include the premium herein above required.

In the event that Payee does not receive any payment on the date due, Maker will pay Payee a late charge of five percent (5%) of the payment outstanding together with the payment and, provided said sum is received within ten (10) days of the date due, Payee agrees not to demand immediate payment of the whole sum of principal and interest as otherwise permitted herein.

If, from any circumstances whatsoever, payment of any obligation due under this Note at the time such performance shall be due shall involve exceeding the maximum amount currently prescribed by any applicable usury statute or any other applicable law, then such obligation shall be reduced to such maximum amount, so that in no event shall any payment be possible under this Note; or under any other instrument evidencing or securing the indebtedness evidenced hereby, that is in excess of such maximum amount.

In the event that an Event of Default shall occur under the Loan and Security Agreement (as hereinafter defined) or any other instrument now or hereafter securing repayment hereof, following any required notice and/or the expiration of any applicable period of grace, then, and in such event, the principal indebtedness evidenced hereby, and any other sums advanced hereunder, together with all unpaid interest accrued thereon, shall, at the option of Payee, at once become due and payable and may be collected forthwith, regardless of the stipulated date of maturity. TIME IS OF THE ESSENCE WITH RESPECT TO THIS NOTE. Interest shall accrue on the outstanding principal for so long as such default continues, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein, at the rate equal to the lesser of fifteen percent (15%) per annum or the maximum rate allowable under law. All such interest shall be paid at the time of and as a condition precedent to the curing of

any such default should Payee, at its sole option, allow such default to be cured. In the event this Note, or any part thereof, is collected by or through an attorney-at-law, Maker agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees, whether or not suit is filed.

This Note is one of the notes referred to in and is secured by the Loan and Security Agreement dated April 5, 1999 between Maker and Payee. The terms of the Loan and Security Agreement are incorporated herein by reference.

Maker waives any right of exemption and waives presentment, protest and demand and notice of protest, demand and of dishonor and nonpayment of this Note, and consents that any holder hereof shall have the right, without notice, to grant any extension or extensions of time for payment of this Note or any part thereof or any other indulgences or forbearances whatsoever, or may release any of the security for this Note without in any way affecting the liability of any other party for the payment of this Note.

The due payment and performance of Maker's obligations hereunder shall be without regard to any counterclaim, right of offset, or any other counterclaim whatsoever which Maker may have against Payee and without regard to any other obligations of any nature whatsoever which Payee may have to Maker, and no such counterclaim or offset shall be asserted by Maker in any action, suit or proceeding instituted by Payee for payment of Maker's obligations hereunder.

This Note and the Loan and Security Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

Maker acknowledges that there is no presumption that the value of the property securing this Note is equal to the face amount of the Note, and that a deficiency judgment may be necessary in proceedings taken for enforcement hereof.

No amendment to this Note shall be binding upon Payee unless it is in writing and duly signed by Payee.

IN WITNESS WHEREOF, the Maker has caused these presents to be duly signed the date first above written.

Witness: _____

Borrower:      Le Petit Bistro, Inc.

By: _____

(Print Name)   ALi m. KABEI

Title:   PRESIDENT

 

No. 1-3892-002

**TERM PROMISSORY NOTE**

$ 244,210.30

November 5, ___, 19 99

FOR VALUED RECEIVED, the undersigned, Le Petit Bistro, Inc. ("Maker"), promises to pay to the order of General Electric Capital Business Asset Funding Corporation ("Payee"), at its office at 10900 N.E. 4th St., Suite 500, Box C-97550, Bellevue, Washington 98009, the principal sum of Two Hundred Forty-Four Thousand Two Hundred Ten Dollars and Thirty Cents ($244,210.30) together with interest on unpaid principal from the date of disbursement of such principal amount until payment in full at a rate of Ten and 75/100's percent (10.75%) per annum ("Rate") computed on the basis of a 360 day year of twelve consecutive thirty day months. Interest hereunder shall be paid on the unpaid principal, together with principal, in Fifty-Eight (58) installments of Five Thousand Four Hundred Sixty-Five Dollars and Sixty-Three Cents ($5,465.63) commencing Sixty (60) days after funding of each facility and monthly thereafter until October 5, 2004 on which date the entire balance of principal and interest unpaid shall be due and payable. It is agreed that each installment, when paid, shall be applied by the holder hereof, first so much as shall be required to the payment of interest accrued as specified hereto, and the balance thereof to the repayment of the principal sum.

Except as may be otherwise expressly provided herein, this Note may not be prepaid in whole or in part, except with the prior written consent of Payee. Maker shall have the privilege of prepaying all (but not part) of the then outstanding balance under this Note on 12/5/01 or on any installment due date thereafter, subject to giving thirty (30) days prior written notice to Payee specifying the date of prepayment and further subject to payment of a prepayment premium equal to the amount, if any, required to offset the adverse impact to Payee of any decline in interest rates. The prepayment premium is determined by (i) calculating the decrease, expressed in basis points (but not less than zero) in the current weekly average yield for Three (3) year U.S. Treasury Constant Maturities as published in Federal Reserve Statistical Release H.15(519) (the "Index") from the weekly average yield of 6.01% as of November 5, 1999 to the Friday (or, if Friday is not a business day, the last business day) of the week immediately preceding the prepayment date (ii) dividing the difference by 100, (iii) multiplying the result by the applicable "Premium Factor" set forth below, and (iv) multiplying the product by the principal to be prepaid. Any prepayment shall be applied first to the prepayment premium, if any, next to accrued interest and late charges (if any), and thereafter to the principal then outstanding. The Premium Factor shall be the amount shown on the following chart for the month in which prepayment occurs.

| Number of Months Remaining | (Years) | Premium Factor |
|---|---|---|
| 24 - 13 | ( 2) | .010 |
| 12 - 1 | ( 1) | .005 |

In the event the Federal Reserve Board ceases to publish Statistical Release H.15(519), then the decrease in Three (3) - Year U.S. Treasury Constant Maturities will be determined from another source designated by Payee.

If Maker shall have given to Payee notice of Maker's intention to so prepay, Maker shall not then be entitled to withdraw such notice, and the indebtedness proposed to be prepaid in such notice together with the aforesaid prepayment fee, if applicable, shall be due and payable upon the date specified for such prepayment in such notice. Upon the occurrence of an Event of Default and acceleration of payment of indebtedness evidenced hereby during a period open to prepayment, Maker shall pay to Payee, in addition to any and all other sums due and payable hereunder, as liquidated damages for the loss of Payee's investment and not as a penalty, an amount equal to the prepayment fee which would have been payable hereunder on such date of acceleration in the event of a voluntary prepayment. Maker and Payee agree that the foregoing amounts do not constitute penalties but rather constitute reasonable calculations of the investment loss that would be sustained by Payee in the event of such prepayment.

It is specifically understood and agreed by Maker that, in the event of a default under this Note or under any instrument securing the Note, a tender of payment of the unpaid principal and accrued interest then outstanding shall be deemed a prepayment, and, accordingly, said tender must include the premium herein above required, or if said tender is made prior to the time this privilege is operative, then said tender must include a premium equal to six (6) months' interest at the Rate computed on the principal amount so tendered. It is further understood and agreed by Maker that Payee shall not be obligated to accept said tender, and said tender shall for all purposes be deemed ineffectual and deficient, unless said tender shall include the premium herein above required.

In the event that Payee does not receive any payment on the date due, Maker will pay Payee a late charge of five percent (5%) of the payment outstanding together with the payment and, provided said sum is received within ten (10) days of the date due, Payee agrees not to demand immediate payment of the whole sum of principal and interest as otherwise permitted herein.

If, from any circumstances whatsoever, payment of any obligation due under this Note at the time such performance shall be due shall involve exceeding the maximum amount currently prescribed by any applicable usury statute or any other applicable law, then such obligation shall be reduced to such maximum amount, so that in no event shall any payment be possible under this Note, or under any other instrument evidencing or securing the indebtedness evidenced hereby, that is in excess of such maximum amount.

In the event of Default shall occur under the Loan and Security Agreement (as hereinafter defined) or any other instrument now or hereafter securing repayment hereof, following any required notice and/or the expiration of any applicable period of grace, then, and in such event, the principal indebtedness evidenced hereby, and any other sums advanced hereunder, together with all unpaid interest accrued thereon, shall, at the option of Payee, at once become due and payable and may be collected forthwith, together with the stipulated date of maturity. TIME IS OF THE ESSENCE WITH RESPECT TO THIS NOTE. Interest shall accrue on the outstanding principal for so long as such default continues, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein, at the rate equal to the lesser of fifteen percent (15%) per annum or the maximum rate allowable under law. All such interest shall be paid at the time of and as a condition precedent to the curing of any such default should Payee, at its sole option, allow such default to be cured. In the event this Note, or any part thereof, is collected by or through an attorney-at-law, Maker agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees, whether or not suit is filed.

This Note is one of the notes referred to in and is secured by the Loan and Security Agreement dated April 5, 1999 between Maker and Payee. The terms of the Loan and Security Agreement are incorporated herein by reference.

This Note consolidates the following Interim Notes executed by Maker in favor of Payee:





| Interim Note Number | Date | Principal Amount |
|---|---|---|
| One | August 19, 1999 | $77,315.15 (Request for Loan Proceeds #3) |
| Two | September 23, 1999 | $95,000.00 (Request for Loan Proceeds #5) |
| Final Funding | to be determined | $71,855.15 (Request for Loan Proceeds #8) |

Maker waives any right of exemption and waives presentment, protest and demand and notice of protest, demand and of dishonor and nonpayment of this Note, and consents that any holder hereof shall have the right, without notice, to grant any extension or extensions of time for payment of this Note or any part thereof or any other indulgences or forbearances whatsoever, or may release any of the security for this Note without in any way affecting the liability of any other party for the payment of this Note.

The due payment and performance of Maker's obligations hereunder shall be without regard to any counterclaim, right of offset, or any other counterclaim whatsoever which Maker may have against Payee and without regard to any other obligations of any nature whatsoever which Payee may have to Maker, and no such counterclaim or offset shall be asserted by Maker in any action, suit or proceeding instituted by Payee for payment of Maker's obligations hereunder.

This Note and the Loan and Security Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

Maker acknowledges that there is no presumption that the value of the property securing this Note is equal to the face amount of the Note, and that a deficiency judgment may be necessary in proceedings taken for enforcement hereof.

No amendment to this Note shall be binding upon Payee unless it is in writing and duly signed by Payee.

IN WITNESS WHEREOF, the Maker has caused these presents to be duly signed the date first above written.

Borrower:    Le Petit Bistro, Inc.

By:

Witness:

(Print Name)    Ali M. KABIRI

Title:    PRESIDENT

 

No.  1-3892-003

**TERM PROMISSORY NOTE**

$  296,201.17                     November 5         , 19  99

FOR VALUED RECEIVED, the undersigned, Le Petit Bistro, Inc. ("Maker"), promises to pay to the order of General Electric Capital Business Asset Funding Corporation ("Payee"), at its office at 10900 N.E. 4th St., Suite 500, Box C-97550, Bellevue, Washington 98009, the principal sum of Two Hundred Ninety-Six Thousand Two Hundred One Dollars and Seventeen Cents ($296,201.17) together with interest on unpaid principal from the date of disbursement of such principal amount until payment in full at a rate of Ten and 75/100's percent (10.75%) per annum ("Rate") computed on the basis of a 360 day year of twelve consecutive thirty day months. Interest hereunder shall be paid on the unpaid principal, together with principal, in Fifty-Eight (58) installments of Six Thousand Six Hundred Twenty-Nine Dollars and Twenty-Two Cents ($6,629.22) commencing Sixty (60) days after funding of each facility and monthly thereafter until _October 5, 2004_ on which date the entire balance of principal and interest unpaid shall be due and payable. It is agreed that each installment, when paid, shall be applied by the holder hereof, first so much as shall be required to the payment of interest accrued as specified herein, and the balance thereof to the repayment of the principal sum.

Except as may be otherwise expressly provided herein, this Note may not be prepaid in whole or in part, except with the prior written consent of Payee. Maker shall have the privilege of prepaying all (but not part) of the then outstanding balance under this Note on _12/5/01_ or on any installment due date thereafter, subject to giving thirty (30) days prior written notice to Payee specifying the date of prepayment and further subject to payment of a prepayment premium equal to the amount, if any, required to offset the adverse impact to Payee of any decline in interest rates. The prepayment premium is determined by (i) calculating the decrease, expressed in basis points (but not less than zero) in the current weekly average yield for Three (3) year U.S. Treasury Constant Maturities as published in Federal Reserve Statistical Release H.15(519) (the "Index") from the weekly average yield of _6.01%_ as of _November 5, 1999_ to the Friday (or, if Friday is not a business day) the last business day) of the week immediately preceding the prepayment date (II) dividing the difference by 100, (iii) multiplying the result by the applicable "Premium Factor" set forth below, and (iv) multiplying the product by the principal to be prepaid. Any prepayment shall be applied first to the prepayment premium, if any, next to accrued interest and late charges (if any), and thereafter to the principal then outstanding. The Premium Factor shall be the amount shown on the following chart for the month in which prepayment occurs.

| Number of Months Remaining | (Years) | Premium Factor |
|---|---|---|
| 24 - 13 | ( 2) | .010 |
| 12 - 1 | ( 1) | .005 |

In the event the Federal Reserve Board ceases to publish Statistical Release H.15(519), then the decrease in Three (3) - Year U.S. Treasury Constant Maturities will be determined from another source designated by Payee.

If Maker shall have given to Payee notice of Maker's intention to so prepay, Maker shall not then be entitled to withdraw such notice, and the indebtedness proposed to be prepaid in such notice together with the aforesaid prepayment fee, if applicable, shall be due and payable upon the date specified for such prepayment in such notice. Upon the occurrence of an Event of Default and acceleration of payment of indebtedness evidenced hereby during a period open to prepayment, Maker shall pay to Payee, in addition to any and all other sums due and payable hereunder, as liquidated damages for the loss of Payee's investment and not as a penalty, an amount equal to the prepayment fee which would have been payable hereunder on such date of acceleration in the event of a voluntary prepayment. Maker and Payee agree that the foregoing amounts do not constitute penalties but rather constitute reasonable calculations of the investment loss that would be sustained by Payee in the event of such prepayment.

It is specifically understood and agreed by Maker that, in the event of a default under this Note or under any instrument securing the Note, a tender of payment of the unpaid principal and accrued interest then outstanding shall be deemed a prepayment, and, accordingly, said tender must include the premium herein above required, or if said tender is made prior to the time this privilege is operative, then said tender must include a premium equal to six (6) months' interest at the Rate computed on the principal amount so tendered. It is further understood and agreed by Maker that Payee shall not be obligated to accept said tender, and said tender shall for all purposes be deemed ineffectual and deficient, unless said tender shall include the premium herein above required.

In the event that Payee does not receive any payment on the date due, Maker will pay Payee a late charge of five percent (5%) of the payment outstanding together with the payment and, provided said sum is received within ten (10) days of the date due, Payee agrees not to demand immediate payment of the whole sum of principal and interest as otherwise permitted herein.

If, from any circumstances whatsoever, payment of any obligation due under this Note at the time such performance shall be due shall involve exceeding the maximum amount currently prescribed by any applicable usury statute or any other applicable law, then such obligation shall be reduced to such maximum amount, so that in no event shall any payment be possible under this Note, or under any other instrument evidencing or securing the indebtedness evidenced hereby, that is in excess of such maximum amount.

In the event that an Event of Default shall occur under the Loan and Security Agreement (as hereinafter defined) or any other instrument now or hereafter securing repayment hereof, following any required notice and/or the expiration of any applicable period of grace, then, and in such event, the principal indebtedness evidenced hereby, and any other sums advanced hereunder, together with all unpaid interest accrued thereon, shall, at the option of Payee, at once become due and payable and may be collected forthwith, regardless of the stipulated date of maturity. TIME IS OF THE ESSENCE WITH RESPECT TO THIS NOTE. Interest shall accrue on the outstanding principal for so long as such default continues, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein, at the rate equal to the lesser of fifteen percent (15%) per annum or the maximum rate allowable under law. All such interest shall be paid at the time of and as a condition precedent to the curing of any such default should Payee, at its sole option, allow such default to be cured. In the event this Note, or any part thereof, is collected by or through an attorney-at-law, Maker agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees, whether or not suit is filed.

This Note is one of the notes referred to in and is secured by the Loan and Security Agreement dated April 5, 1999 between Maker and Payee. The terms of the Loan and Security Agreement are incorporated herein by reference.

This Note consolidates the following Interim Notes executed by Maker in favor of Payee:

7/3/00
To B+F - CT

LOANNEWLOANTERMNOTE (1/93)

| Interim Note Number |  Date |  Principal Amount |
|---|---|---|
| One | August 19, 1999 | $78,442.59 (Request for Loan Proceeds #2) |
| Two | September 23, 1999 | $95,000.00 (Request for Loan Proceeds #6) |
| Final Funding | to be determined | $122,758.58 (Request for Loan Proceeds #9) |

Maker waives any right of exemption and waives presentment, protest and demand and notice of protest, demand and of dishonor and nonpayment of this Note, and consents that any holder hereof shall have the right, without notice, to grant any extension or extensions of time for payment of this Note or any part thereof or any other indulgences or forbearances whatsoever, or may release any of the security for this Note without in any way affecting the liability of any other party for the payment of this Note.

The due payment and performance of Maker's obligations hereunder shall be without regard to any counterclaim, right of offset, or any other counterclaim whatsoever which Maker may have against Payee and without regard to any other obligations of any nature whatsoever which Payee may have to Maker, and no such counterclaim or offset shall be asserted by Maker in any action, suit or proceeding instituted by Payee for payment of Maker's obligations hereunder.

This Note and the Loan and Security Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

Maker acknowledges that there is no presumption that the value of the property securing this Note is equal to the face amount of the Note, and that a deficiency judgment may be necessary in proceedings taken for enforcement hereof.

No amendment to this Note shall be binding upon Payee unless it is in writing and duly signed by Payee.

IN WITNESS WHEREOF, the Maker has caused these presents to be duly signed the date first above written.

Borrower:   Le Petit Bistro, Inc.

By: _____

Witness: _____

(Print Name)   Azi M. Kabiri

Title:   President



No.  1-3892-004

S   269,013.03

November 5 , 19 99

**TERM PROMISSORY NOTE**

FOR VALUED RECEIVED, the undersigned, Le Petit Bistro, Inc. ("Maker"), promises to pay to the order of General Electric Capital Business Asset Funding Corporation ("Payee"), at its office at 10900 N.E. 4th St., Suite 500, Box C-97550, Bellevue, Washington 98009, the principal sum of Two Hundred Sixty-Nine Thousand Thirteen Dollars and Three Cents ($269,013.03) together with interest on unpaid principal from the date of disbursement of such principal amount until payment in full at a rate of Ten and 75/100"s percent (10.75%) per annum ("Rate") computed on the basis of a 360 day year of twelve consecutive thirty day months.  Interest hereunder shall be paid on the unpaid principal, together with principal, in Fifty-Eight (58) installments of Six Thousand Twenty Dollars and Seventy-Three Cents ($6,020.73) commencing Sixty (60) days after funding of each facility and monthly thereafter until  October 5, 2004  on which date the entire balance of principal and interest unpaid shall be due and payable.  It is agreed that each installment, when paid, shall be applied by the holder hereof, first so much as shall be required to the payment of interest accrued as specified hereto, and the balance thereof to the repayment of the principal sum.

Except as may be otherwise expressly provided herein, this Note may not be prepaid in whole or in part, except with the prior written consent of Payee.  Maker shall have the privilege of prepaying all (but not part) of the then outstanding balance under this Note on  12/5/01  or on any installment due date thereafter, subject to giving thirty (30) days prior written notice to Payee specifying the date of prepayment and further subject to payment of a prepayment premium equal to the amount, if any, required to offset the adverse impact to Payee of any decline in interest rates.  The prepayment premium is determined by (i) calculating the decrease, expressed in basis points (but not less than zero) in the current weekly average yield for Three (3) year U.S. Treasury Constant Maturities as published in Federal Reserve Statistical Release H.15(519) (the "Index") from the weekly average yield of  6.01%  as of  November 5, 1999  to the Friday (or, if Friday is not a business day, the last business day) of the week immediately preceding the prepayment date (ii) dividing the difference by 100, (iii) multiplying the result by the applicable "Premium Factor" set forth below, and (iv) multiplying the product by the principal to be prepaid. Any prepayment shall be applied first to the prepayment premium, if any, next to accrued interest and late charges (if any), and thereafter to the principal then outstanding.  The Premium Factor shall be the amount shown on the following chart for the month in which prepayment occurs.

| Number of Months Remaining | (Years) | Premium Factor |
|---|---|---|
| 24 - 13 | ( 2 ) | .010 |
| 12 -  1 | ( 1 ) | .005 |

In the event the Federal Reserve Board ceases to publish Statistical Release H.15(519), then the decrease in Three (3) - Year U.S. Treasury Constant Maturities will be determined from another source designated by Payee.

If Maker shall have given to Payee notice of Maker's intention to so prepay, Maker shall not then be entitled to withdraw such notice, and the indebtedness proposed to be prepaid in such notice together with the aforesaid prepayment fee, if applicable, shall be due and payable upon the date specified for such prepayment in such notice. Upon the occurrence of an Event of Default and acceleration of payment of indebtedness evidenced hereby during a period open to prepayment, Maker shall pay to Payee, in addition to any and all other sums due and payable hereunder, as liquidated damages for the loss of Payee's investment and not as a penalty, an amount equal to the prepayment fee which would have been payable hereunder on such date of acceleration in the event of a voluntary prepayment. Maker and Payee agree that the foregoing amounts do not constitute penalties but rather constitute reasonable calculations of the investment loss that would be sustained by Payee in the event of such prepayment.

It is specifically understood and agreed by Maker that, in the event of a default under this Note or under any instrument securing the Note, a tender of payment of the unpaid principal and accrued interest then outstanding shall be deemed a prepayment, and, accordingly, said tender must include the premium herein above required, or if said tender is made prior to the time this privilege is operative, then said tender must include a premium equal to six (6) months' interest at the Rate computed on the principal amount so tendered. It is further understood and agreed by Maker that Payee shall not be obligated to accept said tender, and said tender shall for all purposes be deemed ineffectual and deficient, unless said tender shall include the premium herein above required.

In the event that Payee does not receive any payment on the date due, Maker will pay Payee a late charge of five percent (5%) of the payment outstanding together with the payment and, provided said sum is received within ten (10) days of the date due, Payee agrees not to demand immediate payment of the whole sum of principal and interest as otherwise permitted herein.

If, from any circumstances whatsoever, payment of any obligation due under this Note at the time such performance shall be due shall involve exceeding the maximum amount currently prescribed by any applicable usury statute or any other applicable law, then such obligation shall be reduced to such maximum amount, so that in no event shall any payment be possible under this Note, or under any other instrument evidencing or securing the indebtedness evidenced hereby, that is in excess of such maximum amount.

In the event of an Event of Default under the Loan and Security Agreement (as hereinafter defined) or any other instrument now or hereafter securing repayment hereof, following any required notice and/or the expiration of any applicable period of grace, then, and in such event, the principal indebtedness evidenced hereby, and any other sums advanced hereunder, together with all unpaid interest accrued thereon, shall, at the option of Payee, at once become due and payable and may be collected forthwith, regardless of the stipulated date of maturity. TIME IS OF THE ESSENCE WITH RESPECT TO THIS NOTE. Interest shall accrue on the outstanding principal for so long as such default continues, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby as set forth herein, at the rate equal to the lesser of fifteen percent (15%) per annum or the maximum rate allowable under law. All such interest shall be paid at the time of and as a condition precedent to the curing of any such default should Payee, at its sole option, allow such default to be cured. In the event this Note, or any part thereof, is collected by or through an attorney-at-law, Maker agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees, whether or not suit is filed.

This Note is one of the notes referred to in and is secured by the Loan and Security Agreement dated April 5, 1999 between Maker and Payee. The terms of the Loan and Security Agreement are incorporated herein by reference.

This Note consolidates the following Interim Notes executed by Maker in favor of Payee:

LOANNEW.LOANTERMNOTE (1/93)




| Interim Note Number | Date | Principal Amount |
|---|---|---|
| One | August 19, 1999 | $84,694.52 (Request for Loan Proceeds #4) |
| Two | September 23, 1999 | $95,000.00 (Request for Loan Proceeds #7) |
| Final Funding | to be determined | $89,318.51 (Request for Loan Proceeds #10) |

Maker waives any right of exemption and waives presentment, protest and demand and notice of protest, demand and of dishonor and nonpayment of this Note, and consents that any holder hereof shall have the right, without notice, to grant any extension or extensions of time for payment of this Note or any part thereof or any other indulgences or forbearances whatsoever, or may release any of the security for this Note without in any way affecting the liability of any other party for the payment of this Note.

The due payment and performance of Maker's obligations hereunder shall be without regard to any counterclaim, right of offset, or any other counterclaim whatsoever which Maker may have against Payee and without regard to any other obligations of any nature whatsoever which Payee may have to Maker, and no such counterclaim or offset shall be asserted by Maker in any action, suit or proceeding instituted by Payee for payment of Maker's obligations hereunder.

This Note and the Loan and Security Agreement shall be governed by and construed in accordance with the laws of the State of Washington.

Maker acknowledges that there is no presumption that the value of the property securing this Note is equal to the face amount of the Note, and that a deficiency judgment may be necessary in proceedings taken for enforcement hereof.

No amendment to this Note shall be binding upon Payee unless it is in writing and duly signed by Payee.

IN WITNESS WHEREOF, the Maker has caused these presents to be duly signed the date first above written.

Borrower:     Le Petit Bistro, Inc.

By: _____

Witness: _____     (Print Name)     ALI M. KABIRI

Title:     PRESIDENT

## PERSONAL GUARANTY

For valuable consideration, the receipt of which is hereby acknowledged, the undersigned (hereinafter called "Guarantor") each jointly and severally unconditionally guaranty to pay to or perform for GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION and its affiliates (hereinafter called "GE CAPITAL"), its successors and assigns, any and all obligations and liabilities whatsoever of Le Petit Bistro, Inc. (hereinafter called the "Obligor"), such obligations and liabilities including but not limited to indebtedness, promissory notes, security agreements, obligations under equipment leases, conditional sales contracts, and lease purchase agreements, (hereinafter called "Obligations"), which the Obligor now has or may hereafter incur or be under to GE CAPITAL. If default shall at any time be made or suffered by the Obligor in the prompt and timely payment of the installments, rents, or other sums to be paid thereunder, or in the performance of any other covenant or condition contained therein, at the times and in the manner provided, the undersigned, for themselves, their heirs, successors and assigns, jointly and severally, agree to pay upon demand said installments, rents, or any other sums that the Obligor may be liable for thereunder, together with all damages that may arise in consequence of the nonperformance by Obligor of any of said covenants and conditions, and fully to perform and carry out all other covenants and conditions of any such obligation on the part of Obligor to be performed. The duty of the undersigned to pay or to perform for GE CAPITAL under any Obligations with respect to which the Obligor is in default is primary and independent of the duties of each other, of the Obligor, of any other guarantors and of all other persons.

The obligations of Obligor secured hereby are intended to be construed in the most comprehensive sense and shall include all Obligations of Obligor, including all those arising under any such indebtedness, lease, contract or agreement, whether to pay or deposit money or perform some other act, whether due or not due, absolute or contingent, liquidated or unliquidated, and whether Obligor may be liable individually or jointly with others, and whether recovery upon the Obligations may be or hereafter become barred by any statue of limitations or be or hereafter become unenforceable.

The undersigned hereby waive(s): (a) demand, protest, notice of protest, notice of Obligor's default, notice of nonpayment or nonperformance, notice of acceptance hereof and default hereunder; (b) the right, if any, to the benefit of, or to direct the application of any security hypothecated to GE CAPITAL until all Obligations, howsoever arising, shall have been paid or performed; (c) the right to require GE CAPITAL to proceed against Obligor, or any other guarantor, or any security, or insurance, or to pursue any other remedy in GE CAPITAL's power.

GE CAPITAL may proceed against the undersigned directly and independently of Obligor, any other guarantor(s), and any other persons. No termination, modification, amendment, extension or renewal of, nor any waiver or excuse of any default under any Obligations, nor the substitution, elimination or addition of any collateral or other assets thereunder, nor the termination of any Obligations with respect to any or all of the collateral or other assets thereunder, nor the death, disability or incapacity of Obligor, the undersigned, or any other guarantors, shall release any of the undersigned, the undersigned hereby consenting thereto and waiving notice of any such transaction or event. The covenants hereof shall survive the redelivery of any item of collateral or any asset, or the acceptance thereof, and the termination of any Obligation.

GE CAPITAL may, without affecting the liability of the undersigned hereunder; (a) take and hold other security for the performance of any Obligations or for the payments of this guaranty; (b) exchange, enforce, waive or release any such security; or (c) release or substitute any one or more endorsers or guarantors, and GE CAPITAL may, without notice to the undersigned, assign this guaranty agreement in whole or in part.

The undersigned agree to pay reasonable attorneys' fees and all other costs and expenses incurred by GE CAPITAL in the enforcement of this guaranty agreement.

This is a CONTINUING GUARANTY AGREEMENT and covers all Obligations until the Guarantor shall have given GE CAPITAL written notice of the withdrawal of this guaranty agreement, but any such withdrawal shall not impair the liability of the Guarantor on any such Obligations incurred or acquired before GE CAPITAL receives such notice.

Any married person who signs this Guaranty agrees that recourse may be had against his or her separate property for all Obligations hereunder.

This guaranty agreement shall be construed under and governed by the laws of the State of Washington. The undersigned hereby submit to the jurisdiction of any state or federal court in the State of Washington in any action or proceeding brought to enforce this Guaranty, and hereby waive any objection to venue and any claim that such court is an inconvenient forum.

_____
SIGNATURE OF Ali M. Kabiri          4360 Ivywood Drive, Marietta, GA 30062

### Spousal Acknowledgment

I hereby acknowledge that my spouse, MARYAM MIRASSADI is acting on behalf of the marital community.

_____      MARYAM MIRASSADI
Signature of Spouse                      Printed Name of Spouse

**EXHIBIT**

B

LOANASSOCDOC\PERSGUAR (1/97)



# INTERIM EQUIPMENT PROMISSORY NOTE

0011014-999
$16,645,000.00

Dated as of _____**3/31**_____, 2003
Bellevue, Washington

THIS INTERIM EQUIPMENT PROMISSORY NOTE (this "Note") is executed as of the above date by **LE PETIT BISTRO, INC.**, a Georgia corporation ("Borrower"), for the benefit of **GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION**, a Delaware corporation ("Lender"), whose address is 10900 N.E. 4th Street, Suite 500, Bellevue, Washington 98004.

## PRELIMINARY STATEMENT

Pursuant to that certain Loan and Security Agreement dated as of the date of this Note between Lender and Borrower (as amended, the "Loan Agreement"), Lender has agreed to make the Equipment Loan to Borrower to provide long-term financing for the Collateral. All initially capitalized terms not otherwise defined in this Note shall have the meanings set forth in the Loan Agreement. The Loan Agreement contemplated that an "Interim Equipment Loan" would be made on the terms and conditions set forth in the Loan Agreement. Borrower is executing and delivering this Note to evidence such Interim Equipment Loan.

## AGREEMENT

Borrower, for value received, hereby promises to pay to Lender, or order, on or before the Maturity Date as herein provided, the principal sum of $16,645,000.00 (the "Maximum Loan Amount"), or so much thereof as may be advanced by Lender to Borrower from time to time (the "Principal Amount"), and interest on the unpaid Principal Amount of this Note from time to time outstanding as hereinafter set forth.

The following terms shall have the following meanings for all purposes of this Note:

"*Adjustable Rate*" means an annual interest rate equal to the sum of the Adjustable Rate Basis plus 4.70.

"*Adjustable Rate Basis*" means, for any Interest Period, the annual interest rate (rounded upwards, if necessary, to the nearest 1/100th of one percent) equal to the one month London Interbank Offered Rate ("LIBOR") on the Adjustable Rate Reset Date as published in The Wall Street Journal. If for any reason such rate is no longer published in The Wall Street Journal, Lender shall select such replacement index as Lender in its sole discretion determines most closely approximates such rate.

"*Adjustable Rate Reset Date*" means the last Business Day of each calendar month, prior to the next Interest Period.

"*Business Day*" means any day on which Lender is open for business other than a Saturday, Sunday or a legal holiday, ending at 5:00 P.M. Seattle, Washington time.

"*First Payment Date*" means [the second month after the month in which the closing occurs, except that, if the closing is on the first of a month, it is the first month after the month in which the closing occurs] _____, 2003.

"*Interest Period*" means (i) initially, the period beginning on the date of this Note and ending on the last day of the calendar month in which such date occurs, and (ii) thereafter, the period beginning on the first day of the calendar month and ending on the last day of such calendar month.

"*Maturity Date*" means the earlier of (i) May 30, 2003 and (ii) the Closing Date.

05-120967 02
FFC No.
Rev. 9/23/02



EXHIBIT

C

 

The Principal Amount shall be advanced only in accordance with the terms and conditions of the Loan Agreement and this Note. Interest shall accrue at the Adjustable Rate on the Principal Amount advanced from time to time as described below on the basis of a 360-day year consisting of twelve thirty-day months; provided, that, interest on the principal amount of this Note for the period commencing with the date such principal amount is advanced by Lender through the last day in the month in which this Note is dated shall be due and payable upon delivery of this Note. Borrower shall pay consecutive monthly installments of interest only on the first day of each calendar month during the term of this Note prior to the Maturity Date. Each payment of principal and interest hereunder shall be applied first toward any past due payments under this Note (including payment of all Costs (as herein defined)), then to accrued interest at the Adjustable Rate, and the balance, after the payment of such accrued interest, if any, shall be applied to the unpaid principal balance of this Note; provided, however, each payment hereunder after an Event of Default has occurred under this Note shall be applied as Lender in its sole discretion may determine. Lender shall notify Borrower in writing on or before the twenty-fifth day of each month during the term of this Note of Lender's determination of the monthly payment of interest to be paid by Borrower for the next Interest Period.

The outstanding Principal Amount and unpaid accrued interest shall be due and payable on the earlier of the Maturity Date or acceleration of this Note as a result of an Event of Default, provided that on the Maturity Date, if all of the conditions precedent to Lender making the Equipment Loan are satisfied, Borrower may, in lieu of paying Lender the outstanding Principal Amount of this Note and all accrued but unpaid interest in immediately available funds, repay such Principal Amount and accrued but unpaid interest by crediting such amounts against the amount of the Equipment Loan. If Borrower elects to credit such amounts against the amount of the Equipment Loan, the amount of the Equipment Loan advanced to Borrower in cash shall be reduced by the outstanding Principal Amount of this Note and all accrued but unpaid interest hereunder.

Borrower shall not have the right to prepay this Note in whole or in part. Any payment under this Note shall be applied first toward any past due payments hereunder (including payment of all Costs, as defined below), then to accrued interest at the Adjustable Rate, and the balance, after the payment of such accrued interest, if any, shall be applied to the unpaid Principal Amount; provided, however, any payment hereunder while an Event of Default has occurred and is continuing shall be applied as Lender in its sole discretion may determine.

Borrower may borrow, in one or more advances (each, an "Advance"), up to the Maximum Loan Amount in accordance with the following requirements; provided, however, Borrower may not borrow, pursuant to this Note, in the aggregate more than the Maximum Loan Amount. Borrower irrevocably authorizes Lender to make or cause to be made, at or about the time of any Advance or at the time of its receipt of any payment of the Principal Amount of this Note, an appropriate notation in Lender's records reflecting the making of such Advance or payment, as applicable. The outstanding amount of this Note set forth in Lender's records maintained with respect to the balance due under this Note (which may include computer records) shall be prima facie evidence of the Principal Amount thereof owing and unpaid to Lender, but the failure to record, or any error in so recording, any such amount on Lender's records shall not limit or otherwise affect the obligations of Borrower hereunder or under this Note to make payments of the Principal Amount or interest on this Note when due. Notwithstanding the foregoing, Borrower agrees to execute such amendments to this Note, amendments and restatements of this Note or substitute or additional promissory notes in the form of this Note as Lender may reasonably request to evidence Borrower's obligations to Lender under this Note.

Borrower shall notify Lender at least ten days before the day on which Borrower desires to receive an Advance. Each such notice (each, a "Notice") shall set forth the requested amount of each Advance and the requested date for such Advance to be made (which may only be made on a Business Day). Each Notice shall constitute a certification by Borrower that the representations and warranties of Borrower set forth in the Agreement are true, correct and complete as of the date of such Notice. Lender's obligation to fund each Advance shall also be subject to the satisfaction of the following conditions precedent as of the date of the requested Advance: (i) no event shall have occurred which is, or with the passage of time would be, an Event of Default under this Note; (ii) the outstanding Principal Amount of this Note, together with the amount of the requested Advance, must not exceed the Maximum Loan Amount; and (iii) Borrower shall have paid the Advance Costs (as defined below). Upon Borrower's satisfaction of the foregoing conditions, Lender will disburse the Advance to Borrower, or, in Lender's sole discretion, to the applicable Equipment vendors in immediately available funds. All costs of the Interim

 

Equipment Loan described in this Note shall be borne by Borrower, including, without limitation, the attorneys' fees and expenses of Borrower and Lender and the escrow fees of Escrow Agent (the "Advance Costs").

. Upon execution of this Note, Borrower shall authorize Lender to establish arrangements whereby all payments of principal and interest hereunder are transferred by Automated Clearing House Debit initiated by Lender directly from an account at a U.S. bank in the name of Borrower to such account as Lender may designate or as Lender may otherwise designate. Each payment of principal and interest hereunder shall be applied first toward any past due payments under this Note (including payment of all Costs (as herein defined)), then to accrued interest at the Adjustable Rate, and the balance, after the payment of such accrued interest, if any, shall be applied to the unpaid principal balance of this Note; provided, however, each payment hereunder after an Event of Default has occurred shall be applied as Lender in its sole discretion may determine.

This Note is secured by the Loan Agreement and the other Loan Documents. Upon the occurrence of an Event of Default, Lender may declare the entire unpaid principal balance of this Note, accrued interest, if any, and all other sums due under this Note and any Loan Documents or Other Agreements due and payable at once without notice to Borrower. All past-due principal and/or interest shall bear interest from the due date to the date of actual payment at the lesser of the highest rate for which the undersigned may legally contract or the greater of 14% and the rate which is 6% per annum above the Adjustable Rate (the "Default Rate"), and such Default Rate shall continue to apply following a judgment in favor of Lender under this Note. If Borrower fails to make any payment or installment due under this Note within five days of its due date, Borrower shall pay to Lender, in addition to any other sum due Lender under this Note or any Loan Document, a late charge equal to 5% of such past-due payment or installment (the "Late Charge"), which Late Charge is a reasonable estimate of the loss that may be sustained by Lender due to the failure of Borrower to make timely payments. All payments of principal and interest due hereunder shall be made (i) without deduction of any present and future taxes, levies, imposts, deductions, charges or withholdings, which amounts shall be paid by Borrower, and (ii) without any other right of abatement, reduction, setoff, defense, counterclaim, interruption, deferment or recoupment for any reason whatsoever. Borrower will pay the amounts necessary such that the gross amount of the principal and interest received by Lender is not less than that required by this Note.

No delay or omission on the part of Lender in exercising any remedy, right or option under this Note shall operate as a waiver of such remedy, right or option. In any event, a waiver on any one occasion shall not be construed as a waiver or bar to any such remedy, right or option on a future occasion. Borrower hereby waives presentment, demand for payment, notice of dishonor, notice of protest and protest, notice of intent to accelerate, notice of acceleration and all other notices or demands in connection with delivery, acceptance, performance, default or endorsement of this Note. All notices, consents, approvals or other instruments required or permitted to be given by either party pursuant to this Note shall be given in accordance with the notice provisions in the Loan Agreement. Should any indebtedness represented by this Note be collected at law or in equity, or in bankruptcy or other proceedings, or should this Note be placed in the hands of attorneys for collection after default, Borrower shall pay, in addition to the principal and interest due and payable hereon, all costs of collecting or attempting to collect this Note (the "Costs"), including reasonable attorneys' fees and expenses of Lender (including those fees and expenses incurred in connection with any appeal) and court costs whether or not a judicial action is commenced by Lender. This Note may not be amended or modified except by a written agreement duly executed by the party against whom enforcement of this Note is sought. In the event that any one or more of the provisions contained in this Note shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such provision had never been contained herein or therein. Time is of the essence in the performance of each and every obligation under this Note.

Notwithstanding anything to the contrary contained in any of the Loan Documents, the obligations of Borrower to Lender under this Note and any other Loan Documents are subject to the limitation that payments of interest and late charges to Lender shall not be required to the extent that receipt of any such payment by Lender would be contrary to provisions of applicable law limiting the maximum rate of interest that may be charged or collected by Lender. The portion of any such payment received by Lender that is in excess of the maximum interest permitted by such provisions of law shall be credited to the principal balance of this Note or if such excess portion exceeds the outstanding principal balance of this Note, then such excess portion shall be refunded to Borrower. All interest paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and/or spread throughout the full term of this Note (including, without limitation, the period of any

renewal or extension thereof) so that interest for such full term shall not exceed the maximum amount permitted by applicable law.

This obligation shall bind Borrower and its successors and permitted assigns, and the benefits hereof shall inure to Lender and its successors and assigns.

05-120967.02
FFC No.
Rev. 9/23/02

IN WITNESS WHEREOF, Borrower has executed and delivered this Note effective as of the date first set forth above.

BORROWER:

**LE PETIT BISTRO, INC.**, a Georgia corporation

By _____

Printed Name  Ali Kabiri
Its           CEO

05-120967.02
FFC No.
Rev. 9/23/02



## EQUIPMENT PROMISSORY NOTE

0011014-001
$17,076,708.69

Dated as of June 4, 2003
Bellevue, Washington

   LE PETIT BISTRO, INC., a Georgia corporation ("Borrower"), for value received, hereby promises to pay to GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION, a Delaware corporation ("Lender"), whose address is 10900 N.E. 4ᵗʰ Street, Suite 500, Bellevue, Washington 98004, or order, on or before August 1, 2010 (the "Maturity Date"), the principal sum of $17,076,708.69, as herein provided. Initially capitalized terms which are not otherwise defined in this Note shall have the meanings set forth in that certain Loan and Security Agreement dated as of the date of this Note between Borrower and Lender, as such agreement may be amended, restated and/or supplemented from time to time (the "Loan Agreement"). In addition, the following terms shall have the following meanings for all purposes of this Note:

   "*Adjustable Rate*" means an annual interest rate equal to the sum of the Adjustable Rate Basis plus 4.70.

   "*Adjustable Rate Basis*" means, for any Interest Period, the annual interest rate (rounded upwards, if necessary, to the nearest 1/100th of one percent) equal to the one month London Interbank Offered Rate ("LIBOR") on the Adjustable Rate Reset Date as published in The Wall Street Journal. If for any reason such rate is no longer published in The Wall Street Journal, Lender shall select such replacement index as Lender in its sole discretion determines most closely approximates such rate.

   "*Adjustable Rate Reset Date*" means the last Business Day of each calendar month, prior to the next Interest Period.

   "*Business Day*" means any day on which Lender is open for business other than a Saturday, Sunday or a legal holiday, ending at 5:00 P.M. Seattle, Washington time.

   "*First Payment Date*" means [the second month after the month in which the closing occurs, except that, if the closing is on the first of a month, it is the first month after the month in which the closing occurs] August 1, 2003.

   "*Interest Period*" means (i) initially, the period beginning on the date of this Note and ending on the last day of the calendar month in which such date occurs, and (ii) thereafter, the period beginning on the first day of the calendar month and ending on the last day of such calendar month.

   "*Payment Period*" means (i) initially, the twelve-month period beginning on the First Payment Date and ending on the day immediately prior to the first Payment Reset Date, and (ii) thereafter, the twelve-month period beginning on each Payment Reset Date and ending on the day immediately prior to the next Payment Reset Date.

   "*Payment Reset Calculation*" means the level monthly payment calculated by the full amortization of the outstanding principal amount of this Note on the Payment Reset Date at the Adjustable Rate (with the definition of "Adjustable Rate Reset Date" defined to mean the last Business Day of the calendar month two months prior to the next Payment Reset Date) over the remaining originally scheduled term of this Note.

   "*Payment Reset Date*" means each anniversary of the First Payment Date.

   Borrower shall pay interest on the outstanding principal amount of this Note at the Adjustable Rate, determined monthly as described above, on the basis of a 360-day year consisting of twelve 30-day months, provided that, interest on the principal amount of this Note for the period commencing with the date such principal amount is advanced by Lender through the last day in the month in which this Note is dated shall be due and payable upon delivery of this Note. Commencing on the First Payment Date, Borrower shall pay consecutive monthly installments on the first day of each calendar month during the term of this Note prior to the Maturity Date in lawful

05-120967.02
FFC No.
Rev 9/23/02

| EXHIBIT |
| --- |
| D |



money of the United States. The monthly installments shall be level during a Payment Period. The initial level monthly payments for the first Payment Period shall be equal to $205,187.63 until the first Payment Reset Date, at which time, and on each succeeding Payment Reset Date thereafter, the level monthly payment to be paid by Borrower shall be adjusted for the next succeeding Payment Period based on the Payment Reset Calculation. All outstanding principal and unpaid accrued interest shall be paid on the Maturity Date. *Note\* Payments will be based on a nine (9) year amortization period.*

Upon execution of this Note, Borrower shall authorize Lender to establish arrangements whereby all payments of principal and interest hereunder are transferred by Automated Clearing House Debit initiated by Lender directly from an account at a U.S. bank in the name of Borrower to such account as Lender may designate or as Lender may otherwise designate. Each payment of principal and interest hereunder shall be applied first toward any past due payments under this Note (including payment of all Costs (as herein defined)), then to accrued interest at the Adjustable Rate, and the balance, after the payment of such accrued interest, if any, shall be applied to the unpaid principal balance of this Note; provided, however, each payment hereunder after an Event of Default has occurred shall be applied as Lender in its sole discretion may determine. After application of any monthly payment in the above manner, in the event that the outstanding principal amount of this Note exceeds 110% of the original principal balance of this Note, Borrower shall prepay, without premium or penalty, on the first day of the next succeeding calendar month after each such occurrence, a principal amount equal to the difference between the outstanding principal balance of this Note and the original principal balance of this Note (the "Negative Amortization Amount"). Lender shall notify Borrower in writing on or before the twenty-fifth day of each calendar month during the term of this Note of Lender's determination of the Negative Amortization Amount, if any, payable on the first day of the next succeeding calendar month. Lender shall also notify Borrower in writing on or before the twenty-fifth day of the calendar month prior to the next Payment Reset Date during the term of this Note of Lender's determination of the level monthly payment to be paid by Borrower based on the Payment Reset Calculation for the next Payment Period.

Borrower may prepay this Note in full, but not in part (except as otherwise set forth below), including all accrued but unpaid interest hereunder and all sums advanced by Lender pursuant to the Loan Documents and any Other Agreements, provided that (i) no Event of Default has occurred under any of the Loan Documents or any Other Agreements, (ii) any such prepayment shall only be made on a regularly scheduled payment date upon not less than 30 days prior written notice from Borrower to Lender, and (iii) except as otherwise set forth below, any such prepayment shall be made together with payment of a prepayment premium equal to:

    (i)    4% of the amount prepaid if the prepayment is made on or following the date of this Note but prior to the first anniversary of the date of this Note;

    (ii)    3% of the amount prepaid if the prepayment is made on or following the first anniversary of the date of this Note but prior to the second anniversary of the date of this Note;

    (iii)    2% of the amount prepaid if the prepayment is made on or following the second anniversary of the date of this Note but prior to the third anniversary of the date of this Note; and

    (iv)    1% of the amount prepaid if the prepayment is made on or following the third anniversary of the date of this Note but prior to the fourth anniversary of the date of this Note.

The foregoing prepayment premium shall be due and payable regardless of whether such prepayment is the result of a voluntary prepayment by Borrower or as a result of Lender declaring the unpaid principal balance of this Note, accrued interest and all other sums due under this Note, the other Loan Documents and any Other Agreements, due and payable as contemplated below.

This Note is secured by the Loan Agreement and the other Loan Documents. Upon the occurrence of an Event of Default, Lender may declare the entire unpaid principal balance of this Note, accrued interest, if any, and all other sums due under this Note and any Loan Documents or Other Agreements due and payable at once without notice to Borrower. All past-due principal and/or interest shall bear interest from the due date to the date of actual payment at the lesser of the highest rate for which the undersigned may legally contract or the greater of 14% and



the rate which is 6% per annum above the Adjustable Rate (the "Default Rate"), and such Default Rate shall continue to apply following a judgment in favor of Lender under this Note. If Borrower fails to make any payment or installment due under this Note within five days of its due date, Borrower shall pay to Lender, in addition to any other sum due Lender under this Note or any other Loan Document, a late charge equal to 5% of such past-due payment or installment (the "Late Charge"), which Late Charge is a reasonable estimate of the loss that may be sustained by Lender due to the failure of Borrower to make timely payments. All payments of principal and interest due hereunder shall be made (i) without deduction of any present and future taxes, levies, imposts, deductions, charges or withholdings, which amounts shall be paid by Borrower, and (ii) without any other right of abatement, reduction, setoff, defense, counterclaim, interruption, deferment or recoupment for any reason whatsoever. Borrower will pay the amounts necessary such that the gross amount of the principal and interest received by Lender is not less than that required by this Note.

No delay or omission on the part of Lender in exercising any remedy, right or option under this Note shall operate as a waiver of such remedy, right or option. In any event, a waiver on any one occasion shall not be construed as a waiver or bar to any such remedy, right or option on a future occasion. Borrower hereby waives presentment, demand for payment, notice of dishonor, notice of protest, and protest, notice of intent to accelerate, notice of acceleration and all other notices or demands in connection with delivery, acceptance, performance, default or endorsement of this Note. All notices, consents, approvals or other instruments required or permitted to be given by either party pursuant to this Note shall be given in accordance with the notice provisions in the Loan Agreement. Should any indebtedness represented by this Note be collected at law or in equity, or in bankruptcy or other proceedings, or should this Note be placed in the hands of attorneys for collection after default, Borrower shall pay, in addition to the principal and interest due and payable hereon, all costs of collecting or attempting to collect this Note (the "Costs"), including reasonable attorneys' fees and expenses of Lender (including those fees and expenses incurred in connection with any appeal) and court costs whether or not a judicial action is commenced by Lender. This Note may not be amended or modified except by a written agreement duly executed by the party against whom enforcement of this Note is sought. In the event that any one or more of the provisions contained in this Note shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision of this Note, and this Note shall be construed as if such provision had never been contained herein or therein. Time is of the essence in the performance of each and every obligation under this Note.

Notwithstanding anything to the contrary contained in any of the Loan Documents, the obligations of Borrower to Lender under this Note and any other Loan Documents are subject to the limitation that payments of interest and late charges to Lender shall not be required to the extent that receipt of any such payment by Lender would be contrary to provisions of applicable law limiting the maximum rate of interest that may be charged or collected by Lender. The portion of any such payment received by Lender that is in excess of the maximum interest permitted by such provisions of law shall be credited to the principal balance of this Note or if such excess portion exceeds the outstanding principal balance of this Note, then such excess portion shall be refunded to Borrower. All interest paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and/or spread throughout the full term of this Note (including, without limitation, the period of any renewal or extension thereof) so that interest for such full term shall not exceed the maximum amount permitted by applicable law.

This obligation shall bind Borrower and its successors and permitted assigns, and the benefits hereof shall inure to Lender and its successors and assigns.

IN WITNESS WHEREOF, Borrower has executed and delivered this Note effective as of the date first set forth above.

BORROWER:

**LE PETIT BISTRO, INC.**, a Georgia corporation

By _____

Printed Name  Ali Kabiri

Its           CEO

05-120967.02
FFC No.
Rev. 9/23/02



## LOAN AND SECURITY AGREEMENT

This LOAN AND SECURITY AGREEMENT (this "Agreement"), dated as of June 4, 2003 (the "Closing Date") is made by and between **LE PETIT BISTRO, INC.**, a Georgia corporation ("Debtor"), and **GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION**, a Delaware corporation ("GE").

NOW, THEREFORE, in consideration of the premises and the covenants set forth herein, the receipt and sufficiency of which are hereby acknowledged, Debtor and GE hereby agree as follows:

1.    <u>Transaction; Closing Conditions; Interim and Term Loans</u>.  A. On the terms and subject to the conditions set forth in the Loan Documents (as defined below), GE shall make an equipment loan to Debtor with respect to the Collateral (as defined below) in the amount of $17,076,708.69  (the "Loan Amount"). Such equipment loan shall be made in the form of an interim equipment loan (the "Interim Loan") evidenced and disbursed in accordance with subsection C below, and a term equipment loan evidenced and disbursed in accordance with subsection D below (the "Term Loan")(the Interim Loan and the Term Loan are defined collectively as the "Equipment Loan"). The Equipment Loan will be evidenced by the Interim Note and the Term Note (as defined in subsections C and D below)(the Interim Note and the Term Note are herein sometimes each called an "Equipment Note" and collectively the "Equipment Notes"), this Agreement, such UCC-1 Financing Statements as GE shall require and the guaranty or guaranties described in the following subsection B, as applicable (such documents, together with all other documents, instruments and agreements executed in connection with, or contemplated by such documents and any amendments to any thereof collectively, the "Loan Documents"). Debtor shall repay the outstanding principal amount of the Equipment Loan with interest thereon in the manner and in accordance with the terms and conditions of the Equipment Notes and the other Loan Documents. The Equipment Loan shall be advanced in cash or otherwise immediately available funds subject to any prorations and adjustments required by this Agreement. For purposes of this Agreement, "Collateral" means all equipment, machinery, furniture, trade fixtures, replacements, substitutions, additions, parts and accessories now owned or hereafter acquired by Debtor and located at the parcel or parcels of real estate described in <u>Exhibit A</u> attached hereto (the "Premises"), including, without limitation, fryers, grills, ovens, warmers, refrigerators, freezers, waste disposal units, dishwashers, beverage dispensers, ice cream makers, racks, display cases, light fixtures, décor, counters, cash registers, salad equipment, tables, seating, signs and similar property of Debtor, including all income therefrom and all proceeds thereof.

B.    The obligation of GE to consummate the transaction contemplated by this Agreement is subject to the fulfillment or waiver of each of the conditions contained in the loan commitment issued by GE to Debtor with respect to the Equipment Loan and the "Loan Closing Checklist" prepared by GE with respect to the Equipment Loan.

C.    The Interim Loan in an amount up to the Loan Amount shall be disbursed by GE to Debtor or at Debtor's direction in up to three (3) partial advances made at the request of Debtor, subject to the satisfaction of the applicable conditions contemplated by the preceding subsection B and this subsection C. The Interim Loan shall be evidenced by and repayable with interest in accordance with an interim equipment promissory note dated as of the date of this Agreement executed by Debtor and payable to the order of GE in the Loan Amount (the "Interim Note"). Debtor shall give GE at least five (5) days' notice, in the form of a request for the advance of loan proceeds (the "Request"), specifying the date on which any portion of the Interim Loan is to be borrowed. Each Request shall be accompanied by an original copy of the invoice or invoices for the Collateral to be acquired with such proceeds. Such notice shall constitute a representation and warranty by Debtor that as of the date of the notice, no Event of Default (as defined in Section 12) or event that, with the lapse of time or the giving of notice or both, would constitute an Event of Default, has occurred and is continuing. GE shall have no obligation to advance any portion of the Interim Loan if an Event of Default shall have occurred and be continuing. No Request shall be delivered to GE after the fifth day preceding the Outside Funding Date (as defined below) and GE shall have no obligation to disburse any portion of the Interim Loan after the Outside Funding Date. GE will disburse the Interim Loan proceeds to the invoicing parties, or if Debtor shall have

**EXHIBIT**

**E**



paid the amount of any such invoice, GE shall reimburse Debtor for such portion of the Loan Amount upon receipt from Debtor of proof of payment satisfactory to GE. The outstanding amount of the Interim Loan set forth in GE's records (which may include computer records) shall be prima facie evidence of the principal amount due and owing to GE under the Interim Note. The Interim Loan shall be due and payable on the earlier of May 30, 2003 (the "Outside Funding Date") and the Closing Date (as defined in the following subsection D), provided, that, if all of the conditions to GE making the Term Loan are satisfied on or before such due date, Debtor may, in lieu of paying GE the outstanding principal amount of the Interim Note and all accrued but unpaid interest thereunder (the "Outstanding Interim Loan Amount") in immediately available funds, repay such amounts by crediting the Outstanding Interim Loan Amount against the amount of the Term Loan.

D.    The Term Loan in the Loan Amount shall be made by GE to Debtor, subject to the satisfaction of the applicable conditions contemplated by the preceding subsection B and this subsection D, but in no event later than the Outside Funding Date. GE shall have no obligation to advance the Term Loan if an Event of Default shall have occurred and be continuing. The Term Loan shall be evidenced by and repayable with interest in accordance with an equipment promissory note dated as of the Closing Date in the Loan Amount executed by Debtor and payable to the order of GE (the "Term Note"). If Debtor elects to credit the Outstanding Interim Loan Amount against the amount of the Term Loan, the amount of the Term Loan advanced to Debtor in cash on the Closing Date shall be reduced by the Outstanding Interim Loan Amount. The date on which such remaining undisbursed portion of the Term Loan shall be disbursed by GE to Debtor shall be deemed the "Closing Date".

2.    Security Interest Created; Obligations Secured.  A.  Debtor hereby grants to GE a security interest in the Collateral to secure the payment of the following indebtedness and obligations (the "Obligations"): (i) payment of indebtedness evidenced by the Equipment Notes, together with all extensions, renewals, amendments and modifications thereof; and (ii) payment of all other indebtedness and other sums, including interest at the applicable rate, which may be owed under, and performance of all other obligations and covenants contained in, any other Loan Document or any Other Agreement (as defined below), together with any other instrument given to evidence or further secure the payment and performance of any obligation secured hereby or thereby. For purposes of this Agreement, the term:

"Affiliate" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization, Governmental Authority (as defined in Section 3(iii) below) or any other form of entity ("Person") which directly or indirectly controls, is under common control with, or is controlled by any other Person. For purposes of this definition, "controls", "under common control with" and "controlled by" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or otherwise; and

"Other Agreements" means, collectively, all agreements and instruments between, among or by (1) any of Debtor and any guarantor of the Obligations (collectively, the "Debtor Parties") and/or any Affiliate of any of the Debtor Parties (including any Affiliate of any predecessor-in-interest to any of the Debtor Parties), and, or for the benefit of, (2) any of GE (including any predecessor-in-interest to GE) and any Affiliate of GE (including any Affiliate of any predecessor-in-interest to GE), including, without limitation, promissory notes and guaranties; provided, however, the term "Other Agreements" shall not include the agreements and instruments defined as the Loan Documents.

B.    Debtor authorizes GE to file financing statements with respect to the security interest of GE, continuation statements with respect thereto, and any amendments to such financing statements that may be necessitated by reason of any of the changes described in Section 13. Debtor agrees that, notwithstanding any provision in the Uniform Commercial Code as adopted in the State of Washington (the "UCC") to the contrary, Debtor shall not file a termination statement of any financing statement filed by GE in connection with any security interest granted under this Agreement if GE reasonably objects to the filing of such termination statement.



C.    GE shall at all times have a perfected security interest in the Collateral that shall be prior to any other interests therein. Debtor shall do all acts and things, shall execute and file all instruments (including security agreements, UCC financing statements, continuation statements, etc.) requested by GE to establish, maintain and continue the perfected security interest of GE in the Collateral, and shall promptly on demand pay all costs and expenses of (i) filing and recording, including the costs of any searches deemed necessary by GE from time to time to establish and determine the validity and the continuing priority of the security interest of GE, and (ii) all other claims and charges that in the reasonable opinion of GE might prejudice, imperil or otherwise affect the Collateral or security interest therein of GE. Debtor agrees that a carbon, photographic or other reproduction of a security agreement or financing statement shall be sufficient as a financing statement. GE is hereby irrevocably appointed Debtor's attorney-in-fact to take any of the foregoing actions requested of Debtor by GE if Debtor should fail to take such actions, which appointment shall be deemed coupled with an interest.

3.    <u>Debtor's Representations and Warranties</u>.  Debtor represents and warrants to GE as of the date of this Agreement and the Closing Date as follows:

(i) All financial statements and other information concerning the Debtor Parties delivered to GE by Debtor in connection with the transaction described in this Agreement (collectively, the "Financial Information") are true, correct and complete in all material respects; there have been no amendments to the Financial Information since the date such Financial Information was prepared or delivered to GE; and Debtor understands that GE is relying upon the Financial Information and Debtor represents that such reliance is reasonable. All financial statements included in the Financial Information were prepared in accordance with generally accepted accounting principles consistently applied ("GAAP") and fairly present as of the date of such financial statements the financial condition of each individual or entity to which they pertain. No change has occurred with respect to the financial condition of any of the Debtor Parties and/or the Collateral as reflected in the Financial Information which has not been disclosed in writing to GE or has had, or could reasonably be expected to result in, a material adverse effect on (i) the Collateral, including without limitation, the use of the Collateral in the operation of a Le Petit Bistro (the "Permitted Concept"), or (ii) Debtor's ability to perform its obligations under the Loan Documents ("Material Adverse Effect").

(ii) Each of the Debtor Parties (other than individuals), as applicable, is duly organized or formed, validly existing and in good standing under the laws of its state of incorporation or formation, Debtor is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in the state(s) where the Collateral is located, and each of the Debtor Parties is qualified as a foreign corporation, partnership or limited liability company, as applicable, to do business in any other jurisdiction where the failure to be qualified would reasonably be expected to result in a Material Adverse Effect. All necessary action has been taken to authorize the execution, delivery and performance by the Debtor Parties of this Agreement and the other Loan Documents. The person(s) who have executed this Agreement on behalf of Debtor are duly authorized so to do. Debtor is not a "foreign corporation", "foreign partnership", "foreign trust", "foreign estate" or "foreign person" (as those terms are defined by the Internal Revenue Code of 1986, as amended).

(iii) Upon execution by the Debtor Parties, this Agreement and the other Loan Documents shall constitute the legal, valid and binding obligations of the Debtor Parties, respectively, enforceable against the Debtor Parties in accordance with their respective terms. There are no suits, actions, proceedings or investigations pending, or to the best of its knowledge, threatened against or involving the Debtor Parties, the Collateral or the Premises before any arbitrator or any governmental authority, agency, department, commission, bureau, board, instrumentality, court or quasi-governmental authority having jurisdiction or supervisory or regulatory authority over the Collateral or any of the Debtor Parties ("Governmental Authority"), except for such suits, actions, proceedings or investigations which, individually or in the aggregate, have not had, and could not reasonably be expected to result in, a Material Adverse Effect. The Debtor Parties are not, and the authorization, execution, delivery and performance of this Agreement and the other Loan Documents will not result, in any breach or default under any other document, instrument or agreement to which any of the Debtor Parties is a party or by which any of the Debtor Parties, the Premises, the Collateral or any of the property of any of the Debtor Parties is subject or

 

bound, except for such breaches or defaults which, individually or in the aggregate, have not had, and could not reasonably be expected to result in, a Material Adverse Effect. The authorization, execution, delivery and performance of this Agreement and the other Loan Documents will not violate any applicable law, statute, regulation, rule, ordinance, code, rule or order. The Collateral is not subject to any right of first refusal, right of first offer or option to purchase or lease granted to a third party.

4.    <u>Use</u>.  Debtor agrees that the Collateral will be used at the Premises solely in the conduct of Debtor's business as a Permitted Concept and will at all times remain in the possession and control of Debtor at the Premises and will not be removed without GE's prior written consent. Debtor promises that the Collateral at all times will be used and operated under and in compliance with all applicable statutes, regulations, rules, ordinances, codes, licenses, permits, orders and approvals of each Governmental Authority having jurisdiction over the Collateral, and all policies or rules of common law, in each case, as amended, and any judicial or administrative interpretation thereof, including any judicial order, consent, decree or judgment applicable to any of the Debtor Parties, except for such noncompliance which will not have, and will not reasonably be expected to have, a Material Adverse Effect. Debtor will not permit any Collateral to be subject to any lien, charge or encumbrance except that of GE and will keep the Collateral free and clear of any and all liens, charges, encumbrances, and adverse claims. Debtor will not sell, lease, rent, or otherwise dispose of any item of Collateral without the prior written consent of GE.

5.    <u>Maintenance and Improvement</u>. Debtor shall at all times, at its own expense, keep the Collateral in good and efficient working order, condition and repair and well maintained, ordinary wear and tear excepted, and shall make all inspections and repairs required by law, regulation or insurance policy. Debtor shall also make any alterations, improvements or additions to the Collateral that are required by law or regulation. Any alterations, improvements, or additions to the Collateral shall be made at the expense of Debtor, shall constitute accessions to the Collateral and shall be subject to GE's security interest.

6.    <u>Loss and Damage</u>. Debtor shall bear the risk of damage, loss, theft, or destruction, partial or complete, of the Collateral from whatsoever source arising, whether or not such loss or damage is covered by insurance, except that while no Event of Default shall have occurred, GE agrees to apply toward payment of obligations of Debtor under this Agreement, insurance proceeds payable to GE by reason of such damage, loss, theft, or destruction. In the event of any damage, loss, theft, or destruction, partial or complete, of any item of Collateral, Debtor shall promptly notify GE in writing and at the option of GE (a) repair or restore the Collateral to good condition and working order, or (b) replace the Collateral with similar equipment in good repair, condition and working order, or (c) pay GE, in cash, an amount equal to the unamortized cost for that item and all other amounts then due and owing under this Agreement, and upon payment of that amount, this Agreement shall terminate with respect to that item only, and GE will release its interest in that item.

7.    <u>Insurance</u>. Debtor shall procure and continuously maintain and pay for (a) all risk physical damage insurance covering loss or damage to the Collateral for not less than the full replacement value thereof naming GE as additional insured and loss payee. (b) bodily injury and property damage combined single limit liability insurance in an amount not less than One Million Dollars ($1,000,000) for each location at which any of the Collateral is located, and (c) such other insurance as may from time to time be reasonably required by GE in order to protect its interests with respect to the Collateral, with such insurance companies and pursuant to such contracts or policies and with such deductibles as are satisfactory to GE. All contracts and policies shall include provisions for the protection of GE notwithstanding any act or neglect of or breach or default by Debtor, shall provide for payment of insurance proceeds to GE, shall provide that they may not be modified, terminated or canceled unless GE is given at least thirty (30) days' advance written notice thereof, and shall provide that the coverage is "primary coverage" for the protection of Debtor or GE notwithstanding any other coverage carried by GE or Debtor protecting against similar risks. Debtor shall promptly notify any appropriate insurer and GE of each and every occurrence that may become the basis of a claim or cause of action against the insured and provide GE with all data pertinent to such occurrence. Debtor shall furnish GE with certificates of such insurance or copies of policies upon request and shall furnish GE with renewal certificates not less



than thirty (30) days prior to the renewal date. Proceeds of all insurance are payable first to GE to the extent of its interest.

8.      Taxes.  Debtor agrees to pay all taxes, assessments and other governmental charges of whatsoever kind and character by whom payable on or relating to any item of Collateral or the sale, ownership, use, shipment, transportation, delivery or operation thereof or payable in respect to any obligation of Debtor. Upon receipt of a request therefore from GE, Debtor will submit written evidence of payment of the obligations described in this section.

9.      Financial Data.  Within 45 days after the end of each fiscal quarter and within 120 days after the end of each fiscal year of Debtor, Debtor shall deliver to GE (a) complete financial statements of the Debtor Parties including a balance sheet, profit and loss statement, statement of cash flows and all other related schedules for the fiscal period then ended; (b) income statements for the business at the Premises; and (c) such other financial information as GE may reasonably request in order to establish compliance with the financial covenants in the Loan Documents, as applicable.  All such financial statements and information shall be prepared in accordance with GAAP from period to period, and shall be certified to be accurate and complete by Debtor (or the Treasurer or other appropriate officer of Debtor).  Debtor understands that GE is relying upon such financial statements and Debtor represents that such reliance is reasonable.  The financial statements delivered to GE need not be audited, but Debtor shall deliver to GE copies of any audited financial statements of Debtor that may be prepared, as soon as they are available.  Debtor shall also provide GE with personal financial statements and tax returns of any guarantor on an annual basis, and such information concerning its business as GE may reasonably request.

10.     General Indemnity.  Debtor shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each of the Indemnified Parties (as defined below) for, from and against any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, diminutions in value, fines, penalties, charges, fees, expenses, judgments, awards, amounts paid in settlement and damages of whatever kind or nature (including, without limitation, attorneys' fees, court costs and other costs of defense) (collectively, "Losses") (excluding Losses suffered by an Indemnified Party directly arising out of such Indemnified Party's gross negligence or willful misconduct; provided, however, that the term "gross negligence" shall not include gross negligence imputed as a matter of law to any of the Indemnified Parties solely by reason of Debtor's interest in the Collateral or Debtor's failure to act in respect of matters which are or were the obligation of Debtor under the Loan Documents) caused by, incurred or resulting from Debtor's operations of or relating in any manner to the Collateral or the Premises, whether relating to their original design or construction, latent defects, alteration, maintenance, use by Debtor or any person thereon, supervision or otherwise, or from any breach of, default under, or failure to perform, any term or provision of this Agreement by Debtor, its officers, employees, agents or other persons, including, without limitation, Losses arising from (1) any accident, injury to or death of any person or loss of or damage to property occurring in connection with the Collateral or the Premises or any portion thereof, (2) any use, non-use or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, the Collateral or the Premises or any portion thereof or the sidewalks, curbs, parking areas, streets or ways adjoining the Premises, (3) any representation or warranty made herein by Debtor, in any certificate delivered in connection herewith or in any other agreement to which Debtor is a party or pursuant thereto being false or misleading in any material respect as of the date such representation or warranty was made, (4) performance of any labor or services or the furnishing of any materials or other property in respect to the Collateral or the Premises or any portion thereof, (5) any taxes, assessments or other charges which Debtor is required to pay under Section 8, (6) any lien, encumbrance or claim arising on or against the Collateral or the Premises or any portion thereof under any applicable regulation or otherwise which Debtor is obligated hereunder to remove and discharge, or the failure to comply with any applicable regulation, (7) the claims of any licensees, tenants or other occupants of all or any portion of the Collateral or the Premises or any Person acting through or under Debtor or otherwise acting under or as a consequence of this Agreement or any sublease, and (8) any act or omission of Debtor or its agents, contractors, licensees, subtenants or invitees.  It is expressly understood and agreed that Debtor's obligations under this Section shall survive the expiration or earlier termination of this Agreement for any



reason   The term "Indemnified Parties" means GE and its directors, officers, shareholders, trustees, beneficial owners, partners and members, any directors, officers, shareholders, trustees, beneficial owners, partners, members of any shareholders, beneficial owners, partners or members of GE, and all employees, agents, servants, representatives, contractors, subcontractors, affiliates, subsidiaries, participants, successors and assigns of any of the foregoing, including, but not limited to, any successors by merger, consolidation or acquisition of all or a substantial portion of the assets and business of GE.

11.    Actions by GE; Lost Note.  A.  Debtor agrees that GE may, at its option, and without any obligation to do so, pay, perform, and discharge any and all amounts, costs, expenses and liabilities that are the responsibility of Debtor under the Loan Documents if Debtor fails to timely pay, perform or discharge the same, and all amounts expended by GE in so doing or in respect of or in connection with the Collateral shall become part of the obligations secured by the Loan Documents and shall be immediately due and payable by Debtor to GE upon demand therefore and shall bear interest at the lesser of the highest rate for which Debtor may legally contract or the rate of fourteen percent (14%) per annum (the "Default Rate").

B.    Debtor agrees that the Loan Documents shall remain in full effect, without waiver or surrender of any of GE's rights there under, notwithstanding the occurrence of any one or more of the following: (i) extension of the time of payment of the whole or any part of the Equipment Note; (ii) any change in the terms and conditions of the Equipment Note; (iii) substitution of any other evidence of indebtedness for the Equipment Note; (iv) acceptance by GE of any collateral or security of any kind for the payment of the Equipment Note; (v) surrender, release, exchange or alteration of any Collateral, collateral or other security, either in whole or in part; or (vi) release, settlement, discharge, compromise, change or amendment, in whole or in part, of any claim of GE against Debtor or of any claim against any guarantor or other party secondarily or additionally liable for the payment of the Equipment Note.

C.    Debtor shall, if the Equipment Note is mutilated, destroyed, lost or stolen (a "Lost Note"), promptly deliver to GE, upon receipt from GE of an affidavit and indemnity in a form reasonably acceptable to GE and Debtor stipulating that the Equipment Note has been mutilated, destroyed, lost or stolen, in substitution therefore, a new promissory note containing the same terms and conditions as the Lost Note with a notation thereon of the unpaid principal and accrued and unpaid interest.  Debtor shall provide 15 days' prior notice to GE before making any payments to third parties in connection with a Lost Note.

12.    Events of Default and Remedies.  A.  Each of the following shall be deemed an event of default by Debtor (each, an "Event of Default"):

(1)    If any representation or warranty of any of the Debtor Parties set forth in any of the Loan Documents is false in any material respect or if any of the Debtor Parties renders any statement or account that is false in any material respect.

(2)    If any principal, interest or other monetary sum due under the Equipment Note or any other Loan Document is not paid within five days after the date when due; provided, however, notwithstanding the occurrence of such an Event of Default, GE shall not be entitled to exercise its rights and remedies set forth below unless and until GE shall have given Debtor notice thereof and a period of five days from the delivery of such notice shall have elapsed without such Event of Default being cured.

(3)    If Debtor fails to observe or perform any of the other covenants, conditions, or obligations of this Agreement; provided, however, if any such failure does not involve the payment of any monetary sum, is not willful or intentional, does not place any rights or interest in collateral of GE in immediate jeopardy, and is within the reasonable power of Debtor to promptly cure after receipt of notice thereof, all as determined by GE in its reasonable discretion, then such failure shall not constitute an Event of Default hereunder, unless otherwise expressly provided herein, unless and until GE shall have given Debtor notice thereof and a period of 30 days shall have elapsed, during which period Debtor may correct or cure such failure, upon failure of which an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.  If such failure cannot reasonably be cured within such 30-day period, as determined

 

by GE in its reasonable discretion, and Debtor is diligently pursuing a cure of such failure, then Debtor shall have a reasonable period to cure such failure beyond such 30-day period, which shall not exceed 90 days after receiving notice of the failure from GE. If Debtor shall fail to correct or cure such failure within such 90-day period, an Event of Default shall be deemed to have occurred hereunder without further notice or demand of any kind being required.

(4)      If any of the Debtor Parties becomes insolvent within the meaning of Title 11 of the United States Code, 11 U.S.C. Sec. 101 *et seq.*, as amended (the "Code"), files or notifies GE that it intends to file a petition under the Code, initiates a proceeding under any similar law or statute relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts (collectively, an "Action"), becomes the subject of either a petition under the Code or an Action, or is not generally paying its debts as the same become due.

(5)      If there is an "Event of Default" or a breach or default, after the passage of all applicable notice and cure or grace periods, under any other Loan Document or any of the Other Agreements.

(6)      If a final, nonappealable judgment is rendered by a court against any of the Debtor Parties which (i) has a material adverse effect on the operation of the Premises as a Permitted Concept, or (ii) is in an amount greater than $100,000.00 and not covered by insurance, and, in either case, is not discharged or provision made for such discharge within 60 days from the date of entry of such judgment.

B.      Upon the occurrence and during the continuance of an Event of Default, subject to the limitations set forth in subsection A, GE shall have all rights and remedies of a secured party in, to and against the Collateral granted by the UCC and otherwise available at law or in equity, including, without limitation: (1) the right to declare any or all payments due under the Equipment Notes, the other Loan Documents, the Other Agreements and all other documents evidencing the Obligations immediately due and payable without any presentment, demand, protest or notice of any kind, except as otherwise expressly provided herein, and Debtor hereby waives notice of intent to accelerate the Obligations and notice of acceleration; (2) the right to recover all fees and expenses (including reasonable attorney fees) in connection with the collection or enforcement of the Obligations, which fees and expenses shall constitute additional Obligations of Debtor hereunder; (3) the right to act as, and Debtor hereby constitutes and appoints GE, Debtor's true, lawful and irrevocable attorney-in-fact (which appointment shall be deemed coupled with an interest) to demand, receive and enforce payments and to give receipts, releases, satisfaction for and to sue for moneys payable to Debtor under or with respect to any of the Collateral, and actions taken pursuant to this appointment may be taken either in the name of Debtor or in the name of GE with the same force and effect as if this appointment had not been made; (4) the right to take immediate and exclusive possession of the Collateral, or any part thereof, and for that purpose, with or without judicial process and notice to the Debtor, enter (if this can be done without breach of the peace) upon any premises on which the Collateral or any part thereof may be situated and remove the same there from (provided that if the Collateral is affixed to real estate, such removal shall be subject to the conditions stated in the UCC); (5) the right to hold, maintain, preserve and prepare the Collateral for sale, until disposed of; (6) the right to render the Collateral unusable and dispose of the Collateral; (7) the right to require Debtor to assemble and package the Collateral and make it available to GE for its possession at a place to be designated by GE which is reasonably convenient to GE; (8) the right to sell, lease, hold or otherwise dispose of all or any part of the Collateral; and (9) the right to sue for specific performance of any Obligations or to recover damages for breach thereof.

GE shall be entitled to receive on demand, as additional Obligations hereunder, interest accruing at the Default Rate on all amounts not paid when due under the Equipment Notes or this Agreement until the date of actual payment. GE shall have no duty to mitigate any loss to Debtor occasioned by enforcement of any remedy hereunder and shall have no duty of any kind to any subordinated creditor of Debtor. Neither the acceptance of this Agreement nor its enforcement shall prejudice or in any manner affect GE's right to realize upon or enforce any other security now or hereafter held by GE, it being agreed that GE shall be entitled to enforce this Agreement and any other security now or hereafter held by GE in such order and manner as it may in its absolute discretion determine. No remedy herein conferred upon or reserved to GE is intended to be exclusive of any other remedy given hereunder or now or hereafter existing at law or in equity or by statute. Every power or remedy given by any of the

Loan Documents to GE, or to which GE may be otherwise entitled, may be exercised, concurrently or independently, from time to time and as often as may be deemed expedient by GE.

C.    Should GE exercise the rights and remedies specified in the preceding subsection B, any proceeds received thereby shall be first applied to pay the costs and expenses, including reasonable attorneys' fees, incurred by GE as a result of the Event of Default. The remainder of any proceeds, after payment of GE's costs and expenses, shall be applied to the satisfaction of the Obligations and any excess paid over to Debtor.

D.    Until an Event of Default shall occur, Debtor may retain possession of the Collateral and may use it in any lawful manner not inconsistent with this Agreement, with the provisions of any policies of insurance thereon or the other Loan Documents.

13.    Sales, Transfers, Assignments and Pledges. Debtor agrees that Debtor shall not, without the prior written consent of GE, sell, convey, mortgage, grant, bargain, encumber, pledge, assign, or otherwise transfer the Collateral or any part thereof or permit the Collateral or any part thereof to be sold, conveyed, mortgaged, granted, bargained, encumbered, pledged, assigned, or otherwise transferred, other than replacements consented to by GE.    A sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Section shall be deemed to include, but not limited to, (a) an installment sales agreement wherein Debtor agrees to sell the Collateral or any part thereof for a price to be paid in installments; (b) an agreement by Debtor leasing all or any part of the Collateral; (c) if any of the Debtor Parties or any general or limited partner or member of any of the Debtor Parties is a corporation, any merger by or with such corporation, or the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise), or the creation or issuance of new stock, by which an aggregate of more than ten percent (10%) of such corporation's stock shall be vested in a party or parties who are not now stockholders; (d) if any of the Debtor Parties or any general or limited partner or any member of any of the Debtor Parties is a limited or general partnership or joint venture, the change, removal or resignation of a general partner, limited partner or managing partner or the transfer or pledge of the partnership interest of any general partner, limited partner or managing partner or any profits or proceeds relating to such partnership interest; and (e) if any of the Debtor Parties or any general or limited partner or member of any of the Debtor Parties is a limited liability company, the change, removal or resignation of a managing member or the transfer or pledge of the membership interest of any member or any profits or proceeds relating to such membership interest.    Notwithstanding the foregoing, a transfer by devise or descent or by operation of law upon the death of a member, partner or stockholder of any of the Debtor Parties or any general or limited partner or member thereof shall not be deemed to be a sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer within the meaning of this Section.

GE's consent to any matter contemplated by this Section shall be subject to the satisfaction of such conditions as GE shall determine in its sole discretion, including, without limitation, (i) the execution and delivery of such modifications to the terms of the Loan Documents as GE shall request, and (ii) the proposed transferee having agreed to comply with all of the terms and conditions of the Loan Documents (including any modifications requested by GE pursuant to clause (i) above).    In addition, any such consent shall be conditioned upon payment by Debtor to GE of (x) a fee equal to  one percent (1%) of the then outstanding principal balance of the Equipment Note and (y) all out-of-pocket costs and expenses incurred by GE in connection with such consent, including, without limitation, reasonable attorneys' fees. GE shall not be required to demonstrate any actual impairment of its security or any increased risk of default hereunder in order to declare the Obligations immediately due and payable upon Debtor's sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer as contemplated by this Section. The provisions of this Section shall apply to every such sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer regardless of whether voluntary or not, or whether or not GE has consented to any previous sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, or transfer pursuant to this Section.



14.    Inspection.  Debtor shall, during normal business hours (or at any time in the event of an emergency), (1) provide GE and GE's officers, employees, agents and advisors with access to the Collateral and all files, correspondence and documents relating to the Collateral (including, without limitation, any of the foregoing information stored in any computer files), and (2) allow such persons to make such inspections, tests, copies, and verifications as GE considers necessary.  Inspections conducted by GE shall be for its own benefit and shall not be relied on by Debtor or any third parties.

15.    Personal Property.  No item of Collateral will be attached or affixed to realty or any building without GE's prior knowledge and the written consent and waiver, in form and substance acceptable to GE, of the landlord and the mortgagee, if any, of the real property to which the Collateral is proposed to be attached or affixed.

16.    Notices.  Except for any notice required under applicable law to be given in another manner, any notices required under this Agreement or any of the other Loan Documents shall be in writing and shall be given by mailing such notice by certified mail or by sending such notice by Federal Express or other nationally recognized courier, addressed to GE at: 10900 N.E. 4th Street, Suite 500, Bellevue, Washington 98004 (mailing address: C-97550, Bellevue, WA  98009) and to Debtor at: 5600 Roswell Road, East Building, Suite 250, Atlanta, GA 30342 or to such other address as either party may from time to time specify in writing to the other.  Notices so mailed or sent shall be deemed given on the date shown on the return receipt or courier's records as the date of delivery or first attempted delivery.

17.    Further Instruments; Document Review.  From time to time, Debtor will execute such further instruments as GE may reasonably require in order to protect, preserve and maintain rights and remedies set forth in this Agreement and the other Loan Documents, including, without limitation, the security interest granted in connection herewith.  In the event Debtor makes any request upon GE requiring GE or GE's attorneys to review and/or prepare (or cause to be reviewed and/or prepared) any documents or other submissions in connection with or arising out of this Agreement or any of the other Loan Documents, then Debtor shall (x) reimburse GE promptly upon GE's demand for all out-of-pocket costs and expenses incurred by GE in connection with such review and/or preparation, including, without limitation, reasonable attorneys' fees, and (y) pay GE a reasonable processing and review fee.

18.    Authorization to Insert; Estoppel Certificates.  Debtor authorizes GE to insert in the spaces provided in the Loan Documents, as applicable, dates, models, serial numbers, loan numbers and other pertinent data relative to the proper identification of Debtor, the Collateral or this Equipment Loan.  At any time, and from time to time, each party agrees, promptly and in no event later than 15 days after a written request from the other party, to execute, acknowledge and deliver to the other party a certificate in the form supplied by the other party, certifying as to such information reasonably requested by the other party in connection with this Agreement and the other Loan Documents.

19.    Survival.  All representations, warranties, covenants, and agreements of Debtor shall survive the execution and delivery of this Agreement or any other agreements or documents executed in connection herewith, and the performance of this Agreement.

20.    Assignment By GE; Binding Effect.  GE may assign in whole or in part its rights under this Agreement.  Upon any unconditional assignment of GE's entire right and interest hereunder, GE shall automatically be relieved, from and after the date of such assignment, of liability for the performance of any obligation of GE contained herein.  This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of Debtor and GE and their respective successors and permitted assigns, including, without limitation, any United States trustee, any debtor in possession or any trustee appointed from a private panel.  Notwithstanding anything to the contrary provided in this Agreement or the other Loan Documents, it is specifically understood and agreed, such agreement being a primary consideration for the execution of this Agreement and the other Loan Documents by GE, that (1) there shall be absolutely no personal liability on the part of any shareholder, director, officer or employee of GE, with respect to any of the terms, covenants and conditions of this Agreement or the other Loan Documents, (2) Debtor waives all claims, demands and causes of action against GE's officers, directors, employees and agents in the event of any breach by GE of any of the terms, covenants and conditions of this

 

Agreement or the other Loan Documents to be performed by GE and (3) Debtor shall look solely to the assets of GE for the satisfaction of each and every remedy of Debtor in the event of any breach by GE of any of the terms, covenants and conditions of this Agreement or the other Loan Documents to be performed by GE, such exculpation of liability to be absolute and without any exception whatsoever.

21.    Joint and Several; Severability.  The obligations of all Debtors hereunder shall be both joint and several. The provisions of this Agreement and the other Loan Documents shall be deemed severable. If any part of this Agreement or the other Loan Documents shall be held invalid, illegal or unenforceable, the remainder shall remain in full force and effect, and such invalid, illegal or unenforceable provision shall be reformed by such court so as to give maximum legal effect to the intention of the parties as expressed therein. This Agreement and the other Loan Documents may be executed in one or more counterparts, each of which shall be deemed an original.

22.    Non-Waiver; Attorney's Fees.  This Agreement, the Equipment Notes and the other Loan Documents comprise the entire agreement between GE and Debtor with respect to the Collateral, and any amendments thereto shall only be in a writing executed by both parties. No delay or failure by GE shall constitute a waiver or otherwise affect or impair any right, power or remedy available to GE nor shall any waiver or indulgence by GE or any partial or single exercise of any right, power or remedy preclude any other or further exercise thereof. The exercise of any right, power or remedy shall in no event constitute a waiver or cure of any default under this Agreement or prejudice GE in the exercise of any right hereunder unless in the exercise of such right all obligations of Debtor under this Agreement are fully performed. In the event of any judicial or other adversarial proceeding between the parties concerning this Agreement or the other Loan Documents, the prevailing party shall be entitled to recover its attorneys' fees and other costs in addition to any other relief to which it may be entitled.

23.    Governing Law; Time of the Essence.  Debtor acknowledges that this Agreement and the other Loan Documents were substantially negotiated in the State of Washington, this Agreement and the other Loan Documents were executed by GE in the State of Washington and delivered by Debtor in the State of Washington, all payments under the Equipment Notes will be delivered in the State of Washington and there are substantial contacts between the parties and the transactions contemplated herein and the State of Washington.  For purposes of any action or proceeding arising out of this Agreement or any of the other Loan Documents, the parties hereto hereby expressly submit to the jurisdiction of all federal and state courts located in the State of Washington and Debtor consents that it may be served with any process or paper by registered mail or by personal service within or without the State of Washington in accordance with applicable law. Furthermore, Debtor waives and agrees not to assert in any such action, suit or proceeding that it is not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. It is the intent of the parties hereto that all provisions of this Agreement and the Equipment Notes shall be governed by and construed under the laws of the State of Washington, without giving effect to its principles of conflicts of law. To the extent that a court of competent jurisdiction finds Washington law inapplicable with respect to any provisions of this Agreement or the Equipment Notes, then, as to those provisions only, the laws of the state(s) where the Collateral is located shall be deemed to apply. Nothing in this Section shall limit or restrict the right of GE to commence any proceeding in the federal or state courts located in the state(s) in which the Collateral is located to the extent GE deems such proceeding necessary or advisable to exercise remedies available under this Agreement or the other Loan Documents. Time is of the essence in the payment and performance by Debtor of all of its obligations under this Agreement and the other Loan Documents.

24.    Cross-Default and Cross-Collateralization.  Notwithstanding anything to the contrary contained in this Agreement or the other Loan Documents: (a) an Event of Default or a breach or default, after the passage of all applicable notice and cure or grace periods, under any Loan Document or Other Agreement which relates to a loan or sale/leaseback transaction which has not been the subject of a securitization, participation or transfer shall not constitute an Event of Default or a breach or default, as applicable, under any Loan Document or Other Agreement which relates to a loan which has been the subject of a securitization, participation or transfer; (b) an Event of Default or a breach or default, after the




passage of all applicable notice and cure or grace periods, under any Loan Document or Other Agreement which relates to a loan which is included in any Loan Pool shall not constitute an Event of Default or a breach or default, as applicable, under any Loan Document or Other Agreement which relates to a loan which is included in any other Loan Pool; (c) the Loan Documents and Other Agreements corresponding to the loans in any Loan Pool shall not secure the obligations of any of the Debtor Parties and/or any Affiliate of any of the Debtor Parties contained in any Loan Document or Other Agreement which does not correspond to a loan in such Loan Pool; and (d) the Loan Documents and Other Agreements which do not correspond to a loan in any Loan Pool shall not secure the obligations of any of the Debtor Parties and/or any Affiliate of any of the Debtor Parties contained in any Loan Document or Other Agreement which does correspond to a loan in such Loan Pool. For purposes of this Section, the term "Loan Pool" means: (i) in the context of a securitization, any pool or group of loans that are a part of such securitization; (ii) in the context of a transfer, all loans which are sold, transferred or assigned to the same transferee; and (iii) in the context of a participation, all loans as to which participating interests are granted to the same participant.

25.    **Waiver of Jury Trial and Punitive, Consequential, Special and Indirect Damages.** DEBTOR AND GE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR ITS SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.  THIS WAIVER BY THE PARTIES HERETO OF ANY RIGHT EITHER MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.  FURTHERMORE, DEBTOR AND GE HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER AND ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY EITHER PARTY AGAINST THE OTHER OR ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, ANY OF THE OTHER LOAN DOCUMENTS OR ANY DOCUMENT CONTEMPLATED HEREIN OR RELATED HERETO.  THE WAIVER BY DEBTOR AND GE OF ANY RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED BY THE PARTIES HERETO AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

26.    **Corporate Fixed Charge Coverage Covenant.**  Until such time as all of Borrower's obligations under the Note and the other Loan Documents are paid, satisfied and discharged in full, Borrower shall maintain a Corporate Fixed Charge Coverage Ratio of at least 1.30:1, as determined on the last day of Borrower's fiscal year.  For purposes of this Section, the term "Corporate Fixed Charge Coverage Ratio" shall mean with respect to the twelve month period of time immediately preceding the date of determination, the ratio calculated for such period of time, each as determined in accordance with GAAP, of (a) the sum of net income, depreciation and amortization, interest expense and operating lease expense, minus income taxes or charges equivalent to income taxes allocable to the period of determination, to (b) the sum of operating lease expense, scheduled principal payments of long term debt, scheduled  maturities of all capital leases and interest expense (excluding non-cash interest expense and amortization of non-cash financing expenses).

27.    **Patriot Act Provisions.**  A.  The following terms shall have the meanings specified for this Section: "*Anti-Money Laundering Laws*" means all applicable laws, regulations and government guidance on the prevention and detection of money laundering, including, without limitation, 18 U.S.C. § § 1956 and 1957, and the BSA; "*BSA*" means the Bank Secrecy Act (31 U.S.C. § § 5311 et. seq.), and its implementing regulations, Title 31 Part 103 of the U.S. Code of Federal Regulations; "*Entity*" means any entity that is not a natural person; and "*OFAC Laws and Regulations*" means Executive Order 13224 issued by the President of the United States of America, the Terrorism Sanctions Regulations (Title 31



Part 595 of the U.S. Code of Federal Regulations), the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), and the Cuban Assets Control Regulations (Title 31 Part 515 of the U.S. Code of Federal Regulations), and all other present and future federal, state and local laws, ordinances, regulations, policies, lists (including, without limitation, the Specially Designated Nationals and Blocked Persons List) and any other requirements of any Governmental Authority (including, without limitation, the United States Department of the Treasury Office of Foreign Assets Control) addressing, relating to, or attempting to eliminate, terrorist acts and acts of war, each as hereafter supplemented, amended or modified from time to time, and the present and future rules, regulations and guidance documents promulgated under any of the foregoing, or under similar laws, ordinances, regulations, policies or requirements of other states or localities.

B. Debtor represents and warrants to GE as of the date of this Agreement and the Closing Date as follows: (i) none of the Debtor Parties, and no individual or entity owning directly or indirectly any interest in any of the Debtor Parties, is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations; (ii) Debtor has taken all reasonable measures, in accordance with all applicable Anti-Money Laundering Laws, with respect to each holder of a direct or indirect interest in the Debtor Parties, to assure that funds invested by such holders in the Debtor Parties are derived from legal sources; (iii) to Debtor's knowledge after making due inquiry, neither any of the Debtor Parties nor any holder of a direct or indirect interest in the Debtor Parties (a) is under investigation by any Governmental Authority for, or has been charged with, or convicted of, any violation of any Anti-Money Laundering Laws, or drug trafficking, terrorist-related activities or other money laundering predicated crimes or a violation of the BSA, (b) has been assessed civil penalties under these or related laws, or (c) has had any of its funds seized or forfeited in an action under these or related laws; and (iv) Debtor has taken reasonable steps, consistent with industry practice for comparable organizations and in any event as required by law, to ensure that the Debtor Parties are and shall be in compliance with all (a) Anti-Money Laundering Laws and (b) OFAC Laws and Regulations.

C. Debtor covenants to GE from and after the date of this Agreement and until all of the Obligations are satisfied in full, as follows: (i) Debtor shall require, and shall take reasonable measures to comply with the requirement, that no individual or entity owning directly or indirectly any interest in any of the Debtor Parties is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations; (ii) the Debtor Parties shall at all times comply with the OFAC Laws and Regulations and Anti-Money Laundering Laws; (iii) Debtor shall immediately notify GE in writing if any individual or entity owning directly or indirectly any interest in any of the Debtor Parties or any director, officer, member, manager or partner of any of such holders is an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of any of the OFAC Laws and Regulations, or is under investigation by any governmental entity for, or has been charged with, or convicted of, drug trafficking, terrorist-related activities or any violation of Anti-Money Laundering Laws, has been assessed civil penalties under these or related laws, or has had funds seized or forfeited in an action under these or related laws; (iv) without limiting the terms and conditions of Section 13 of this Agreement, Debtor agrees that, from and after the date of this Agreement and until all of the Obligations are satisfied in full, no interest in any of the Debtor Parties, or in any individual or person owning directly or indirectly any interest in any of the Debtor Parties, shall be transferred, assigned or conveyed to any individual or person whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations and/or who is in violation of any of the OFAC Laws and Regulations, and any such transfer, assignment or conveyance shall not be effective until the transferee has provided written certification to Debtor and GE that (A) the transferee or any person who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or is otherwise in violation of the OFAC Laws and Regulations, and (B) the transferee has taken reasonable measures to assure that any individual or entity who owns directly or indirectly any interest in transferee, is not an individual or entity whose property or interests are subject to being blocked under any of the OFAC Laws and Regulations or

is otherwise in violation of the OFAC Laws and Regulations. Debtor further agrees to make the Debtor OFAC Laws and Regulations Policies, together with the information collected thereby concerning the Debtor Parties or any individual or entity owning directly or indirectly any interest in any of the Debtor Parties, available to GE upon request.

**GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION**

By: _____
Name:    Dawn Peretti
Title:    Vice President

**Le Petit Bistro, Inc.,** a Georgia corporation

By: _____
Name:  Ali Kabiri
Title: CEO

## EXHIBIT A

### PREMISES

190 Marietta St., Atlanta, GA 30303

50 Upper Alabama Street, Atlanta, GA 30303

4400 Ashford Dunwoody Rd., Atlanta, GA 30346

4800 Briarcliff Rd., Atlanta, GA 30345

303 Peachtree Ctr., Ave., Atlanta, GA 30303

3393 Peachtree Rd., Atlanta, GA 30326

3101 PGA Blvd., Palm Beach Gardens, FL 33410

2800 W. Big Beaver Road, Troy, MI 48084

400 Ernest Barret Parkway, Kennesaw, GA 30144

2100 Pleasant Hill Rd., Duluth, GA 30136

6000 W. Glades Rd., Boca Raton, FL 33431

700 Haywood Rd., Greenville, SC 29615

19575 Biscayne Blvd., Aventura, FL 33180

8001 S. Orange Blossum Trail #968, Orlando, FL 32819

400 Commons Way, Bridgewater, NJ 08807

4000 Baldwin Rd., Auburn Hills, MI 48326

50 Massachusetts Ave. NE E-Space 28, Washington DC 20002

7535 Dadeland Mall, Miami, FL 33156

1175 Peachtree St., Atlanta, GA 30361

4822 NE Burlington, Burlington, MA 01803

999 S. Washington, North Attleboro, MA 02760

67 Providence Pl., Providence, RI 02903

300 Boylston St., Chesnut Hill, MA 02167

4475 Roswell Rd., Marietta, GA 30062

3348 Peachtree Rd., Atlanta, GA 30326

7101 Democracy Blvd., Bethesda, MD 20817

331 North Garden, Bloomington, MN 55425

4325 Glendwood Ave., Raleigh, NC 27612

3475 Peidmont Rd. NE, Atlanta, GA 30305

30 Mall Drive, West Jersey, NJ 07310

Route 80 & Mt. Hope Avenue, Rockaway, NJ 07866

250 Westshore Plaza, Tampa, FL 33609

100 Main Street, White Plains, NY 10601

La Teraza 545 F. Roosevelt Ave., Hato Ray, PR 00918

3003 Summit Blvd., Atlanta, GA 30319

67 Providence Place Space FC-7, Providence, RI

4400 Ashford Dunwoody Rd., Atlanta, GA 30346

2102 Roosevelt Field Mall, Garden City, NY 11530

230 W. Hum Road, Cleveland, OH 44113

2403 Dallas Pkwy., Plano, TX 75093

2223 North Westshore Blvd., Tampa, FL 33607

8702 Keystone Crossing Blvd., Indianapolis, IN 46240

10300 Forest Hill Blvd., Wellington, FL 33414

1500 Polaris Pkwy., Columbus, OH 43240

10300 Southside Blvd. #3090, Jacksonville, FL 32256

10 Rosedale Center, Roseville, MN 55113

Clayton Road & Brentwood Blvd., St. Louis, MO 63117

5565 Glenridge Connecter, Dunwoody, GA 30342

3401 Nicholasville Rd. Space FC-5, Lexington, KY 40503

310 Daniel Webster Hwy. N-103, Nashua, NH 03060

849 E. Commerce St., San Antonio, TX 78205

100 Cambridge Side Park Space F-7, Cambridge, MA

9501 Arlington Expressway, Jacksonville, FL 32225

1000 Cumberland Pkwy. Space-1310, Atlanta, GA 30339



Newark International Airport Terminal C, Newark, NJ

1201 16th Street, Denver, CO 80202

49 West Maryland St., Indianapolis, IN 46204

172 West County Center, Des Peres, MO 63131

721 Parkway Plaza Space FF-19, El Cajon, CA 92020

27288-B Novi Road, Suite FC102, Novi, MI 48377

 

## UNCONDITIONAL GUARANTY OF PAYMENT AND PERFORMANCE (EQUIPMENT)

Dated as of ___3/31/03___

For valuable consideration, the receipt of which is hereby acknowledged, Ali Kabiri ("Guarantor") unconditionally, absolutely and irrevocably: (i) guarantees and promises to pay to GENERAL ELECTRIC CAPITAL BUSINESS ASSET FUNDING CORPORATION, a Delaware corporation ("Lender"), or order, any and all amounts, costs, fees, expenses and charges of any kind or type whatsoever, which may or at any time be due to Lender by Le Petit Bistro, Inc., a Georgia corporation ("Borrower") pursuant to the Loan Documents (as defined in the Loan and Security Agreement dated as of the date hereof between Borrower and Lender (the "Loan Agreement")), any other document, agreement, instrument or certificate contemplated by the Loan Documents, and any amendments to any of the Loan Documents or any such other document, agreement, instrument or certificate (collectively, the "Documents"); and (ii) guarantee the truthfulness and accuracy of all representations, warranties and certifications of Borrower, the satisfaction of all conditions by Borrower and the full and timely performance of all obligations to be performed by Borrower, under or pursuant to the Documents (the matters which are guaranteed pursuant to this Guaranty are hereinafter collectively referred to as the "Obligations"). The obligations of Guarantor under this Guaranty are primary, and independent of the obligations of of Borrower, and a separate action or actions may be brought and executed against Guarantor, whether or not such action is brought against Borrower and whether or not Borrower be joined in such action or actions. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Loan Agreement.

This is an absolute and unconditional guaranty of payment and performance and not of collection. Guarantor unconditionally and irrevocably: (a) waives any requirement that Lender first make demand upon, or seek to enforce or exhaust remedies against, Borrower or any other person or entity or any of the collateral or property of Borrower or such other person or entity before demanding payment from, or seeking to enforce this Guaranty against Guarantor; (b) waives and agrees not to assert any and all rights, benefits and defenses which might otherwise be available under the provisions of applicable law that might operate to limit Guarantor's liability under, or the enforcement of, this Guaranty; (c) agrees that this Guaranty shall remain in full effect without regard to, and shall not be affected or impaired by, any invalidity, irregularity or unenforceability in whole or in part of any of the Documents, or any limitation of the liability of Borrower or Guarantor thereunder, or any limitation on the method or terms of payment thereunder which may now or hereafter be caused or imposed in any manner whatsoever; (d) waives any right to participate in any security now or hereafter held by Lender or in any claim or remedy of Lender or any other person against Borrower with respect to the Obligations; (e) waives any statute of limitations affecting Guarantor's liability hereunder; (f) waives all principles and provisions of law which conflict with the terms of this Guaranty; and (g) waives diligence, presentment, protest, demand for performance, notice of nonperformance, notice of intent to accelerate, notice of acceleration, notice of protest, notice of dishonor, notice of execution of any Documents, notice of extension, renewal, alteration or amendment, notice of acceptance of this Guaranty, notice of defaults under any of the Documents and all other notices whatsoever. This Guaranty is a continuing guaranty, and the obligations, undertakings and conditions to be performed or observed by Guarantor under this Guaranty shall not be affected or impaired by reason of the happening from time to time of the following with respect to the Documents, all without notice to, or the further consent of, any Guarantor: (i) the waiver by Lender of the observance or performance by Borrower, Guarantor of any of the obligations, undertakings, conditions or other provisions contained in any of the Documents, except to the extent of such waiver; (ii) the extension, in whole or in part, of the time for payment of any amount owing or payable under the Documents; (iii) the modification or amendment (whether material or otherwise) of any of the obligations of Borrower under, or any other provisions of, any of the Documents, except to the extent of such modification or amendment; (iv) the taking or the omission of any of the actions referred to in any of the Documents (including, without limitation, the giving of any consent referred to therein); (v) any failure, omission, delay or lack on the part of Lender to enforce, assert or exercise any provision of the Documents, including any right, power or remedy conferred on Lender in any of the Documents or any action on the part of Lender granting indulgence or extension in any form; (vi) the assignment to or assumption by any third party of any or all of the rights or obligations of Borrower under all or any of the Documents; (vii) the release or discharge of Borrower from the performance or observance of any obligation, undertaking or condition to be performed by Borrower under any of the Documents by operation of law, including any rejection or disaffirmance of any of the Documents in any bankruptcy or similar proceedings; (viii) the receipt and acceptance by Lender or any other person or entity of notes, checks or other instruments for the payment of money and extensions and renewals thereof; (ix) any action, inaction or election of remedies by Lender which results in any impairment or destruction of any subrogation rights of Guarantor, or any rights of Guarantor to proceed against any other person or entity for reimbursement; (x) any setoff, defense, counterclaim, abatement, recoupment, reduction, change in law or any other event or circumstance which might otherwise constitute a legal or equitable discharge or defense of a guarantor, indemnitor or surety under the laws of the State of Washington, the state(s) in which the Equipment is located or any other jurisdiction; and (xi) the termination or renewal of any of the Obligations or any other provision thereof.

This Guaranty shall continue in full force and effect until all of the Obligations are duly, finally and permanently paid, performed and discharged and are not subject to any right of reborrowing or extension by Borrower, and Lender gives Guarantor written notice of the full and final satisfaction of the Obligations. The Obligations shall not be considered fully paid, performed and discharged unless and until all payments by Borrower to Lender are no longer subject to any right on the part of any person whomsoever, including but not limited to Borrower, Borrower as a debtor-in-possession and/or any trustee in bankruptcy, to disgorge such payments or seek to recoup the amount of such payments or any part thereof. This Guaranty shall remain in full force and effect and continue to be effective in the event that (i) any petition is filed by or against Borrower or any Guarantor for liquidation or reorganization, including, without limitation, under Title 11 of the United States Code, 11 U.S.C. Sec. 101 et seq. (the "Code"), (ii) Borrower or Guarantor becomes insolvent or makes an assignment for the benefit of creditors or (iii) a receiver or trustee is appointed for all or any significant part of Borrower's or Guarantor's assets. This Guaranty shall continue to be effective or be reinstated, as applicable, if at any time payment and performance of the Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by Lender, whether as a "voidable preference", "fraudulent conveyance" or otherwise, all as though such payment or performance had not been made. In the event that any payment of the Obligations, or any part thereof, is rescinded, reduced, restored or returned, the Obligations shall be reinstated and deemed reduced only by such amount paid to Lender and not so rescinded, reduced, restored or returned.

Guarantor shall not have any right of subrogation, indemnity or reimbursement nor hold any other claim against Borrower, and does hereby release Borrower from any and all claims by Guarantor now or hereafter arising against Borrower. Notwithstanding the preceding sentence, in the event that Guarantor shall have any claims against Borrower, any indebtedness of Borrower now or hereafter held by any or all Guarantor is hereby subordinated to the indebtedness of Borrower to Lender. Any such indebtedness of Borrower to Guarantor, if Lender

**EXHIBIT**

F




so requests, shall be collected, enforced and received by Guarantor as trustee for Lender and be paid over to Lender on account of the Obligations, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty.

In addition to the amounts guaranteed under this Guaranty, Guarantor agrees to pay (i) all of Lender's attorneys' fees and other costs and expenses which may be incurred by Lender in the enforcement of this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts extent a petition is filed by or against Borrower under the Code) at the Default Rate (as defined in the Equipment Note) on any Obligations not paid when due. Guarantor hereby agrees to indemnify and hold harmless Lender for, from and against any loss, cause of action, claim, cost, expense or fee, including but not limited to attorney's fees and court costs, suffered or occasioned by the failure of Borrower to satisfy its obligations under the Documents. The agreement to indemnify Lender contained in this paragraph shall be enforceable notwithstanding the invalidity or unenforceability of the Documents or any of them or the invalidity or unenforceability of the liabilities of Borrower under the Documents may be Guaranty. All moneys available to Lender for application in payment or reduction of the liabilities of Borrower, in such manner, in such amounts and at such time or times as applied by Lender to the payment or reduction of such liabilities of Borrower, in such manner, in such amounts and at such time or times as Lender may elect.

This Guaranty is delivered in the State of Washington, and it is the intent of Guarantor and Lender that this Guaranty shall be deemed to be a contract made under and governed by the internal laws of the State of Washington, without regard to its principles of conflicts of law. For purposes of any action or proceeding involving this Guaranty, Guarantor submits to the jurisdiction of all federal and state courts located in the State of Washington and consents that Guarantor may be served with any process or paper by registered mail or by personal service within or without the State of Washington in accordance with applicable law. Furthermore, Guarantor waive and agree not to assert in any such action, suit or proceeding that they are not personally subject to the jurisdiction of such courts, that the action, suit or proceeding is brought in an inconvenient forum or that venue of the action, suit or proceeding is improper. Nothing contained in this section shall limit or restrict the right of Lender to commence any proceeding in the federal or state courts located in the state(s) in which the Equipment is located or where Guarantor resides to the extent Lender deems such proceeding necessary or advisable to exercise remedies available under the Documents.

All of Lender's rights and remedies under the Documents and this Guaranty are intended to be distinct, separate and cumulative and no such right and remedy is intended to be in exclusion of or a waiver of any of the others. If under applicable law, Lender proceeds to realize benefits under any Document granting Lender a lien upon any collateral pledged under such Document, either by judicial foreclosure or by non-judicial sale or enforcement, Lender may, at is sole option, determine which of such remedies or rights it may pursue without affecting any of such rights and remedies under this Guaranty. If, in the exercise of any of its rights and remedies, Lender shall forfeit any of its rights or remedies, including its right to enter a deficiency judgment against Borrower or any pledgor, whether because of any applicable laws pertaining to "election of remedies" or the like, Guarantor hereby consents to such action by Lender and waives any claim based upon such action. Any election of remedies which results in the denial or impairment of the right of Lender to seek a deficiency judgment against Borrower or any pledgor shall not impair one guarantor Guarantor's obligation to pay the full amount of the Obligations. In the event Lender shall bid at any foreclosure or trustee's sale or at any private or public sale permitted by law for all or any part of the Obligations. In the event Lender less than the amount of the Obligations and the amount of such bid need not be paid by Lender but shall be credited against the Obligations. The amount of the successful bid at any such sale shall be conclusively deemed to be the fair market value of the collateral and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Guaranty, notwithstanding that any present or future law or court decision or ruling may have the effect of reducing the amount of any deficiency claim to which Lender might otherwise be entitled but for such bidding at any such sale.

This Guaranty is solely for the benefit of Lender, its successors and assigns and is not intended to nor shall it be deemed to be for the benefit of any third party, including, without limitation, Borrower. This Guaranty and all obligations of Guarantor hereunder shall be binding upon the successors and assigns of one guarantor Guarantor, hereunder (including, a debtor-in-possession on behalf of such Guarantor) and shall, together with the rights and remedies of Lender, hereunder, inure to the benefit of Lender, all future holders of any instrument evidencing any of the Obligations and its successor and assigns. No sales, participations, assignments, transfers or other dispositions of any agreement governing or instrument evidencing the Obligations or any portion thereof or interest therein shall in any manner affect the rights of Lender or its successors and assigns hereunder. Guarantor may not assign, sell, hypothecate or otherwise transfer any interest in or obligations under this Guaranty. If any provision of this Guaranty shall be unenforceable, the enforceability of the other provisions shall not be affected and they shall remain in full force and effect. Guarantor agrees to take such action and to sign such other provisions shall not be affected and they shall intent of this Guaranty. This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original.

LENDER. BY ACCEPTING THIS GUARANTY, AND THE GUARANTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY LENDER OR THE GUARANTOR AGAINST THE OTHER OR THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY, THE RELATIONSHIP OF LENDER, BORROWER AND/OR THE GUARANTOR, BORROWER'S USE OR OCCUPANCY OF THE PREMISES, THE AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. THIS WAIVER BY LENDER AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY HAS BEEN NEGOTIATED AND IS A MATERIAL INDUCEMENT FOR LENDER ACCEPTING THIS GUARANTY. FURTHERMORE, THE GUARANTOR AND LENDER HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES FROM THE OTHER AND ANY OF THE OTHER'S AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY AND ALL ISSUES PRESENTED IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY THE GUARANTOR AGAINST THE OTHER OR ANY OF THEIR AFFILIATES, OFFICERS, DIRECTORS OR EMPLOYEES OR ANY OF THEIR SUCCESSORS WITH RESPECT TO ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS GUARANTY OR ANY DOCUMENTS CONTEMPLATED HEREIN OR RELATED HERETO. THE WAIVER BY THE LENDER AND GUARANTOR OF ANY RIGHT THEY MAY HAVE TO SEEK PUNITIVE, CONSEQUENTIAL, SPECIAL AND INDIRECT DAMAGES HAS BEEN NEGOTIATED AND IS AN ESSENTIAL ASPECT OF THEIR BARGAIN.

05-119579.02
Rev. 9/10/02

IN WITNESS WHEREOF, the undersigned Guarantor has executed this Guaranty effective as of the date first set forth above.

Social Security or
Federal Tax I.D. Numbers:

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

GUARANTOR:

Ali Kabiri
4360 Ivywood Drive NE
Marietta, GA 30062

05-119579.02

STATE OF GEORGIA              )
                                     ) SS.
COUNTY OF FULTON         )

The foregoing instrument was acknowledged before me this _2nd_ day of _April_ ___, by Ali Kabiri.

_____
Notary Public

My Commission Expires:

Notary Public, Cobb County, Georgia
My Commission Expires Sept. 18, 2003

05-119579.02

SEP-05-03  13:43  FROM-                                    T-088  P.013/085  F-180

**State of Minnesota**                    **County of Hennepin**                    **District Court**

| CCT | LIST CHARGE STATUTE ONLY | MOC | OOC | CTY ATTY FILE NO. | CONTROLLING AGENCY | CONTROL NO. |
|-----|--------------------------|-----|-----|-------------------|--------------------|-------------|
| 1-33 | 289A.63 | Y1500 | X | 03-1715 | MN062025Y | 02000076 |

COURT CASE NO.                    DATE FILED

# AMENDED

☒ Amended          ☐ Tab Charge Previously Filed

☐ *If more than 6 counts (see attached) ☐ *If Domestic Assault as defined by MS 518B.01, subd.A.

**State of Minnesota,**

☐ SERIOUS FELONY          ☐ SUMMONS
☒ FELONY                  ☒ WARRANT
☐ GROSS MISDM DWI         ☐ ORDER OF DETENTION
☐ GROSS MISDM             ☐ EXTRADITION

**PLAINTIFF,**

VS.

| NAME: first, middle, last | Date of Birth | Legal Edge Number |
|---------------------------|---------------|-------------------|
| **Le Petit Bistro, Inc.** | 03020905 | NA | 03-16595 |
| 900 Circle 75 Parkway, Ste. 930 Smyrna, Georgia 30339 | | | |
| **Ali M. Kabiri** | 03041757 | 12/07/1957 | 03-21590 |
| 120 Riley Ridge Rd. NW Atlanta, Georgia 30327-4359 | | | |

**DEFENDANTS.**

**THIS COMPLAINT IS AMENDED TO ADD DEFENDANT KABIRI TO BE CHARGED AS A CO-DEFENDANT ON ALL 33 COUNTS, TO CHANGE THE COMPLAINANT, AND ADD INFORMATION TO THE PROBABLE CAUSE PORTION ON PAGE 5&6 AS UNDERLINED:**

Your complainant, Thomas Teale, is employed by the State of Minnesota as a Special Agent in the Criminal Investigation Division of the Minnesota Department of Revenue, and in that capacity has participated in the investigation of this case, and has familiarized himself with the investigation of fellow agents and believes the following to be true:

In February 2002, the Minnesota Department of Revenue Compliance initiated an audit of the defendant Corporation, Le Petit Bistro, Inc., because it had never filed a sales tax return or paid sales tax in the State of Minnesota.

Records maintained at the Minnesota Department of Revenue indicate that on March 2, 2000, a person identifying himself as Ali H. Kabiri telephoned to register his non-Minnesota Corporation, Le Petit Bistro, Inc., with the Minnesota Department of Revenue. Mr. Kabiri identified himself as the President of Le Petit Bistro, Inc., and provided a local address for the corporation as 331 North Garden, Bloomington, MN 55325-5519. Le Petit Bistro registered to pay sales taxes on a monthly basis and was provided with a Minnesota Taxpayer ID Number. Pursuant to Minnesota law, monthly filers are required to remit the tax by the 20th day of the following month. On March 2, 2000, the Department of Revenue mailed information including sales tax "fact sheets" to the Georgia address provided by Kabiri: Suite E250, 5600 Roswell Rd NE, Atlanta, GA 30342-1127.

FORM-J

**EXHIBIT**

_G_

REV. 12/95

Computer records at the Minnesota Department of Revenue show that sales tax return forms for the months April 2000 to June 2001 were mailed each month to Le Petit Bistro, Inc. Beginning in July 2001, the Department of Revenue changed to a paperless system for filing sales tax returns. The records show that beginning in July 2001, the Department of Revenue sent computer generated demands to file a sales tax return to Le Petit Bistro, Inc., on July 14, 2000, August 14, 2000, August 25, 2000, October 10, 2000, November 8, 2000, December 11, 2000, January 9, 2001, January 30, 2001, February 27, 2001, March 27, 2001, April 30, 2001, May 30, 2001, and June 28, 2001. After the change to a paperless filing system, the Department of Revenue sent computer generated demands for payment of sales tax to Le Petit Bistro, Inc. on November 15, 2001, December 5, 2001, January 3, 2002, March 21, 2002, April 17, 2002, May 9, 2002, May 30, 2002, June 13, 2002, July 29, 2002, September 18, 2002, September 25, 2002, November 7, 2002, November 19, 2002, November 22, 2002, December 4, 2002, December 13, 2002, December 30, 2002, and January 3, 2003.

Terasue Pragit of the Department of Revenue Compliance Unit learned that Le Petit Bistro Inc., operated two shopping mall food court restaurants in the Twin Cities metropolitan area—one at the Mall of America in the City of Bloomington, Hennepin County, Minnesota, and one at the Rosedale Shopping Center in the City of Roseville, Ramsey County, Minnesota. Pragit spoke with the manager of the Mall of America restaurant who stated that sales records were sent to the corporate office in Atlanta, Georgia.

On March 4, 2002, Pragit spoke with K.G., an employee of Le Petit Bistro in Atlanta Georgia regarding the fact that sales tax returns had not been filed. K.G. stated that everything had been turned over to the owner, "Ali." Terasue Pragit then had several telephone conversations regarding Le Petit Bistro Inc.'s Minnesota Sales Tax obligations with a person who identified himself as "Ali." "Ali" told Pragit that Le Petit Bistro opened a food court restaurant in the Mall of America in the year 2001. On March 8, 2002, "Ali" said that he was in the process of filing his sales tax and expected to have it completed by next week. Because of the status of the audit, Pragit told "Ali" that he needed to send her all of the sales documentation so that she could file the past due returns. "Ali" asked if there would be interest and penalties assessed. Pragit indicated that there would be interest and penalties imposed. "Ali" asked, "Can we just overlook these?" Pragit told "Ali" that because no taxes had been filed for business, that penalties and interest must be assessed. "Ali" said that he would be faxing all of the documentation to Pragit. On March 12, 2002, Pragit spoke with "Ali" again and asked if he sent the sales records yet. "Ali" said that he would fax the information later that day. On March 13, 2002, Pragit received by facsimile transmission a handwritten document with the heading: "Le Petit Bistro Mall of America." The document listed monthly sales for the period January 2001 through February 2002. The cover sheet indicated that the sender was "Ali Kabiri." The cover sheet was on letter head for Le Petit Bistro, Inc., with the address 5600 Roswell Road, Prado East, Suite 250, Atlanta, Georgia 30342. On March 19, 2002, Pragit spoke with Ali Kabiri again by telephone and told him that the report was not acceptable and that she needed additional documentation to verify the sales figures. Pragit told Kabiri that she had been told that the sales register tapes were sent to Atlanta and that she wished to review the tapes. "Ali" said that he thought he had daily sales journals and that he would send the information. Pragit had not received and information by March 25, 2002, and she telephone "Ali" again requesting bank statements. On April 4, 2002, Pragit spoke with "Ali" and again requested the information. "Ali" said that he would make sure that Pragit received all of the information by the next week. On May 1, 2002, Pragit left a message for "Ali" requesting the information again. "Ali" never returned the call. Pragit never received any further information from "Ali" or anyone else on behalf of the corporation.

Pragit learned that Le Petit Bistro, Inc. at the Mall of America banked at Highland Bank in Bloomington, Minnesota. The Minnesota Department of Revenue obtained bank statements from Highland Bank, previously I-Bank, related to Account 3010013551 for Le Petit Bistro, Inc., for the period of time from March 14, 2000, through July 31, 2002. Almost $900,000 was deposited into this account during this period of time. The account reflected activity throughout this period of time, in contradiction to Ali Kabiri's statement that the Mall of America restaurant did not open until 2001. Additionally, the monthly deposits to the account were significantly greater than the gross sales that were reported in the handwritten document provided to the Department of Revenue by Ali Kabiri.

Department of Revenue Special Agent Thomas Teale learned that the Rosedale Restaurant banked at the Bremer Bank in Roseville, Minnesota. The Minnesota Department of Revenue obtained bank statements from Bremer Bank related to Account 6632893 for Le Petit Bistro, Inc., for the period of time from January 28, 2002 through December 5, 2002. These statements indicate that $148,235.69 was deposited into this account during this period of time. The Department of Revenue obtained signature cards for the Bremer Bank and Highland Bank Accounts. Ali M. Kabiri was the only authorized signer on both accounts.

Special Agent Teale obtained lease agreements between the management companies for the Mall of America and Rosedale Shopping Center and Le Petit Bistro, Inc.

On July 15, 1999, Le Petit Bistro, Inc. entered into a lease agreement for space in a food court in the Mall of America. This lease agreement was signed by the president and secretary of Le Petit Bistro, Inc., and both of the signatures appear to match the signature cards for Ali M. Kabiri on file with Highland and Bremer Banks. The lease agreement directs that notices to Le Petit Bistro, Inc. be sent to 5600 Roswell Road, Suite 250, Atlanta, Georgia 30342. The Mall of America lease agreement provides as follows: "The Premises shall be occupied and used by Tenant solely for the purpose of conducting therein the business of the retail sale of high quality European style bistro, offering charcuterie and crudite salads, homemade soups and stews, European hot entrees, bistro sandwiches including focaccia and roll-ups, lahvash/pita quiche, baked desserts and beverages including beer, wine and specialty coffee drinks." The operation of the business as required by this provision in the lease agreement would result in taxable sales transactions and no non-taxable sales transactions.

On September 5, 2001, Le Petit Bistro, Inc. entered into a lease agreement for space in the food court at Rosedale Center. The lease agreement lists the notice address for Le Petit Bistro, Inc. as 5600 Roswell Road, East Building, Suite 250, Atlanta Georgia 30342, Attn: Mr. Ali M. Kabiri President. The lease agreement is signed by the president of Le Petit Bistro and the signature appears to match the signature cards for Ali M. Kabiri on file with Highland and Bremer Banks. The Rosedale Center lease agreement provides as follows: "...Tenant shall use the Premises solely for the following purpose: For the operation of a high quality European style bistro, offering charcuterie and crudite salads, homemade soups and stews, European hot entrees, bistro sandwiches, including focaccia and lahvosh/pita, quiche, baked desserts and beverages, including beer, wine, and specialty coffee drinks, and for no other purpose whatsoever." The operation of the business as required by this provision in the lease agreement would result in taxable sales transactions and no non-taxable sales transactions.

On August 14, 2002, Mike Geschlecht of the Minnesota Department of Revenue Compliance Unit purchased lunch at the Le Petit Bistro in the Rosedale Center in the City of Rosedale, Ramsey County, Minnesota. The cost of the meal was $6.94 and Geschlecht was charged $0.45 sales tax that was collected. On the same day, Terasue Pragit with the Compliance Unit also purchased lunch at the Mall of America restaurant for $6.28 including $0.38 sales tax that was collected. On February 8, 2003, Special Agent Cate Boyko purchased lunch at the Le Petit Bistro at 331 North Garden in the Mall of America in the City of Bloomington, Hennepin County, Minnesota. The cost of the meal was $5.95 and Special Agent Boyko was charged $0.39 sales tax that was collected. Gechlecht, Pragit and Boyko all observed that Le Petit Bistro, Inc., appeared to be operating the restaurants pursuant to the lease agreement provisions stated above. The Department of Revenue employees did not observe any non-taxable transactions.

Le Petit Bistro, Inc.'s lease agreements with the Mall of America and Rosedale Center both required Le Petit Bistro, Inc. to pay a portion of the rent based upon its gross sales—the higher the monthly gross sales, the higher the required rent payment. For this reason, both lease agreements required that Le Petit Bistro, Inc., report its monthly gross sales to Mall of America and Rosedale Center management respectively.

Special Agent Teale obtained the gross sales figures reported by Le Petit Bistro, Inc. to the Mall of America and Rosedale Center. Mall of America provided records of actual monthly gross sales figures submitted by Le Petit Bistro from March 2000 through October 2002. Mall of America also provided 2 facsimile transmittals regarding the monthly sales from Cinta Calhoun/Le Petit Bistro, Inc., 5600 Roswell RD., East Bldg., Suite 250, Atlanta, GA 30342. Rosedale

Center provided a report dated December 5, 2002, that reflected actual monthly sales figures submitted by Le Petit Bistro from January 2002 through October 2002.

The following table calculates sales tax due based upon figures submitted by Le Petit Bistro, Inc. to the Minnesota Department of Revenue, Mall of America, and Rosedale Center:

| | Sales Reported To MOA | Sales Reported To Rosedale | Sales Reported to Dept of Rev. | Tax Due Per Reports To Landlords | Tax Due Per Reports To Dept of Rev. |
|---|---|---|---|---|---|
| March 2000 | $560.23 | | | $  36.41 | |
| April 2000 | $58,163.00 | | | $3,780.60 | |
| May 2000 | $47,402.23 | | | $3,081.14 | |
| June 2000 | $52,475.32 | | | $3,410.90 | |
| July 2000 | $67,075.66 | | | $4,359.92 | |
| Aug. 2000 | $62,929.86 | | | $4,090.44 | |
| Sept. 2000 | $46,639.21 | | | $3,031.55 | |
| Oct. 2000 | $42,408.22 | | | $2,756.53 | |
| Nov. 2000 | $42,986.12 | | | $2,794.10 | |
| Dec. 2000 | $50,103.78 | | | $3,256.75 | |
| Jan. 2001 | $34,030.97 | | $12,134.00 | $2,212.01 | $788.71 |
| Feb. 2001 | $31,255.50 | | $11,630.00 | $2,031.61 | $755.95 |
| March 2001 | $39,824.34 | | $13,495.00 | $2,588.58 | $877.18 |
| April 2001 | $35,796.76 | | $12,752.00 | $2,326.79 | $828.88 |
| May 2001 | $30,393.00 | | $12,937.00 | $1,975.55 | $840.91 |
| June 2001 | $36,129.00 | | $13,574.00 | $2,348.39 | $882.31 |
| July 2001 | $42,029.00 | | $13,691.00 | $2,731.89 | $889.92 |
| Aug. 2001 | $49,810.00 | | $12,121.00 | $3,237.65 | $787.87 |
| Sept. 2001 | $24,608.00 | | $11,376.00 | $1,599.52 | $739.44 |
| Oct. 2001 | $27,252.00 | | $12,722.00 | $1,771.38 | $826.93 |
| Nov. 2001 | $30,488.00 | | $13,120.00 | $1,981.72 | $852.80 |
| Dec. 2001 | $42,594.00 | $1,437.00 | $14,595.00 | $2,862.02 | $948.68 |
| Jan. 2002 | $30,839.00 | $40,148.00 | $10,283.00 | $4,614.16 | $668.40 |
| Feb. 2002 | $27,417.00 | $31,501.00 | $11,164.00 | $3,829.68 | $725.66 |
| March 2002 | $34,800.00 | $28,732.00 | | $4,129.58 | |
| April 2002 | $30,243.00 | $23,867.00 | | $3,517.16 | |
| May 2002 | $29,474.00 | $20,933.00 | | $3,276.46 | |
| June 2002 | $37,731.00 | $21,515.00 | | $3,851.00 | |
| July 2002 | $44,849.00 | $21,598.00 | | $4,319.06 | |
| Aug. 2002 | $41,706.00 | $22,731.00 | | $4,188.41 | |
| Sept. 2002 | $27,279.00 | $17,723.00 | | $2,925.14 | |
| Oct. 2002 | $30,540.00 | $18,179.00 | | $3,166.74 | |
| Totals | $1,229,832.20 | $248,364.00 | $175,594.00 | $96,082.84 | $11,413.64 |

The Table above reflects that Le Petit Bistro, Inc. should have paid $96,082.84 in sales tax to the State of Minnesota during the period of time from March 200 to October 2002. Le Petit Bistro, Inc., has never filed a sales tax return in the State of Minnesota or paid any sales tax in the State of Minnesota. The Table above reflects that Le Petit Bistro, Inc. reported $555,552.57 in sales to its landlords for the period of time that "Ali Kabiri" reported $175,594.00 in sales to Terasue Pragit of the Department of Revenue on March 13, 2002.

A search of the State of Georgia Internet site indicated that as of 11-8-02, the corporation Le Petit Bistro Inc. was registered as a corporation in the State of Georgia with a corporate address of 4360 Ivywood Drive, NE, Marietta

-05-03   13:46   FROM-

gia, 30062. The registered agent is listed as Ali M. Kabiri with the same address as the corporation. Ali M. Kabiri so listed as the Chief Executive Officer, Chief Financial Officer and Secretary of the Corporation, at the same ress.

1 May 19, 2003, Fulton, County Georgia police officers, assisted by agents with the Minnesota Department of evenue, executed a search warrant at the home of defendant Kabiri (hereinafter referred to as "Kabiri search arrant"). The agents discovered documentation that defendant Kabiri was the sole shareholder of Le Petit Bistro, Inc. Bistro, Inc.'s net worth as of September 30, 2002, was reported as $10,717,498. The report indicates that on December 12, 2002, the president of Le Petit Bistro, Inc., Ali Kabiri, reported that the net income of the corporation for the period January 1, 2002, through September 30, 2002, was $3,899,542.

During the Kabiri search warrant, the agents found a large number of bankers boxes in defendant Kabiri's garage that had labels for Le Petit Bistro restaurants across the country. The agents seized the box for "Mall of America." The box contained weekly recap sheets including sales tape summaries and other information that Terasue Pragit had requested in March 2002.

During the Kabiri search warrant, the agents discovered documentation showing that defendant Kabiri had attempted to sell Le Petit Bistro, Inc. in fall 2000 and 2001. American Safety Financial Corporation (hereinafter ASCF) worked with defendant Kabiri to prepare for a potential buyer's due diligence investigation. The agents recovered a letter dated October, 10, 2000, from Steve Sirang, Managing Director of ASCF, to defendant Kabiri, summarizing ASCF's findings. The letter included the following paragraphs:

Sales Tax Liability. It is our understanding that not all state sales tax returns have been prepared and timely filed with the appropriate sales tax authorities for certain stores for years ended 1998, 1999, and 2000. This means that the company presently has undisclosed sales tax liabilities on its reported financial statements. Such liabilities will include sales tax liability, interest, failure to pay and failure to file penalties.

The preparation and filing of the sales tax returns for years 1998, 1999, & 2000, as well as verifying the accuracy of the sales tax returns, which already have been filed, should be assigned to on additional competent staff accountant beginning immediately.

Defendant Kabiri signed the letter under the words: "Read and Acknowledged."

Le Petit Bistro and ASCF had engaged Everest Alliance Capital to market and sell Le Petit Bistro. Le Petit Bistro entered into negotiations with a prospective buyer. Hard copies of e-mail communications and memoranda found during the Kabiri search warrant show that the prospective buyer discovered that Le Petit Bistro, Inc. had significant unpaid federal payroll tax and state sales and payroll tax obligations. In an e-mail to Ali Kabiri, Steve Sirang of ASCF attached a document addressing the due diligence issues that the prospective buyer raised, including the tax obligations. The agents also found a The document suggested that Le Petit Bistro would calculate any potential sales tax by store (including Mall of America) for the "Sales Summary Schedule" dated May 8, 2001, that calculated sales tax by store (including Mall of America) for the years 1999 and 2000. An undated document labeled "Sales Tax Estimates" estimated sales tax in summary fashion for the years 1997 through 2000 as between approximately $2,500,000 and $2,750,000.

Defendant Kabiri was copied on an e-mail dated May 14, 2001 from a representative of ASCF to a representative of the prospective buyer. According to the e-mail, "Ali" agreed to set up an escrow account not to exceed $3,000,000 to address the issue of the unpaid payroll and sales tax liabilities. The escrow account was not to include federal payroll tax liability. The e-mail also represented that "Le Petit Bistro will agree to reduce any potential exposure in excess of such amount at closing."

The negotiations fell apart for the sale of Le Petit Bistro. During the execution of the "Kabiri" search warrant, the agents found a letter dated June 28, 2002, to Le Petit Bistro (Attn: Ali Kabiri) on behalf of Everest Alliance Capital threatening legal action for Le Petit Bistro's failure to disclose its unpaid payroll and sales tax liabilities.

During the Kabiri search warrant, the revenue agents found evidence that tax liens had been filed against Le Petit Bistro, Inc. in Georgia, Missouri, Texas, Florida, and New Jersey. The agents also found tax delinquency notices and/or failure to file tax notices from the states of Florida, Indiana, Massachusetts, Michigan, Missouri, North Carolina, and Texas.

During the execution of the Kabiri search warrant, defendant Kabiri asked Agents Teale and Boyko if there was some way to make this go away. Defendant Kabiri said that he was having problems with his business due to employee turnover, rapid expansion and cash flow. Agent Boyko asked defendant Kabiri if he collected sales tax in Minnesota and defendant Kabiri said, "yes."

## O F F E N S E

THE OFFENSE PORTION OF THIS COMPLAINT IS AMENDED TO ADD DEFENDANT KABIRI TO ALL 33 COUNTS AS AIDING AND ABETTING AS FOLLOWS:

COUNT 1: Failure to Remit a Tax (Felony)
Minn. Stat. 1999, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about April 20, 2000, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of March 2000.

COUNT 2: Failure to Remit a Tax (Felony)
Minn. Stat. 1999, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about May 20, 2000, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of April 2000.

COUNT 3: Failure to Remit a Tax (Felony)
Minn. Stat. 1999, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about June 20, 2000, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of May 2000.

COUNT 4: Failure to Remit a Tax (Felony)
Minn. Stat. 1999, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about July 20, 2000, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of June 2000.

**COUNT 5:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about August 20, 2000, or when required by law, in Hennepin County, Minnesota, **Le Petit Bistro, Inc.** and **Ali M. Kabiri,** acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of July 2000.

**COUNT 6:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about September 20, 2000, or when required by law, in Hennepin County, Minnesota, **Le Petit Bistro, Inc.** and **Ali M. Kabiri,** acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of August 2000.

**COUNT 7:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about October 20, 2000, or when required by law, in Hennepin County, Minnesota, **Le Petit Bistro, Inc.** and **Ali M. Kabiri,** acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of September 2000.

**COUNT 8:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about November 20, 2000, or when required by law, in Hennepin County, Minnesota, **Le Petit Bistro, Inc.** and **Ali M. Kabiri,** acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of October 2000.

**COUNT 9:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about December 20, 2000, or when required by law, in Hennepin County, Minnesota, **Le Petit Bistro, Inc.** and **Ali M. Kabiri,** acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of November 2000.

**COUNT 10:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about January 20, 2001, or when required by law, in Hennepin County, Minnesota, **Le Petit Bistro, Inc.** and **Ali M. Kabiri,** acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of December 2000.

**COUNT 11:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about February 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of January 2001.

**COUNT 12:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about March 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of February 2001.

**COUNT 13:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about April 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of March 2001.

**COUNT 14:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about May 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of April 2001.

**COUNT 15:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about June 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of May 2001.

**COUNT 16:** Failure to Remit a Tax (Felony)
Minn. Stat. 2000, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about July 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of June 2001.

**COUNT 17: Failure to Remit a Tax (\_\_ony)**
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about August 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of July 2001.

**COUNT 18: Failure to Remit a Tax (Felony)**
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about September 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of August 2001.

**COUNT 19: Failure to Remit a Tax (Felony)**
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about October 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of September 2001.

**COUNT 20: Failure to Remit a Tax (Felony)**
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about November 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of October 2001.

**COUNT 21: Failure to Remit a Tax (Felony)**
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about December 20, 2001, or when required by law, in Hennepin County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of November 2001.

**COUNT 22: Failure to Remit a Tax (Felony)**
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about January 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of December 2001.

SEP-05-03   13:48   FROM-                                    T-088   P.022/085   F-189

COUNT 23: Failure to Remit a Tax (Felony)
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about February 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of January 2002.

COUNT 24: Failure to Remit a Tax (Felony)
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about March 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of February 2002.

COUNT 25: Failure to Remit a Tax (Felony)
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about April 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of March 2002.

COUNT 26: Failure to Remit a Tax (Felony)
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about May 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of April 2002.

COUNT 27: Failure to Remit a Tax (Felony)
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about June 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of May 2002.

COUNT 28: Failure to Remit a Tax (Felony)
Minn. Stat. 2001, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about July 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of June 2002.

**COUNT 29:** Failure to Remit a Tax (Felony)
Minn. Stat. 2002, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about August 20, 2002, or when required by law, in Hennepin and Ramsey Counties, Minnesota, **Le Petit Bistro, Inc.** and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of July 2002.

**COUNT 30:** Failure to Remit a Tax (Felony)
Minn. Stat. 2002, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about September 20, 2002, or when required by law, in Hennepin and Ramsey Counties, MN, **Le Petit Bistro, Inc.** and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of August 2002.

**COUNT 31:** Failure to Remit a Tax (Felony)
Minn. Stat. 2002, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about October 20, 2002, or when required by law, in Hennepin and Ramsey Counties, MN, **Le Petit Bistro, Inc.** and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit MN state sales tax for the month of September 2002.

**COUNT 32:** Failure to Remit a Tax (Felony)
Minn. Stat. 2002, §289A.63 subd. 1(b), subd. 11; §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about November 20, 2002, or when required by law, in Hennepin and Ramsey Counties, MN, **Le Petit Bistro, Inc.** and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, willfully attempted to evade or defeat tax by failing to remit Minnesota state sales tax for the month of October 2002.

SEP-05-03   13:49   FROM-                                   T-088   P.024/085   F-199

**COUNT 33: Filing False Document (Felony)**
Minn. Stat. 2001, §289A.63 subd. 2(b), §609.03(1); §609.05
Penalty: 0-5 years and/or $10,000

That on or about March 13, 2002, in Ramsey County, Minnesota, Le Petit Bistro, Inc. and Ali M. Kabiri, acting alone or intentionally aiding, advising, hiring, counseling or conspiring together, filed with the Minnesota Commissioner of Revenue a document known by Le Petit Bistro, Inc. to be fraudulent or false concerning a material matter.

**NOTICE: You must appear for every court hearing on this charge. A failure to appear for court on this charge is a criminal offense and may be punished as provided in Minn. Stat. § 609.49.**

COMPLAINANT'S NAME:

Thomas Teale

COMPLAINANT'S SIGNATURE:

DATE:

6/18/03

PROSECUTING ATTORNEY'S SIGNATURE:

NAME/TITLE:
Thomas S. Arneson (209211) dkl
Assistant County Attorney

ADDRESS/TELEPHONE:
C2000 Government Center, Minneapolis, MN 55487
Telephone: (612) 348-9717

SEP-05-03   13:50   FROM-                                    T-089   P.025/085   F-100



NAME:                                    SIGNATURE:

TITLE:

STATE OF MINNESOTA          COUNTY OF HENNEPIN

STATE OF MINNESOTA

Plaintiff

Vs.

Le Petit Bistro, Inc.,

Defendant(s).

AMENDED



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

GENERAL ELECTRIC CAPITAL
BUSINESS ASSET FUNDING
CORPORATION, a Delaware
corporation,

        Plaintiff,

    v.

LE PETIT BISTRO, INC., ALI
KABIRI, MARYAM MIRASSADI,
a/k/a MARIAM M. KABIRI, a/k/a
MARIAN M. KABIRI, a/k/a MARYAN
KABIRI, AND DOES 1 THROUGH
100, INCLUSIVE,

        Defendants.

CIVIL ACTION FILE

NO.



## ORDER OF PREJUDGMENT ATTACHMENT

THIS MATTER is before the Court on Plaintiff General Electric Capital

Business Asset Funding Corporation's ("GEBAF") Motion for Writ of

Prejudgment Attachment against Defendant Ali Kabiri ("Kabiri") pursuant to

Fed.R.Civ.P. 64 and Ga. Code Ann. § 18-3-1. Having reviewed the Motion, and

the supporting materials, and being fully advised in the premises, the Court hereby

FINDS that:

02-154158.1/1

1.    Kabiri is a resident of Georgia with a last known address of 120 Riley Ridge Road NW, Atlanta, Georgia 30327-4359.

2.    Based on the Complaint, the Emergency Motion For Temporary Restraining Order and Preliminary and Permanent Injunction Against Defendants Le Petit Bistro, Inc. and Ali Kabiri; and For Prejudgment Attachment Against Defendant Ali Kabiri and the affidavits filed in this matter, GEBAF has asserted claims against Kabiri in the approximate sum of $20,000,000 based upon certain guaranties that he executed in favor of GEBAF in connection with loans made by GEBAF to Defendant Le Petit Bistro, Inc. ("Le Petit") between 1999 and 2003. It is alleged that Kabiri is the sole shareholder and the CEO of Le Petit.

3.    Pursuant to Fed.R.Civ.P. 64, remedies such as prejudgment attachment "are available under the circumstances and in the manner provided by the law of the state in which the district court is held." Pursuant to Ga. Code Ann. § 18-3-1, the Court may order a prejudgment attachments when the debtor moves or is about to move his domicile outside the limits of the county and/or when the debtor is causing his property to be removed beyond the limits of the state.

4.    Evidence presented in the affidavits in support of the Emergency Motion suggests that Kabiri is building or otherwise maintains a residence outside of the United States and that he is in the process of leaving the country. Moreover,

evidence presented in the affidavits further suggest that Kabiri has transferred significant sums of money outside of the United States. Although the evidence suggests that the assets constituting these transfers have come from Le Petit, GEBAF has alleged that Le Petit, through Kabiri, has made fraudulent conveyances of Le Petit's assets, to the detriment of GEBAF and other creditors, and that such fraudulent conveyances include the wire transfers of cash to locations outside of the United States. Moreover, GEBAF has alleged, and such allegations are supported by the Emergency Motion and supporting affidavits, that Le Petit is the alter ego of Kabiri, thereby further supporting the contention that Kabiri has caused or is causing his property to be removed beyond the limits of the state.

5.    Based on the foregoing, GEBAF has established one or more of the grounds necessary for a prejudgment attachment under Ga. Code Ann. § 18-3-1 and has demonstrated a reasonable probability that it will succeed on one or more of its claims against Kabiri.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.    A Writ of Prejudgment Attachment is hereby issued against any and all real or personal property of Kabiri in the State of Georgia, or the proceeds of the sale of such assets, up to and including the sum of Twenty Million Dollars ($20,000,000).

2.    The Clerk shall issue a Writ of Attachment directing the United States Marshall to levy and execute on any and all real or personal assets of Kabiri in the State of Georgia.

SO ORDERED this _____ day of _____, 2003.


_____
United States District Court Judge

# United States District Court

NORTHERN ——— DISTRICT OF ——— GEORGIA

GENERAL ELECTRIC CAPITAL BUSINESS
ASSET FUNDING CORPORATION,

**V.**

LE PETIT BISTRO, INC., ALI KABIRI,
MARYAM MIRASSADI, a/k/a MARIAM M.
KABIRI, a/k/a MARIAN M. KABIRI,
a/k/a MARYAN KABIRI, AND DOES 1 THROUGH
100, INCLUSIVE

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

# 1:03-CV-2847

TO: (Name and address of defendant)

MARYAM MIRASSADI, a/k/a Mariam M. Kabiri,
a/k/a Marian M. Kabiri, a/k/a Maryan Kabiri
120 Riley Ridge Road, NW
Atlanta, GA 30327-4359

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

MARK M. MALONEY
KING & SPALDING LLP
191 PEACHTREE STREET
ATLANTA, GEORGIA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

CLERK

DATE

(BY) DEPUTY CLERK

# United States District Court

NORTHERN ——— DISTRICT OF ——— GEORGIA

GENERAL ELECTRIC CAPITAL BUSINESS
ASSET FUNDING CORPORATION,

**V.**

LE PETIT BISTRO, INC., ALI KABIRI,
MARYAM MIRASSADI, a/k/a MARIAM M.
KABIRI, a/k/a MARIAN M. KABIRI,
a/k/a MARYAN KABIRI, AND DOES 1 THROUGH
100, INCLUSIVE

## SUMMONS IN A CIVIL CASE

CASE NUMBER:

1.03 cv-2842

TO: (Name and address of defendant)

ALI KABIRI
120 Riley Ridge Road, NW
Atlanta, GA 30327-4359

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

MARK M. MALONEY
KING & SPALDING LLP
191 PEACHTREE STREET
ATLANTA, GEORGIA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS

CLERK                                              DATE

(BY) DEPUTY CLERK

ORIGINAL

# United States District Court

_____ NORTHERN _____ DISTRICT OF _____ GEORGIA _____

GENERAL ELECTRIC CAPITAL BUSINESS
ASSET FUNDING CORPORATION,

## SUMMONS IN A CIVIL CASE

### V.

LE PETIT BISTRO, INC., ALI KABIRI,
MARYAM MIRASSADI, a/k/a MARIAM M.
KABIRI, a/k/a MARIAN M. KABIRI,
a/k/a MARYAN KABIRI, AND DOES 1 THROUGH
100, INCLUSIVE

CASE NUMBER:

## 1:03-CV-2847

TO: (Name and address of defendant)

LE PETIT BISTRO, INC.
c/o its registered agent
Ali M. Kabiri
900 Circle 75 Parkway
Suite 930
Atlanta, GA 30327

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

MARK M. MALONEY
KING & SPALDING LLP
191 PEACHTREE STREET
ATLANTA, GEORGIA 30303

an answer to the complaint which is herewith served upon you, within _____ 20 _____ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

LUTHER D. THOMAS                              SEP 19 2003

CLERK                                          DATE

(BY) DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**ORIGINAL**

GENERAL ELECTRIC CAPITAL
BUSINESS ASSET FUNDING
CORPORATION, a Delaware
corporation,

        Plaintiff,

    v.

LE PETIT BISTRO, INC., ALI
KABIRI, MARYAM MIRASSADI,
a/k/a MARIAM M. KABIRI, a/k/a
MARIAN M. KABIRI, a/k/a MARYAN
KABIRI, AND DOES 1 THROUGH
100, INCLUSIVE,

        Defendants.

CIVIL ACTION FILE

NO.

**1:03-CV-2847**

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the documents listed on the

attached Exhibit A upon Defendants by causing a true and correct copy thereof to

be delivered to Defendants as follows:

Le Petit Bistro, Inc.
c/o Mr. Ali M. Kabiri
900 Circle 75 Parkway, Suite 930
Atlanta, GA 30339
(First Class Mail)

Le Petit Bistro, Inc.
c/o Mr. Ali Kabiri
120 Riley Ridge Road NW
Atlanta, GA 30327
(First Class Mail)

Mr. Ali Kabiri
120 Riley Ridge Road NW
Atlanta, GA 30327
(First Class Mail)

John A. Creasy, Jr.
Paller & Creasy PC
4200 Northside Parkway, Suite
200
Atlanta, Georgia 30327
(Hand delivery)

02-154447.1/1

Dated this 19th day of September 2003.

KING & SPALDING LLP

L. Joseph Loveland
Ga. Bar No. 459350
Mark M. Maloney
Ga. Bar No. 468104
191 Peachtree Street
Atlanta, Georgia 30303-1763
(404)572-4600(Telephone)
(404) 572-5100(Facsimile)

and

Kutak Rock LLP
John H. Bernstein (Colo. Bar #17358)
Craig N. Johnson (Colo. Bar #21905)
Kate E. Manka (Colo. Bar #32583)
Suite 3100
1801 California Street
Denver, CO  80202
(303)297-2400(Telephone)
(303) 292-7799 (Facsimile)

Attorneys for Plaintiff General Electric
Capital Business Asset Funding Corporation

## EXHIBIT A

1.    Complaint for Emergency Relief and Damages

2.    Motion to File Documents Under Seal

3.    Brief in Support of Motion to File Documents Under Seal

4.    Order Granting Motion to File Documents Under Seal

5.    Affidavit of Todd V. Jones (Filed Under Seal)

6.    Affidavit of Stuart Adair

7.    Affidavit of John H. Bernstein

8.    Affidavit of Lisa M. Jenkins Wells

9.    Affidavit of Sandra L. Orvis

10.    Emergency Motion for Appointment of Receiver over Defendant Le Petite Bistro, Inc. And Request for Immediate Hearing

11.    Brief in Support of its Emergency Motion for the Appointment of a Receiver over Defendant Le Petit Bistro, Inc.

12.    Order for Appointment of Receiver *Pendent Lite*

13.    Emergency Motion for Temporary Restraining Order And Preliminary and Permanent Injunction Against Defendants Le Petit Bistro, Inc. and Ali Kabiri; and for Prejudgment Attachment Against Defendant Ali Kabiri And Request for Immediate Hearing

14.    Brief in Support of its Emergency Motion for Temporary Restraining Order and Preliminary and Permanent Injunction against Defendants Le Petit Bistro, Inc. and Ali Kabiri; and for Prejudgment Attachment against Defendant Ali Kabiri

15.    Temporary Restraining Order and Notice of Hearing

16.    Order of Prejudgment Attachment

17.    Certificate of Service

02-154447.1/4